**REDACTED VERSION**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST FILED UNDER SEAL

| | |
|---|---|
| CROMAN CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) No. 12-75C |
| THE UNITED STATES, | ) (Judge George W. Miller) |
| Defendant. | ) |
| and | ) |
| MOUNTAIN WEST HELICOPTERS, LLC, | ) |
| and | ) |
| COLUMBIA HELICOPTERS, INC., | ) |
| and | ) |
| SILLER HELICOPTERS, INC., | ) |
| Defendant-Intervenors. | ) |

## PLAINTIFF'S MOTION FOR JUDGMENT
## ON THE ADMINISTRATIVE RECORD

Alan I. Saltman
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Ave, N.W.
Suite 600
Washington, DC 20036
Phone: (202) 452-2140
Fax:    (202) 775-8217
email: AISaltman@smithcurrie.com

Attorney for Plaintiff

OF COUNSEL:

Stephen J. Kelleher
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Ave, N.W.
Suite 600
Washington, DC 20036
Phone: (202) 452-2140
Fax:   (202) 775-8217
email:  SJKelleher@smithcurrie.com

Dated:  April 27, 2012

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................ iii

I.  STANDARD OF REVIEW ...............................................................................1

II. INTRODUCTION ..............................................................................................2

    A.  Procedural History ................................................................................11

III. THE FOREST SERVICE IMPROPERLY AWARDED LINE ITEM 23
     TO SILLER ......................................................................................................14

    A.  The Forest Service Improperly Failed To Act In A Consistent
        Manner And Reject Siller's Offer For Line Item 23 As Required
        By The RFP...........................................................................................15

    B.  The Agency Also Both Conducted An Improper Tradeoff Procedure
        And Failed To Justify Why Siller's Proposal Warranted Paying
        An Extremely High Price......................................................................19

    C.  The Selection Of Siller For Award Of Item 23 Was Also Improper
        Because It Was Based In Substantial Part On One-Word Adjectival
        Ratings That Were Undefined And That Lead To False Precision
        Of The Scores On Which The Selection Was Made................................26

IV. FOR THE SAME REASONS THE FOREST SERVICE ALSO IMPROPERLY
     AWARDED LINE ITEMS 17, 23, 28, 29, 30, 32, AND 33 ..............................33

    A.  The Agency Both Conducted An Improper Tradeoff Procedure
        And Failed To Justify Why Paying The Awardee's Higher Price
        Was Warranted......................................................................................34

V.  CROMAN IS ENTITLED TO INJUNCTIVE RELIEF......................................35

    A.  Croman Was Prejudiced By The Errors In This Procurement, And,
        If Not For Those Errors, Would Have Been Awarded At Least One,
        If Not Three, Line Items ........................................................................36

    B.  Croman Will Suffer Irreparable Harm If Injunctive Relief Is Not
        Granted..................................................................................................36

C.     Injunctive Relief Is In The Public's Interest Because Not Only Will
       It Help Preserve The Integrity Of The Competitive Procurement System
       But It Will Allow The Same Services To Be Obtained At A Lower Overall
       Cost ..................................................................................................................37

D.     The Harm To Croman Outweighs Any Harm To The Government And
       To Third Parties, Including Siller, Columbia And Firehawk...........................38

VI .  CONCLUSION...........................................................................................................40

ii

## TABLE OF AUTHORITIES

**CASES**                                                                                **PAGE**

Afghan Am. Army Servs. v. United States,
    90 Fed. Cl. 341 (2009) .......................................................................................1, 2, 27, 36

Alfa Laval Separation Inc. v. United States,
    175 F.3d 1365 (Fed. Cir. 1999)........................................................................…...........2

Banknote Corps. Of Am. v. United States,
    365 F.3d 1345 (Fed. Cir. 2004)........................................................................…...........1

Beneco Enters., Inc.,
    B-283154, 2000 CPD ¶ 69 ........................................................................…...........22

Blackwater Lodge & Trading Co. v. United States,
    86 Fed. Cl. 488 (2009) ........................................................................…...........21

Coastal Sci. and Eng'g, Inc.,
    B-236041, 89-2 CPD ¶ 436........................................................................…...........22

Comprehensive Health Servs., Inc. v. United States,
    70 Fed. Cl. 700 (2006) ........................................................................…...........21

DeTekion Sec. Sys., Inc.,
    B-298235, 2006 CPD ¶ 130 ........................................................................…...........21

Dismas Charities, Inc.,
    61 Fed. Cl. 191 (2004) ........................................................................…...........21

Fox & Company,
    B-197272, 80-2 CPD ¶ 340 ........................................................................…...........21, 32

General Offshore Corp.,
    B-246824, 92-2 CPD ¶ 335........................................................................…...........20

Great Lakes Dredge & Dock Co. v. United States,
    60 Fed. Cl. 350 (2004) ........................................................................…...........37, 38

HP Enterprise Services, LLC v. United States,
    2012 WL 1131584 (Fed. Cl. 2012)........................................................................…...........35

Impresa Construzioni Geom. Domenico Garufi v. United States,

238 F.3d 1324 (Fed. Cir. 2001) ...........................................................................…........36

Impresa Construzioni Geom. Domenico Garufi v. United States,
52 Fed. Cl. 826 (2002) ...........................................................................…........37

Industrial Property Management, Inc. v. United States,
59 Fed. Cl. 318 (2004) ...........................................................................…........19

Info Scis. Corp. v. United States,
80 Fed. Cl. 759 (2008) ...........................................................................…........2

Johnson Controls World Servs., Inc.,
B-289942, 2002 CPD ¶ 88 ...........................................................................…........20

Lockheed Missiles & Space Co.,
4 F.3d 955 (Fed. Cir. 1993) ...........................................................................…........22

Magellan Corp. v. United States,
27 Fed. Cl. 446 (1993) ...........................................................................…........37

Midland Supply Inc.,
B-298720, 2007 CPD ¶ 2 ...........................................................................…........23

Serco Inc. v. United States,
81 Fed. Cl. 463 (2008) ........................................................................... *passim*

Shumaker Trucking and Excavating Contractors, Inc.,
B-290732, 2002 CPD ¶ 169 ...........................................................................…........20

Si-Nor, Inc.,
B-282064, 2000 CPD ¶ 159 ...........................................................................…........25

Standard Commc'ns, Inc. v. United States,
101 Fed. Cl. 723 (2011) ........................................................................... *passim*

State Management Services, Inc.,
B-255528, 95-1 CPD ¶ 25 ...........................................................................19

T&S Prods., Inc. v. United States,
48 Fed. Cl. 100 (2000) ...........................................................................37

TRW, Inc. v. Unisys Corp.,
98 F.3d 1325 (Fed. Cir. 1996) ...........................................................................21

United Int'l Investigative Servs., Inc. v. United States,
    41 Fed. Cl. 312 (1998) ...............................................................................……........37
Wackenhut Services, Inc.,
    B-400240, 2008 CPD ¶ 184 ........................................................................……........21

## STATUTES AND REGULATIONS

28 U.S.C. § 1491(b)(1) ...........................................................................……..........1

FAR § 15.101-1 ..............................................................................................19, 35

FAR § 15.308.......................................................................................……........19

## MISCELLANEOUS

Joseph S. Danowsky, "Statistical Report Flaws: A Spotter's Guide,"
    18 No. 8 Acct. & Fin. Planning for L. Firms 1 (2005) ....................................31

Michael J. Smithson, Statistics with Confidence: An Introduction for
    Psychologists 48-49 (2000)..............................................................................31

Nash, Cibinic & Yukins, FORMATION OF GOVERNMENT CONTRACTS 835 (4th ed. 2011) .............20

National Wildfire Coordinating Group, National Interagency Aviation Council,
    Interagency Aviation Strategy, 21 (July. 2008), available at
    http://www.fs.fed.us/aboutus/budget/requests/6244655_FSNIAC_Strategy_Final.pdf
    (last accessed April 26, 2012)............................................................................. 4-5

National Interagency Fire Center Predictive Service, National Wildland Significant
    Fire Potential Outlook (Apr. 1, 2012), available at
    http://www.predictiveservices.nifc.gov/outlooks/monthly_seasonal_outlook.pdf,
    (last visited April 25, 2012) ...............................................................................5

The President's Budget Request for the U.S. Forest Service in Fiscal Year 2013
    Before the Senate Committee on Energy and Natural Resources, 112 Cong.
    (2012) (testimony of Tom Tidwell, Chief, United States Forest Service,
    March 6, 2012), available at http://www.energy.senate.gov/public/index.cfm/hearings-
    and-business-meetings?ID=2f81c9e7-35a3-4c20-b016-2e6924e6d2d5
    (last accessed April 25, 2012).............................................................................5

Croman Corporation ("Croman") is entitled to judgment on the Administrative Record ("AR"). For the reasons set forth below plaintiff has demonstrated that (1) the Agency improperly failed to reject the proposal of the company awarded line item 23 of the RFP that is the subject of this motion even though its extraordinarily high price demonstrated a total lack of understanding of what was required to perform that line item, (2) the Agency failed to conduct a legally sufficient tradeoff process, (3) the Agency failed to justify paying the higher prices that it did for many line items, and (4) the Agency's awards were based in substantial part on one-word adjectival rating that were both unsupported and mathematically manipulated by computer to give false precision and not on reasoned best-value determinations made by human beings. As further demonstrated, Croman is entitled to the injunctive relief that it requests.

## I.    STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1491(b)(1), this Court is to review a post-award bid protest to determine whether an Agency's actions were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." Afghan Am. Army Servs. v. United States, 90 Fed. Cl. 341, 354 (2009). The plaintiff must establish by a preponderance of the evidence that the agency's actions lacked either a reasonable basis or violated applicable statutes and regulations. Id., citing Banknote Corps. Of Am. v. United States, 365 F.3d 1345 (Fed. Cir. 2004). Furthermore, the plaintiff must show that the agency failed to provide a "coherent and reasonable explanation of its exercise of discretion" and, or in the alternative, that there was a "clear and prejudicial violation of applicable statutes or regulations." Id. Finally, the award decision made by the agency must be within a "zone of acceptable results," i.e., "the result of a process that

consider[ed] the relevant factors and is within the bounds of reasoned decision making." Id. at 355, quoting Info Scis. Corp. v. United States, 80 Fed Cl. 759 (2008).

While an agency is given considerable discretion in negotiated procurements under FAR Part 15, if the errors it commits in the procurement process are of sufficient magnitude then the relief requested by a protestor is warranted. Afghan Am., 90 Fed. Cl. at 355. Even if a protestor demonstrates an error in the procurement process, it must, however, also show that it was prejudiced thereby. Id. To demonstrate prejudice, the protestor must prove that "there was a substantial chance it would have received the contract award but for this mistake." Id., citing Alfa Laval Separation Inc. v. United States, 175 F.3d 1365 (Fed. Cir. 1999).

## II.   INTRODUCTION

On January 14, 2011, the Department of Agriculture, Forest Service National Interagency Fire Center ("the Agency" or "the Forest Service") issued Request for Proposals ("RFP") AG-02-4B-S-11-9001 seeking offers to provide and operate helicopters to be used to fight forest fires, i.e., to drop water and/or slurry on active fires. The RFP sought offers to provide and operate 34 helicopters on and Exclusive Use basis.[1] The solicitation covered the provision and operation of both Heavy and Medium Type I and Type II helicopters (distinctions based on the helicopter's size and related capacity to lift cargo). In this regard, the solicitation provided two minimum performance specifications based on government's anticipated needs

That is, for Heavy helicopters the RFP stated:

Applicable performance Specifications for line items 1 through 15

---

[1]In general terms, under an Exclusive Use contract, the contractor is required to have its helicopter on site and at the Forest Service's disposal 24/7 throughout the normal fire season.

2

> CAPABILITY OF
> Hovering out of ground effect (HOGE)
> At 8,000 feet pressure altitude and 25° C with jettisonable Payload of **5000 pounds**, as determined by Exhibit 13, Standard Interagency Load Calculation form, using a standard pilot weight of 200 pounds and fuel for one hour and 30 minutes (01+3O) as determined by Exhibit 12, Hourly Flight Rates, Fuel Consumption, and Weight Reduction Chart. (Emphasis added.)

RFP at B-72. AR at 117 the applicable performance specifications for Medium helicopters, i.e., items 16-34, were not, however, as demanding, i.e., they required only a:

> CAPABILITY OF:
> Hovering out of ground effect (HOGE)
> At 7,000 feet pressure altitude and 25° C with jettisonable Payload of **3300 pounds**, as determined by Exhibit 13, Standard Interagency Load Calculation form, using a standard pilot weight of 200 pounds and fuel for one hour and 30 minutes (01+3O) as determined by Exhibit 12, Hourly Flight Rates, Fuel Consumption, and Weight Reduction Chart. (Emphasis added.)

RFP at B-73, AR 117.

The solicitation contemplated the award of multiple contracts. Each contract was to be fixed price (with an economic price adjustment) with a base year and three one-year options. Because of the importance of assuring the availability of aircraft for each line item (also referred to herein as CLINs), under the terms of the RFP each offeror was permitted to bid multiple aircraft for each line item so that if an offered helicopter were not selected for award of line item "A" it could still be considered for award of line item "B."[2]

Such being the case, in its initial proposal of February 28, 2011, Croman offered three of its helicopters (i.e., N611CK, N612CK and N613CK) on each of the 34 line items in the

---

[2]Conversely, if a helicopter was offered for line items A though Z inclusive and it was to be selected for award of line item "A," it would no longer be considered for award of line items "B" through "Z."

solicitation and two other helicopters (N1043T and N1048Y) only with regard to line items 16-34.[3]  On May 31, 2011, the Forest Service advised Croman that helicopters N611CK, N612CK and N613CK did not meet the payload performance specifications for Heavy lift helicopters, line items 1-15, and thus that Croman's proposal would no longer be considered for award of those line items.  Additionally, during the long period when the proposals were being evaluated, one of Croman's helicopters (N1048Y) became committed to other work and Croman withdrew that helicopter from its proposal.  As such, in that proposal the Forest Service evaluated Croman's proposed four aircraft (N611CK, N612CK, N613CK and N10 43T) for each line items 16-34 inclusive.[4]  The instant action relates to the failure of the Forest Service to award Croman line item 23 (and the resulting necessity to partially cancel the RFP by eliminating line items 21, 22, 27 and 34 of the solicitation[5]) and line items 17, 23, 28, 29, 30, 32 and/or 33.

---

[3]Helicopter N1048Y was not, however, bid on line item 23 which required a helicopter with a tank; something which N1048Y did not have.

[4]But see supra note 3.

[5]At the debriefing, Croman was advised that the Forest Service had decided to cancel line items 21, 22, 27 and 34 because it needed money that would have been spent on these items to fund yet another study of an already discredited form of fire-fighting airplane, a fixed wing waterscooper.  The AR states varying other reasons, i.e., that: "Due to FY 12 Fire and Aviation funding concerns and based upon previous Fire and Aviation Helicopter Program Analysis, an optimum number of aircraft was determined to be thirty (30).[*]  As a result of this recommendation four (4) line items were eliminated based on staffing and location requirements." AR 13394, and that these line items were eliminated "due to budget constraints." AR 16040.

In any event, the cancellation of 4 of the original 34 line items (a 12% reduction in response capability) and the agency's steadfast refusal to re-instate them has occurred despite (1) a very dry winter and resulting predictions of a very severe 2012 fire season** and (2) the reduced availability of air tankers to fight forest fires from 19 airplanes last year to only 11 in 2012.***

---

4

While the RFP states that the Forest Service intended, as it has done historically, to evaluate offers and award contracts without discussions, with regard to this solicitation the Forest Service made two requests for best and final offers. By doing so, even though the Forest Service clearly indicated that, in evaluating proposals, the non-price factors which were going to be qualitatively evaluated when combined, were "significantly more important than Price," RFP at E-7, AR 282, the Forest Service "de facto" indicated that price was not unimportant. Indeed, during the course of negotiations, the Forest Service not only requested best and final offers on July 28, 2011 soliciting revised prices but also solicited a second round of price revisions on September 9, 2011. The Forest Service's September 9, 2011, letter stated in pertinent part that: "Due to our potential budget constraints for the upcoming Fiscal Year 2012 we need to tighten our expenditures for all resources including Helicopters within the Agency. We are again requesting that you review your pricing for helicopters proposed and resubmit your best and final price proposal by September 20, 2011, COB. A second round of price proposal revisions is

_____

*This statement is totally at odds with the recommendations of the National Interagency Aviation Council to maintain a core federal fleet) of 34 type 1 . . . helicopters on an exclusive use basis. National Wildfire Coordinating Group, National Interagency Aviation Council, Interagency Aviation Strategy, 21 (July 2008), available at http://www.fs.fed.us/aboutus/budget/requests/6244655_FSNIAC_Strategy_Final.pdf (last accessed April 26, 2012).
**See, e.g., National Interagency Fire Center Predictive Service, National Wildland Significant Fire Potential Outlook (Apr. 1, 2012), available at http://www.predictiveservices.nifc.gov/outlooks/monthly_seasonal_outlook.pdf, (last visited April 25, 2012).
***See The President's Budget Request for the U.S. Forest Service in Fiscal Year 2013 Before the Senate Committee on Energy and Natural Resources, 112 Cong.19 (2012) (testimony of Tom Tidwell, Chief, United States Forest Service, March 6, 2012), available at http://www.energy.senate.gov/public/index.cfm/hearings-and-business-meetings?ID=2f81c9e7-35a3-4c20-b016-2e6924e6d2d5 (last accessed April 25, 2012)

unusual but given the budget constraints all Agencies are facing, it is imperative we consider your best price ID." AR 5161.

In response to these requests, Croman did not revise its prices. This fact notwithstanding, Croman's evaluated price was lower than that of the offeror selected by the Forest Service for CLINs 17, 23, 28, 29, 30, 32 and/or 33. In fact, Croman's price advantage on Item 23 was in excess of ██████ i.e., the difference between the evaluated price of the awardee, Siller Helicopter Inc. ("Siller") ██████████ and Croman's evaluated price ██████████ <u>see</u> AR 16054, <u>i.e.</u>, Siller's evaluated price was 105% <u>higher</u> than Croman's. Similarly, with regard to CLIN 29, Croman's price advantage was ██████████████████ <u>see</u> AR 16057, <u>i.e.</u>, Columbia Helicopter's evaluated price was ████ higher than Croman's. The exact same price advantage existed with respect to both CLINs 30 and 32. For line items 28 and 33, Croman's price advantage was ██████████████████ AR 16056, 16060 (<u>i.e.</u>, Firehawk's evaluated price was ████ higher than Croman's). For line item 17, Croman's price advantage was ██████████████████ AR 16051 (<u>i.e.</u>, Firehawk's evaluated price was ████ higher than Croman's). Nevertheless, Croman was not awarded any of these line items.

With regard to the evaluation of proposals, the RFP also provided in pertinent part that: "Award . . . will be based on best value." RFP at § B, AR 46. "Awards will be made to those offerors whose proposals are technically acceptable and whose technical/price relationships are the most advantageous to the Government. The significance of the spread of scores will be determined on the basis of what the difference might mean in terms of performance and what it would cost the Government to take advantage of it. Award may not necessarily be made for

6

technical capabilities that would appear to exceed those needed for the successful performance of the work." RFP at § E-4, AR 282.

In Section E-3 of the RFP Technical Evaluation Factors receiving qualitative evaluation[6] were listed in descending order of importance.[7] AR 280-282. As to the relative importance of these Factors vis-à-vis Price, the solicitation provided that "The non-price factors - Mandatory Documentation, Aircraft Performance, Safety/Risk Management, Past Performance and Organizational Experience - when combined are significantly more important than Price." RFP at § E-4, AR 282.

With regard to "Price," the RFP also stated in pertinent part that: "The Government will evaluate "Price" of offers for award purposes by adding the price [i.e., the daily Availability Rate proposed by the offeror,] for the base year plus option periods and adding the specified flight rate [for each aircraft as set out in the RFP at Ex. 12, AR 211] multiplied by the estimated flight hours [also sent out in the RFP] to determine overall price being offered."[8] RFP at § E-3, AR 280.

---

[6]The RFP also listed Mandatory Documentation as an evaluation factor. However, as the RFP stated in § E-3 "Mandatory Documentation is a pass/fail factor" whereunder a proposal not providing the requisite Mandatory Documentation "will be eliminated from the further consideration," i.e., will not be the subject of any qualitative evaluation under the remaining factors. AR 275.

[7]RFP at § E-3, AR 280 and RFP at § E- 4, AR 282.

[8]Such being the case, although labeled as an evaluation of "Price" or "Total Price," what the agency in fact evaluated was the anticipated cost to the government over the life of the contract of making an award to an offeror for a particular helicopter. This fact is recognized by the agency in the AR 16042 where this item is properly referred to as ██████████████ ████████████ See also AR 15995.

As described in the AR, Technical proposals were evaluated by a Technical Evaluation Team ("the TET"). The TET first assigned a pass/fail rating to each proposal with regard to Mandatory Documentation. AR 15995. The evaluation of Past Performance and Organizational Experience was initially conducted by ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

Not set forth in the RFP, or in any way disclosed to offerors, the Agency then employed what it calls a ███████████████████████████████████████

███████████████████████████████ Id. Among other things, with regard to

---

[9]Exceptional, Acceptable, Neutral, Marginal, Unacceptable.

[10]Exceptional = 1, Acceptable = 2, Neutral = 3, Marginal = 4, Unacceptable = 5.

[11]Based on the ratings produced by the teams, the TET assigned an adjectival consensus rating. A summary of the "adjectival consensus rating by the TET" given each offeror in three of the four technical factors that were qualitatively evaluated is set forth on pg. 15997 of the AR. In pertinent part, that summary sets forth the following results of the evaluation:

| Offeror | Safety and Risk Management | | Past Performance | | Organizational Experience | |
|---|---|---|---|---|---|---|
| Croman Corp. | | ████ | | ████ | | ████ |
| Siller Helicopters | | ████ | | ████ | | ████ |
| Columbia Helicopters | | ████ | | ████ | | ████ |
| Helicopter Transport Services Inc. | | ████ | | ████ | | ████ |
| Firehawk Helicopters | | ████ | | ████ | | ████ |

Id.

Aircraft Performance, the most important Factor in the RFP, ████ (not the TET) assigned a unique technical score to each aircraft proposed based on that aircraft's ability to lift more than the specified minimum payload requirement.  AR 13405.[12]  The elaborate scheme by which ████ ████████ each aircraft ██████████████████ on the amount it could lift above the minimum specification is set forth at AR 16013.[13]  Additionally ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ id., i.e., ████████████████

████████████████████████████████████████

████████████████████████████████████████████

████[14]

In doing this, not only was there no human evaluation of the most important technical Factor, Aircraft Performance, but the Agency simply took the undocumented collective adjectival opinions of the ████████████ which had led to the TET's ████████████

████████████████████████████████████████

---

[12]Contrary to the narrative set forth in the AR 13394, unlike with regard to the other technical factors,  with regard to Aircraft Performance, proposals were never ████████████ ████████████████

[13]Whether the resulting ratings and the agency's use of them were meaningful or distorted differences between offerors is discussed infra.

[14]AR 15995.

[15]See the Technical Evaluation worksheets of the ████████████████████ ████████████████ set out in TAB 28 of the AR.

█████████████████████████████████████████████ <u>See</u>

AR Tab 67, Attachment 5. The ████ then applied the technical Factor weightings noted above.

<u>See</u> AR 15996. The results, again accomplished with no human evaluation, were the

recommendations for award. AR 15999.

The Agency states that "after the technical proposal evaluations" prices were evaluated

to determine aircraft price reasonableness and the Offerors' understanding of the level of effort

required to successfully perform the contract," and that the TET rejected two helicopters, <u>i.e.</u>,

---



██████████████████████████████████████████████████████████

AR 15999 (emphasis added).  In this regard, the Agency states that ████████████
████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████[17]  AR 15999.

The AR also states that in addition to applying the technical Factor weightings to be used, the

████████████████████████  AR 15995.

   Through the process described above, ████████████████████████████████
██████████████████████████████████████████████████████████

██████████████████  AR 15998 (emphasis added).

   The Agency also states, without further explanation, that █████████████████████
██████████████████████████████████████████████████

██████████████████  AR 15999.  Whether or not a proper review was

accomplished, the fact is that by the undated certification set forth in the AR Tab 68 at 16213,

the Source Selection Authority ("SSA") agreed with the proposed awards shown in  the

Summarization of Recommended  Awards, AR 16000 (and in bold on █████████████, AR Tab

67, Attachment 4).  The SSA's certification also avers that █████████████ represents the

best value and prioritized aircraft performance over price, while still taking price into account.

AR 16000.

   **A.   Procedural History**

---

[17]In this regard, the RFP states that: "A price analysis will be conducted to determine
overall price reasonableness and by using the formula specified below [to compute cost per
pound]."  RFP at § E-2, AR 275.

Shortly after being advised that it not been selected for the award of any line item, on

January 3, 2011, Croman filed a protest at the Government Accountability Office ("GAO")

alleging, among other things, that: (1) its technical proposal had not been properly evaluated; (2)

the Forest Service had failed to make a determination of the significance of the technical scoring

advantage of the awardee's proposal on line items 17, 23, 28, 29, 30, 32 and 33 but nevertheless

awarded those line items to an offeror with the highest technical score but not the lowest price;

(3) the award of line item 23 was also otherwise improper; and (4) the Forest Service improperly

cancelled part of the solicitation, i.e., line items 21, 22, 27, and 34.

At or about the same time, two other offerors also filed GAO protests.  On January 18,

2012, the Forest Service filed a Motion to Dismiss various grounds of protest asserted by the

three protesters.

By decision of January 27, 2012, GAO dismissed Croman's protest in part because

"[a]lthough Croman maintains that the Forest Service failed to assess the significance of any

non-price difference between the awardees and Croman, the protest identifies no evidence to

support this claim." AR 15942.[18]  (Of course, in the absence of the AR, while Croman's assertion

is in fact true, see discussion below, it would have been virtually impossible for Croman to have

had any evidence of this.)

Nevertheless, on January 31, 2012, the Forest Services alerted Croman that it was taking

corrective action on this solicitation.  In the letter issued in this regard, the Agency indicated that

---

[18]GAO also totally ignored Croman's argument that the award of Item 23 was improper because, contrary to the provisions of the RFP, it resulted in the Forest Service's acquisition of technical capabilities that greatly exceeded those needed for the successful performance of the work covered by that line item (at an increased cost of some ████). See AR 15943.

it would re-evaluate the technical proposals of offerors that had proposed aircraft for contract line items 16-34, but only with regard to three of the four qualitatively evaluated technical factors:  Safety/Risk Management; Past Performance; and Organizational Experience, i.e., it would not re-evaluate Aircraft Performance.  AR Tab 60.

On March 16, 2012, the Forest Service contacted offerors to alert them that the Agency had completed its re-evaluation.  As a result of the corrective action, while the awardees on two line items were switched, Croman again was not awarded any line item.  Because numerous actions of the Forest Service in evaluating proposals remained improper and inconsistent with the terms of the RFP and/or applicable law, on February 3, 2012, Croman filed the instant suit.

As described in detail below, Croman asserts that, notwithstanding the fact that for line item 23, Siller submitted a price that was more than ▮▮▮▮▮ as Croman's and, among other things, did not demonstrate the requisite understanding of the level of effort needed to perform the services, item 23 was again awarded to Siller and not Croman.  Moreover, despite the fact that Croman was evaluated as ▮▮▮▮▮ in three of the four Technical Factors that were qualitatively evaluated and, for line items 29, 30 and 32, not only offered a helicopter that had a greater lift capacity than that offered by the selected offeror, Columbia Helicopters[19] but had a lower price, each of those line items were awarded to Columbia.

---

[19]While both Columbia and Croman each received an ▮▮▮▮▮ adjectival consensus rating by the TET in all other technical factors, notwithstanding the fact that Croman's helicopter had a greater lift capacity than did Columbia's helicopter, ▮▮▮▮ found Columbia to have a ▮▮▮▮▮ higher technical rating that Croman.  See AR 16057.  Of course, as discussed below, not only did the Agency disregard the ▮▮▮▮▮▮▮ in favor ▮▮▮▮▮▮▮ aimed at making ultra-fine distinctions based on mere general opinion data but no human being ever stopped to determine if the ▮▮▮ "technical advantage" had any

13

Likewise, despite having a lower price and an evaluation of ▮▮▮▮▮▮▮ in Operational

Experience compared to Firehawk's ▮▮▮▮▮▮▮ rating, Firehawk, not Croman, was awarded

line items 17, 28 and 33.[20]

## III.  THE FOREST SERVICE IMPROPERLY AWARDED LINE ITEM 23 TO SILLER

As set forth, in Counts 2 and 3 of Croman's Complaint, the Forest Service's award of line

item 23 to Siller was improper, being both inconsistent with the terms of the RFP and the

applicable law.

As noted, the solicitation covered the provision and operation of both Heavy and Medium

helicopters (a distinction based on the helicopter's size and related capacity to lift cargo).  That

is, the RFP set forth a minimum performance requirement for helicopters on CLINs 1-15, i.e.,

that at an altitude of 8,000 feet the helicopter be able to lift **5000 pounds**, plus a pilot and fuel.

RFP at B-73, AR 117.  CLINs 16-34 had a different requirement.  That is, the minimum

performance requirement for helicopters on line items 16-34 was that at lower altitude, 7,000

feet, the helicopter only had to be able to lift **3300 pounds**, plus a pilot and fuel.  RFP at B-73,

AR 117.

As the reduced specification connotes, less was required of Medium helicopters to

successfully perform line items 16-34 than what Heavy helicopters needed to do to successfully

perform line items 1-15.  Such being the case, quite unsurprisingly, the average price of the

_____

significance whatsoever and or was worth spending ▮▮▮▮▮▮▮▮▮▮ of taxpayer dollars to
obtain it.

[20]The ▮▮▮ found Firehawk to have a ▮▮▮▮▮▮ higher technical rating that Croman.
See AR 16051.  As with other line items, no human being ever stopped to determine if this ▮▮
▮▮▮▮▮▮▮▮▮▮▮ had any significance whatsoever and or was worth spending ▮▮▮▮▮▮▮
▮▮▮▮▮ of taxpayer dollars to obtain it.

selected offerors for CLINs 16-34 (excluding the four cancelled CLINs and CLIN 23) was



███████, i.e., less than one-third of the average price of the Heavy helicopters awarded line

items 1-15 ██████████.  See Attachment A hereto.

     Siller's evaluated price for line item 23 was █████████ (AR 16054, Column N), i.e.,

more than ██████ the average evaluated price of the other Medium helicopters awardees.[21]

Siller's base year daily availability rate (id., Column F), ████████[22] was also much higher (i.e.,

███████████) than the █████████ average base year daily availability rate of the other Medium

helicopters awardees.[23]  See Attachment A.

## A.  The Forest Service Improperly Failed To Act In A Consistent Manner And Reject Siller's Offer For Line Item 23 As Required By The RFP

     The RFP required that each offeror's proposal had to be submitted in two parts (a

Business (Price) Proposal and a Technical Proposal) "so that evaluation of one may be

accomplished independently from evaluation of the other."  RFP § E-2, AR 274.  In this regard

the RFP further provided that:  "Each price proposal shall be evaluated to determine its

reasonableness and to determine the demonstrated understanding of the level of effort needed to

successfully perform the services."  Id. at AR 275 (emphasis added).  The RFP also stated that:

---

[21]In comparison, Croman's evaluated price for line item 23 was ██████████ AR 16054,
i.e., it was right in line with the price at which all other line items for Medium helicopters were
awarded.

[22]During the option years, Siller's proposed daily availability rate escalated by ██████ to
██████ AR 16054, Line 498, Columns F and I.  By comparison, in those years the average
daily availability rate of the other Medium helicopter awardees escalated by ██████ to ████████
See Attachment A.

[23]AR 16054.

"Award may not necessarily be made for technical capabilities that would appear to exceed those needed for the successful performance of the work." RFP at § E-4, AR 282. While the Forest Service undertook such a review and, as a result, rejected offers on certain line items, it improperly failed to do so with regard to the Siller's proposal on line item 23.

As set forth in the AR at 13408, another offeror, ███████████████, had proposed to use two particular model Heavy helicopter for line items 1-15, i.e., two ████[24] The base year daily availability rate proposed by ████ for one of the ████ was ████ Id. (The daily availability rate for the other ████ was ████ Id.) The lower of Erickson's proposed rates was considerably more than the ████ average base year daily availability rate of the Heavy helicopters being recommended for award of line items 1-15. Id. In fact, it was more that ████ higher than the average base year daily availability rate being proposed for those helicopters.[25]

Such being the case, the Agency eliminated both of the ████ proposed by ████ from consideration for award stating that ████████████ ███████████████████████████████████ ███████████████ AR 13408.

While the Agency's elimination of the two ████ proposed by Erickson at base year availability rates that were more than ████ higher than those of the offerors selected for award of comparable items, is both commendable in view of the Forest Service's asserted budget

---

[24]As set forth in Erickson's Technical proposal, the ████ has a huge lift capacity. AR 5522-5523.

[25]The proposed rate for the higher priced ████ was ████ higher than average base year daily availability rate of the helicopters being recommended for award of line items 1-15.

16

crunch and was entirely consistent with the requirements of the RFP, the Agency failed to take similarly required action with regard to Siller's proposal on line item 23. That is, inexplicably, the Forest Service failed to reject Siller's excessively-priced offer for line item 23 even though its proposed base year availability rate for that item was ████ **higher** than to those of the offerors selected for award of comparable items.

Solely on the basis of the unreasonableness of Siller's price, the Forest Service's failure to eliminate Siller from the competition for award of item 23 was arbitrary and capricious and not consistent with the terms of the RFP.

The impropriety of the selection of Siller for award of item 23 is further supported by the fact that the Siller's offer of a Heavy helicopter at the price associated therewith (including the extreme cost of flying it (something that is taken into account in the total evaluated price)) clearly indicated that Siller lacked the requisite "understanding of the level of effort needed to successfully perform the services" described in item 23. Put simply, Siller failed to appreciate that, unlike line items 1-15, given the reduced lift requirements applicable to items 16-34, an extremely expensive Heavy helicopter was not needed to successfully meet the performance requirements of line item 23. Conversely, not only did the Forest Service blithefully make award to Siller at a price that, by the Agency's own standards, was unreasonable, but in doing so, contrary to the terms and tenor of the RFP, it spent ████ to obtain "technical capabilities that . . . exceed [ed] those needed for the successful performance of the work," i.e., at great cost, for line item 23, the Forest Service obtained a helicopter that admittedly had a huge lift capacity, when the Forest Service's specifications for item 23 indicated that a helicopter with far less lift capacity would do just fine.

17

Given the above, the Court should enjoin the Forest Service from obtaining performance for line item 23 from Siller, and from any company other than Croman. The latter request is entirely appropriate given the similar infirmities and circumstances relating to the other offerors who proposed to perform line item 23, i.e., in order of the evaluation of their technical proposals:

- ████████████████████ proposed base year availability rates that were even higher than Siller's, see AR16054, lines 490, 492-497, Column F, and for the same reason as Siller it must be eliminated from consideration for award of item 23.

- The helicopter proposed by Rainer Heli International (T699RH), AR 16050, line 491, was awarded contract line item 16 and is therefore unavailable.

- Another offeror, ████████████████, proposed a base year availability rate ████████, AR 16054, line 498, Column F, that, while less than Siller's, was still some 50% higher than those of the offerors selected for award of comparable items. Using the Agency's own actions with regard to ████████████ as a guide, ████████████ ████████ rates are also too high and for the same reason as Siller, it too must be eliminated from consideration of award of item 23.

Awarding line item 23 to Croman rather than of Siller will reduce the Forest Service's cost by some ████████ This is more than enough money (at the average price of a medium helicopter ████████[26] to fully fund at least one of the cancelled line items. Such being the case, in light of the substantial concern that exist about the severity of the 2012 fire season[27] and the greatly reduced number of air tankers and helicopters available to fight fires,[28] the Court should also direct the Agency to seriously consider using the money saved by a proper award of item 23 to reinstate at least one of the cancelled line items and make award thereunder based on a proper evaluation of proposals.

---

[26]See Attachment A.

[27] See supra note 5 n.**.

[28]See supra note 5 n.***.

18

19

**B.    The Agency Also Both Conducted An Improper Tradeoff Procedure And Failed To Justify Why Siller's Proposal Warranted Paying An Extremely High Price**

The Federal Acquisition Regulation § 15.101-1 provides that:

(a) A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror.

(c) This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal. <u>The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406.</u>  (Emphasis added).[29]

In this regard, in competitive negotiations, the Agency is required to make cost (or price) technical tradeoffs where one proposal is rated higher technically than another but the other is lower in cost. <u>Industrial Property Management, Inc. v. United States</u>, 59 Fed. Cl. 318, 324 (2004), <u>citing</u> <u>State Management Services, Inc.</u>, B-255528, 95-1 CPD ¶ 25, at *5.

Consistently, § E-4 of RFP states that:

- Awards will be made to those offerors whose proposals are technically acceptable and whose technical/price relationships are the most advantageous to the Government.

- The critical factor in making any price/technical tradeoff is not the spread between the technical scores but the significance of the difference.

- The significance of the spread of scores will be determined on the basis of what the difference might mean in terms of performance and what it would cost the Government to take advantage of it.  AR 282.

---

[29]Concomitantly, FAR §15.308 provide in pertinent part that:  The source selections decision shall be documented and the documentation shall include the rationale for any business judgment and tradeoff s made . . . including the benefits associated with additional costs.

These provisos merely echo the seminal principals that scores alone will not support a sources selection decision, see Nash, Cibinic & Yukins, FORMATION OF GOVERNMENT CONTRACTS 835 (4th ed. 2011), that in such selection decisions "The determining element is not the difference in technical merit, per se, but the contracting agency's judgment concerning the significance of that difference." See, e.g., General Offshore Corp., B-246824, 92-2 CPD ¶ 335, at *4 and that "the propriety of the price/technical tradeoff decision turns not on the difference in the technical scores or ratings per se, but on whether the selection official's judgment concerning the significance of the difference was reasonable and adequately justified in light of the RFP's evaluation scheme." Shumaker Trucking and Excavating Contractors, Inc., B-290732, 2002 CPD ¶ 169, citing Johnson Controls World Servs., Inc., B-289942, 2002 CPD ¶ 88, at 6.

As this Court has previously held, "[e]ven where, as here, a solicitation provides that technical criteria are more important than price, an agency must select a lower-priced, lower technically scored proposal if it reasonably decides that the premium associated with selecting the higher-rated proposal is unwarranted." Serco Inc. v. United States, 81 Fed. Cl. 463, 496 (2008) (emphasis added), cited favorably in cases including Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. 723, 733 (2011). That is, unless the benefits of awarding to a higher-priced are both documented and "grounded in reason" no such award is appropriate. As further noted in Serco, the decisional law suggests that mere discussion of differences in technical merit, without a discussion of the significance of those differences in terms of contract performance or agency needs, is not enough to meet the requirements of the FAR. 81 Fed. Cl. at 498. That is, even a dazzling array of computer-generated numbers purportedly reflecting the relative technical merit of the offerors and the various helicopters which they proposed (see AR Tab 67, Attachment 4),

21

without any discussion of the significance of the differences which those scores purport to represent is similarly insufficient.  As stated in <u>Blackwater Lodge & Trading Co. v. United States</u>, 86 Fed. Cl. 488, 515-16 (2009), "the law <u>compels</u> . . . <u>the SSA</u> to determine whether [a proposed awardee's] unique strengths warrant[ ] the premium represented by its higher-priced proposal."  That is, neither adjectival rating nor point scores mandate the automatic selection of a particular proposal; rather, they are tools to assist the source selection officials in making award decisions. <u>See</u>, <u>e.g.</u>, <u>DeTekion Sec. Sys., Inc.</u>, B-298235, 2006 CPD ¶ 130; <u>Wackenhut Services, Inc.</u>, B-400240, 2008 CPD ¶ 184; <u>Fox & Company</u>, B-197272, 80-2 CPD ¶ 340.

"In determining whether an agency has complied with [FAR § 15.101-1], this court must determine whether the agency's decisions are grounded in reason." <u>Serco</u>, 81 Fed. Cl. at 496, <u>citing</u> <u>TRW, Inc. v. Unisys Corp.</u>, 98 F.3d 1325 1327 (Fed. Cir. 1996); <u>Comprehensive Health Servs., Inc. v. United States</u>, 70 Fed. Cl. 700, 721 (2006), <u>i.e.</u>:

> the regulation requires the agency to make a business judgment as to whether the higher price of an offer is worth the technical benefits its acceptance will afford. <u>Serco</u>, 81 Fed. Cl. at 496, <u>citing</u> <u>TRW, Inc.</u>, 98 F.3d at 1327; <u>Dismas Charities, Inc.</u>, 61 Fed. Cl. 191, 203 (2004).
>
> o Doing this obliges the agency to do more than simply parrot back the strengths and weaknesses of the competing proposals-rather, the <u>agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price</u>. <u>Serco</u>, 81 Fed. Cl. at 497 (emphasis added) (footnotes omitted).
>
> o Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise. <u>Id.</u> (footnotes omitted).  Indeed, the FAR requires that the source selection decision be "well documented with regard to [the Agency's] tradeoff analyses." <u>Standard Commc'ns</u>, 101 Fed. Cl. at 735.

Measured by these standards, it is apparent that anything that purported to be a tradeoff decision leading to the selection of Siller for award of line item 23 at a price more than ███ that of Croman's was materially flawed.

That is, the above requirements notwithstanding, the AR is utterly devoid of:

- any statement as to the relative strengths and weaknesses of Croman's and Siller's technical proposals (other than a dazzling array of numbers carried out to 4 decimal places).
- any determination (and the rationale for it) that the ████ advantage in technical score that the ███ assigned Siller over Croman (a purported ███ advantage) was worth paying more than ███ the price proposed by Croman.[30]

Indeed, because the Agency used the ███ to ████████████████ ████████████████████████████ AR 16040, it admits that ██████████ ████████████████████████████ ████████████████████████ AR16044 (emphasis added).

The Agency's further statement that ████████████████████ ████████████████████████

---

[30]This omission is substantial in and of itself but even more so in light of the fact that, as required by § E-4 of the RFP quoted above, any significance in the spread of scores that might exist between two offers must be diminished (and in this case diminished greatly) by "what it would cost the Government to take advantage of it," i.e., $9 million in times of an admitted budget crunch.

Indeed, logic alone suggests that as the magnitude of the difference between two proposals increases, in order for the higher-priced offer to be selected for award the relative benefits yielded by it must also increase. Serco, 81 Fed. Cl. at 497, citing Beneco Enters., Inc., B-283154, 2000 CPD ¶ 69, *5. As the Court continued:

> To conclude otherwise, threatens to "minimize[ ] the potential impact of price" and, in particular, to make "a nominal technical advantage essentially determinative, irrespective of an overwhelming price premium." Coastal Sci. and Eng'g, Inc., B-236041, 89-2 CPD ¶ 436, *2 (1989); see also Lockheed Missiles & Space Co., 4 F.3d 955, 969-70 (Fed. Cir. 1993).

████████████████████████████████████████████

████████████████████████ AR 16044 (emphasis added), is engineer's attempt to

explain away the Agency's failure meet the legal requirement for a human being to make an

informed judgment as to whether <u>each particular selection decision</u> is grounded in reason and not

just founded on a dazzling array of computer-generated numbers (which may not even have

meaning and/or distorts any minor difference that may exist between offerors, <u>see</u> discussion

<u>infra</u>).[31]

Mere mechanical comparisons, such as the one that took place in the evaluation of

responses to this RFP, are improper. <u>Serco</u>, 81 Fed. Cl. at 496-97. Rather, an agency is

"**compelled by the FAR**" to document its reasons for choosing the higher-priced offer" and mere

generalized statements that "fail to reveal the agency's tradeoff calculus" are not sufficient to

permit judicial review of the award decisions. <u>Id.</u> at 497 (emphasis added). <u>See</u> <u>also</u>, <u>e.g.</u>,

<u>Midland Supply Inc.</u>, B-298720, 2007 CPD ¶ 2 (award based on agency's assigning raw point

scores to subfactors, averaging them, then multiplying results by Factor weight and totaling was

unreasonable in the absence of documentation or explanation to support the price/technical

tradeoff).

---

[31]In <u>Serco</u>, the Court discussed surrogates that the agency offered up for measuring the
reasonableness of the tradeoff analyses conducted and rejected formalistic incantations that were
applied irrespective of the difference in price between offerors. <u>Id.</u> at 499. In the instant case,
the rigid adoption of the OM's, computer-generated technical evaluation warrants a similar
treatment by the Court.
This is even more the case because, as discussed below, just as in <u>Serco</u>, the ████
information that the Forest Service used for some of the technical evaluation was unreliable and
the resulting multi-digit technical rankings therefore suffered from some degree of false
precision. <u>Id.</u> at 500, <u>see</u> discussion <u>infra</u>.

24

Here, the Agency has stated that, ████████████████████████████
████████████████████████████████████████████████
████████ AR 15999. Moreover, the Source Selection Decision states that ████████
████████████████████████████████████████
████████████████████████████████████████
████████ AR 16034. However, such generalized statements do not satisfy the obligations of the Agency to make decisions that are grounded in reason and to document them. Serco, 81 Fed. Cl. at 497. See also Standard Commc'ns, 101 Fed. Cl. at 736-37.

Serco, just as the instant case, involved an RFP in which the technical factors "when combined, are significantly more important than Cost or Price." 81 Fed. Cl. at 467. There, the protest was sustained even though, unlike in the instant case, the SSA was at least briefed about the strengths and weaknesses of the offerors, id. at 474, a tradeoff analysis was done for each of the 62 acceptable offerors vying for one of the approximately 25 to 30 awards to be made,[32] lower-priced offerors were advised that the agency had determined that the greater technical merit of higher-priced competitors represented a better value to the government, id., and, for the three highest-priced offerors, the agency conducted an even more thorough analysis. Id. at 474-75. Nevertheless, the Court still concluded that the SSA's decision to select proposals with the highest computer-generated numerical technical scores was materially flawed, i.e.,

- the tradeoff analysis was deficient, first, because "it failed to indicate whether the government would receive benefits commensurate with the price premium it proposed to pay." Id. at 497, citing Lockheed Missiles, 4 F.3d at 959-60; and

---

[32] See Serco, 81 Fed. Cl. at 470.

25

- in almost every relevant instance, the record includes little or no documentation, evidence or explanation of the benefits that the agency associated with the awardee's supposedly superior technical ratings which would outweigh what, in many circumstances, was a significantly higher price. Id. at 498-99, citing Si-Nor, Inc., B-282064, 2000 CPD ¶ 159, at *3 (summary conclusion that the awardee's "outstanding past performance outweighs the lower price offered by" the protestor held to be inadequate).

Given that here the Forest Service did even less than GSA did in Serco and simply rubber-stamped the selections with the highest computer-generated numerical technical scores made by the ██, the evaluation is similarly materially flawed. Indeed, without adequate documentation, it is simply not possible to determine if the SSA engaged in an appropriate best-value tradeoff analysis. Standard Commc'ns, 101 Fed. Cl. at 737-38.

In Serco, the Court criticized the premium of $3.6 million paid by the agency where the lowest-priced award was for $21 million, i.e., a 17% premium. Serco, 81 Fed. Cl. at 498. If paying a 17% premium was questionable in Serco, the payment of a premium in excess of ██ on line item 23 in the present case is even more questionable. Notably, assuming that the minimum acceptable score achievable was 4.00, as indicated in the following chart, the cost per point of technical merit of Siller's proposal was wildly in excess of Croman's:



| | Total Price | Rating<br>AR Tab 67 | Point difference<br>from lowest<br>possible rating of<br>4 | Dollars per<br>Point above<br>minimum |
|---|---|---|---|---|
| Siller | | | | |
| Croman | | | | |

Just as in Serco, "[t]hese figures are informative not because the Agency was required to conduct such statistical studies as part of its tradeoff analysis, but because the disparities

demonstrate that [the agency] needed to conduct more careful tradeoff analyses, in whatever form they took." Id. at 498, n.57.

     **C.**    **The Selection Of Siller For Award Of Item 23 Was Also Improper Because It Was Based In Substantial Part On One-Word Adjectival Ratings That Were Undefined And That Lead To False Precision Of The Scores On Which The Selection Was Made**

As noted, the evaluation of Past Performance and Organizational Experience was initially conducted by ███████████████████████████████████████ ████████████████████[33]   Each team ██████████████████████████████ ████████████████████████████   As can be seen in the AR Tab 28, for each subfactor ███████████████████████████████████████████████████ ████████[34]   However, nothing in the AR contains any information whatsoever as to why ████ ████████████████████████████████ i.e., the  perceived strengths and weaknesses that caused the teams to place X's where they did on the worksheets  were apparently never memorialized.

███████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

_____

[33] See supra note 15.

[34] The rating boxes were: Exceptional, Acceptable, Neutral, Marginal or Unacceptable.

[35] Exceptional = 1, Acceptable = 2, Neutral = 3, Marginal = 4, Unacceptable = 5.

███████████████████████████████████████████████

████████████████████████████[37] ████████████████████████ where they

became important components in determining the misnamed ██████████████████ AR

Tab 67, Attachment 4, Column Y, on which ███████ selection decisions were based.[38]

     The seeming precision of the various four decimal point numerical ratings noted above

aside, the fact is that the critical ████████████████████ of each helicopter and many of the

numbers that were input in generating those ratings were the product of a significantly imprecise

process, i.e., they were based on the average of averages of mere (unexplained) one-word

opinions.[39]

     That process is erroneous in at least two regards.  First, at the outset each ████ assigned a

collective adjectival assessment of each offeror in each subfactor even though nowhere in the

RFP, or elsewhere, was there any indication of what █████ was specifically to evaluate or

what each adjectival rating being assigned actually represented.  Compare Afghan Am. (RFP

contained a detailed definition of each adjectival rating used in the evaluation).

     In the instant case, because the AR does not contain or even reference any such

definitions of the adjectival ratings, the only reasonable conclusion that can be drawn is that each

---

[36]Id.  See also, e.g., AR 15996.

[37]Id.

[38]As is indicated in Column Y of Attachment 4 of Tab 67, the seemingly precise
█████████████████████████ was a number carried out to four decimal places.

[39]This was true not just with regard to the items about which Croman complains but with
regard to each and every item in the RFP.

member of the ███████████ used his/her own pre-conceptions of the definitions of the adjectival ratings.[40] As indicated in <u>Serco</u>, 81 Fed. Cl. at 463, 483, the provision of the definitions of adjectival ratings to be assigned by the individuals whose options are being surveyed (such as ██████████████████) is significant in assessing the reliability of the resulting compilation of opinions. Because no such definitions were provided here, whether the compilation of the opinions of the members of ██████████ reliably indicates distinctions between the offerors is questionable at best. Indeed, because the meaning of the adjectival ratings being assigned was not made clear, at the very core of the Past Performance and Organizational Experience evaluations is a set of extremely important, but extremely imprecise data.

Moreover, the compilation of the opinions of the members of ██████████████ was not supplemented by narratives, notes or even annotations that provided any insight into what the teams' thought processes were in assigning any adjectival rating. <u>See</u> AR Tabs 28.02 to 28.05. For example, █████████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████ <u>See</u> AR 13367.

Despite this imprecision in the basic evaluation ratings, the TET nevertheless used the numerical average of these ratings as direct input into ██████. By doing so, the imprecision of the basic survey data was propagated throughout the evaluation process. That is, the Agency

---

[40]Croman is not asserting that the RFP needed to include such definitions. The lack of them does not make the RFP flawed. However, their absence in the evaluation process does lessen the extent to which the Agency should have relied upon the numerical values that were generated from the adjectival ratings by ██████████. <u>See</u> <u>Serco</u>, 81 Fed. Cl. at 487.

input the ██████████████ calculated for Past Performance and Organizational

Experience into ████████ along with the equally flawed scores for Safety/Risk Management,[41] the



Overall Evaluated Price and ███████████. Based on this data, the ████ calculated the 4

decimal place overall ███████████████ from which it recommended awards for the

CLINs. See AR Tab 67, Attachment 3.

In Serco, GSA used an almost identical procedure – a procedure which the Court found

wanting. There GSA took past performance survey data from which it developed a consensus

rating for each subfactor under Past Performance, assigned a whole number to each such rating

and averaged them into the overall Past Performance score. Id. at 486. A similar procedure was

used with regard to Basic Contract Plans. Id. Each such score was "carried out to three

decimals." Id.

In its opinion in Serco, the Court asked "But were these numbers actually significant to

three decimals, such that GSA could make rational distinctions based upon the thousandths of a

point-as it did?," id. at 487, and then found that "There are strong indications that the answer to

this question is no." Id.

In reaching its conclusion, the Court discussed false precision occurring where, both as in

Serco and here, agency personnel, such as the members of the individual teams, are forced to

choose between one adjectival rating, e.g., "Exceptional" (with an corresponding numerical



31

value of 1), and another, e.g., "Acceptable" (with a corresponding value of 2), even though a

fraction (such as 1.8) would have been more accurate. Id. at 488. As the Court indicated, the

resulting false precision of averaging whole numbers and carrying them out to multiple decimal

places "can act like a siren charming the unwary into making arbitrary comparisons based upon

digits that are not meaningful." Id. (citing Joseph S. Danowsky, "Statistical Report Flaws: A

Spotter's Guide," 18 No. 8 Acct. & Fin. Planning for L. Firms 1 (2005) and Michael J. Smithson,

Statistics with Confidence: An Introduction for Psychologists 48-49 (2000)) ("decisions based on

[false precision] will be made with greater confidence than is warranted"). That is, "Those

succumbing to this seduction," such as the Forest Service in the instant case, "render conclusions

that appear valid, but, in fact, are not," id., i.e., "Pseudo-precision of calculated results is also

especially questionable when the input numbers are symbolic rather than actual measurements."

Id. at 490, quoting Statistical Report Flaws: A Spotter's Guide, 18 No. 8 Acct. & Fin. Planning

for L. Firms (2005).

        Just as, in Serco, here, the agency (or more accurately ▮▮▮▮) made a host of "fine-line

distinctions" using the four digit computer-generated technical scores that were based on

imprecise basic evaluation ratings, including using them to  select offerors for award.  Indeed, as

noted, the technical scoring difference between Siller and Croman for line item 23 was only a bit

more than ▮▮▮▮▮▮▮  Concomitantly, here, just as in Serco, there are strong reasons to

"suspect that the ultimate comparison of technical proposals were undermined by false precision,

particularly since no error propagation analysis . . . was performed." Id.

        The "obvious threat of false precision in the numbers employed [in the Forest Service's

selection decisions] ought to have caused the agency to be more circumspect in relying on its

32

multi-digit technical ratings." Id. at 489.  In fact, in Serco, the Court noted that, in other cases,

agencies have been "much more cautious" in applying similar statistics to distinguish between

proposals, i.e., tending to view proposals with relatively close technical scores as being

essentially equivalent.  See cases cited id. at n.38.  The Court further concluded that "the

existence of that imprecision greatly intensified the need for the agency to make reasoned

decisions considering price and, relatedly, best values."  Id. at 490.

 With striking similarity, here the Forest Service has propagated error in its selection

process, and thereby increased the need for reasoned decision making.  Unfortunately, as

discussed above, the record reveals that the Forest Service utterly failed to engage in any such

reasoned decision making but rather simply accepted the numbers and resulting award selections

produced ███████████

 Such being the case, just as in Serco, this Court may

> "need not decide whether *vel non* the false precision here, standing alone, is fatal to
> the awards made."  That is so primarily because it is not so much the ***generation*** of
> these statistics, but the way in which they were ***wielded,*** that poses the most potential
> for concluding that the awards here were arbitrary, capricious and otherwise contrary
> to law. For the moment, it is sufficient to conclude that the existence of that
> imprecision greatly intensified the need for the agency to make reasoned decisions.
> Id. at 490 (footnotes omitted, emphasis in original).  Id.

 Utilizing ratings based on subjective and inherently imprecise, though not necessarily

inaccurate, evaluations, coupled with the fact that the resulting output ██████████ was based on

that data did, however, require the Forest Service to take extreme care in making its selection

decisions.  In other cases dealing with technical ratings derived numerically, the GAO has stated

that "technical scores alone . . . do not form the basis for the award of a contract.  Numerical

point scores, when used for proposal evaluation, are useful as guides to intelligent decision

making, but are not themselves controlling in determining award, since these scores can only

reflect the disparate, subject and objective judgments of the evaluators." Fox & Company, B-

197272, 80-2 CPD ¶ 340 (emphasis added).

Under the circumstances, the use of ratings that were subjective and inherently imprecise

as a key component of the final evaluation score and the concomitant automatic selections made

based on those scores without more renders those selection "decisions" arbitrary, capricious and

otherwise contrary to law.

## IV.  FOR THE SAME REASONS THE FOREST SERVICE ALSO IMPROPERLY AWARDED LINE ITEMS 17, 23, 28, 29, 30, 32, AND 33

Much like the manner in which it awarded line item 23 to Siller, i.e., to the offeror that

█████ indicated had the highest numerical technical score irrespective of price, the Forest

Service also awarded line items 29, 30, 32 and line items 17, 28 and 33.  As set forth in AR 67,

Attachment 4:

| CLIN | Offeror | Overall Rating as computed by the ███ i.e., the ███ (Column Y) | **Aircraft Performance** Lift capacity above minimum in lbs. (Column S) | Total evaluated price (Column N) |
|------|---------|------|------|------|
| 29 | Columbia Croman | ███ | ███ | ███ |
| 30 | Columbia Croman | ███ | ███ | ███ |
| 32 | Columbia Croman | ███ | ███ | ███ |
| 17 | Firehawk Croman | ███ | ███ | ███ |

34

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 28 | Firehawk | ██ | | ██ | | ██ | | |
| | Croman | ██ | | ██ | | ██ | | |
| | | | | | | | | |
| 33 | Firehawk | ██ | | ██ | | ██ | | |
| | Croman | ██ | | ██ | | ██ | | |

As the above table indicates, with regard to items 29, 30 and 32, Croman had both a lower price ████████████████████ and its helicopter had a greater lift capacity (the top rated technical factor) than did the awardee, Columbia. Additionally, as set forth supra, the TET had assigned both Croman and Columbia a rating of ████████ in each of the other technical factors – Safety and Risk Management, Past Performance, and Organizational Experience. These bases alone would appear to indicate that award of these line items should, have been made to Croman not Columbia.

Likewise, with regard to each line item 17, 28 and 33, Croman had a price some ████████ lower than Firehawk's. Although, unlike the situation on line items 29, 30 and 32, on line items 17, 28 and 33, the awardee's helicopter did have a greater lift capacity than Croman's helicopter, Firehawk was rated by the TET as merely being ████████ in Organizational Experience as compared to Croman's having received an ████████ rating in that Factor. See Chart supra note 11. These bases alone would appear to indicate that award of these line items should, have been made to Croman not Firehawk.

However, to the extent that the above facts do not warrant enjoining the Agency from obtaining performance of each line items 29, 30 or 32 and/or line items 17, 28 and 33 from any offeror other than Croman, then for the reasons set forth below, the Court should nonetheless enjoin the Agency from obtaining performance of each of those line items from the awardee.

**A.    The Agency Both Conducted An Improper Tradeoff Procedure And Failed To Justify Why Paying The Awardees' Higher Price Was Warranted**

For all of the reasons noted above with regard to line item 23, for line items 17, 23, 28, 29, 30, 32, and 33, the Agency not only similarly failed to make award to the low-priced offeror but also failed to compile the strengths and weaknesses of competing proposals, make a business judgment as to whether the higher price of highest technically scored offeror was worth the technical benefits its acceptance would afford as required by FAR § 15.101-1, and document the rationale for doing so.  See id.

As described in detail above, just as with  line item 23, these failures both individually and collectively render the Agency's selection decisions for line items 17, 23, 28, 29, 30, 32, and 33 arbitrary, capricious and otherwise contrary to law.

**V.    CROMAN IS ENTITLED TO INJUNCTIVE RELIEF**

Croman is entitled to injunctive relief.  Specifically, Croman asks this Court to:

a.    Permanently enjoin the Forest Service, from obtaining performance from Siller for Contract Line Item 23 of RFP AG-02-4B-S-11-9001 or any company other than Croman (provided that the Forest Service finds Croman to be a responsible offeror),[42] and further direct the Agency to consider applying any resulting savings to the re-implementation of line items 21, 22 , 27 and/or 34.

b.    Permanently enjoin the Forest Service, from obtaining performance of for contract line items 29, 30 and 32 Columbia Helicopters (and, unless Croman has been awarded more line items than the number of helicopters it bid and still has available), or any company other than Croman (provided that the Forest Service finds Croman to be a responsible offeror).

c.    Permanently enjoin the Forest Service, from obtaining performance for contract line items 17, 28 and 32 from Firehawk Helicopters (and, unless Croman has been awarded more line items than the number of helicopters it bid and still has available),

---

[42]Such a remedy was ordered by the Court in Standard Commc'ns, 101 Fed. Cl. at 745.

36

or any company other than Croman (provided that the Forest Service finds Croman to be a responsible offeror).

d. Additionally and in the alternative, direct that the Forest Service re-evaluate proposals received under RFP AG-02-4B-S-11-9001 in accordance with the interpretation of the solicitation and the legal requirements of a proper best- value evaluation set forth in the Court's opinion.[43]

e. Direct the Agency to take such additional action as this Court deems appropriate to implement its decision and provide relief to Croman.

As demonstrated above, Croman has met the "heavy burden" that plaintiffs are required to meet for injunctive relief to be granted, i.e., it has demonstrated that the agency's actions lacked a reasonable basis, failed to provide a coherent and reasonable explanation of its exercise of discretion" and that there was a "clear and prejudicial violation of applicable statutes and regulations."

Moreover, as explained below, Croman also meets the requirements for it to be granted the injunctive relief requested. Afghan Am., 90 Fed. Cl. at 365-366 (citations omitted).

### A.   Croman Was Prejudiced By The Errors In This Procurement, And, If Not For Those Errors, Would Have Been Awarded At Least One, If Not Three, Line Items

To establish that an agency has violated applicable law or regulation, the protester "must show a clear and prejudicial violation of applicable statutes or regulations." Standard Commc'ns, 101 Fed. Cl. at 743 (2011) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001)). Prejudice is established when a protestor "shows that there was a substantial chance it would have received the award" but for the errors committed by the Agency. Id at 743. Croman has shown that it was prejudiced by the Agency's

---

[43]Such a remedy was recently ordered by the Court in HP Enterprise Services, LLC v. United States, 2012 WL 1131584 (Fed. Cl. 2012).

action in that had the Agency acted properly there is a substantial chance that not only would Croman have been awarded line item 23, but that it would also have been awarded one or more of the following line item 17, 28, 29, 30 32 and/or 33.

**B.    Croman Will Suffer Irreparable Harm If Injunctive Relief Is Not Granted**

To establish that an injunction is required, the protestor must also show that it will suffer irreparable harm absent an injunction. Standard Commc'ns, 101 Fed. Cl. at 744. In Standard Commc'ns, the Court ruled that the agency did not engage in a fair procurement process because it had not properly documented its best value trade-off. Id. The Court ruled that as a result, the protestor lost its opportunity to compete in the fair procurement process for a contract; something which constituted suffering irreparable harm. Id. Croman has suffered identical harm. The errors that the agency has committed in the instant case have denied Croman its right to have its proposal fairly and lawfully considered.

Additionally, Croman will suffer irreparable harm in the form of lost profits. If Croman had been awarded one or more CLINs under this RFP, it would earn profits from that work. This Court has long held that "deprivation of potential profits has been found to constitute irreparable harm." Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 369 (2004). See Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998).

Moreover, just as in Serco, 81 Fed. Cl. at 502, Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993), and numerous other cases, where, as here, the plaintiff's only relief at law is the recovery of bid preparation costs, the plaintiff has demonstrated that it lacks an adequate remedy, and will suffer irreparable harm, then the injunction should be granted.

**C.** **Injunctive Relief Is In The Public's Interest Because Not Only Will It Help Preserve The Integrity Of The Competitive Procurement System But It Will Allow The Same Services To Be Obtained At A Lower Overall Cost**

This Court has ruled that the "public interest in protecting the integrity of the procurement system is well served by granting injunctive relief." Standard Commc'ns, 101 Fed. Cl. at 745 (citing T&S Prods., Inc. v. United States, 48 Fed. Cl. 100, 113 (2000)). The public interest in the present case will be served if injunctive relief is granted for that and other reasons. First, the Agency failed to conduct a proper best value trade-off as required by the FAR. As in Standard Commc'ns, injunctive relief is proper in such a case. Second, the award decisions, made by the Forest Service, if not enjoined, will, for no good reason, result in the government's spending considerably more of the taxpayers' money than necessary to meet the government's needs or to get less helicopter coverage than the government should for the same dollar expenditure.

**D.** **The Harm To Croman Outweighs Any Harm To The Government And To Third Parties, Including Siller, Columbia And Firehawk**

To grant an injunction, the Court must find that the balance of hardships weighs "in favor of affording relief to plaintiff." Standard Commc'ns, 101 Fed. Cl. at 744. As stated, Croman faces the harm resulting from not having competed in a fair procurement process and as a result not performing CLINs that it otherwise would have been awarded. In contrast, the government will not face any substantial hardship if this Court were to issue an injunction.

In the later regard, first, an injunction will not prevent the government from obtaining needed helicopter services pursuant to this solicitation because, under the injunction requested, at

least one if not more of the items can be directly awarded to Croman and other awards can be made after an appropriate re-evaluation or re-solicitation.

The Court in Great Lakes, 60 Fed. Cl. at 370, ruled that the balance of the hardship weighed in favor of the protestor following a cancellation of a solicitation in that the contractor would suffer the harm of lost profits and the "denial of its right to have its bid fairly and lawfully considered." The Court also found that the government would "suffer no harm" upon the granting of the injunction because it would "receive precisely what it solicited." Id. As in Great Lakes, here, the government will face no real harm if the injunction is granted. If the relief that Croman seeks is granted the government will receive precisely the helicopter services it sought in the solicitation and quite likely at prices lower than the present awards.

Though the resulting relief would change the award structure, since Croman only has three helicopters available, Croman could, at best, only be awarded three line items out of the seven that it has protested and any line items are re-instated as a result of cost savings realized. Offerors such as Columbia and Firehawk would be eligible to receive award of the remaining line items depending on where their respective proposals fell in in a proper best value determination. As such, these firms do not face much if any hardship if one or more of the CLINs that have been awarded to them were awarded to Croman (or even to another offeror). Though superficially a change in awards could seem to impose a hardship on these companies if ultimately they do not receive the same number of awards that they presently have, however, it does not. That is, all that such a situation would reflect is that, if the Agency had made a proper award decision based on a documented human-made tradeoff decision in the first place, those

40

firms would not have been entitled to, and thus would not have been awarded the line items that they were.

Additionally, to the extent that the Court enjoins performance and orders a re-evaluation or re-solicitation of any or all line items, the government will not be without coverage for its helicopter service needs.  That is, the Agency has advised that it has exercised the options contained in the-soon-to expire existing Exclusive Use contracts (i.e., the contracts pursuant to which the government obtained Medium helicopter service last season).  By so doing, the Agency will be able to offer continued performance under these existing contracts through the bulk of the 2012 fire season, i.e., until September 30, 2012.  As such, even if the Court were to issue an injunction and direct that a new evaluation or re-solicitation take place, the government will have coverage of its needs.  (Moreover, any gaps in coverage can be obtained on a spot market basis (albeit at spot market prices) pursuant to the Call When Needed contracts that it has with many helicopter companies including Croman, Siller, Columbia and Firehawk.[44])

## VI.  CONCLUSION

For each of the reasons set forth above, Croman is entitled to judgment in its favor on the Administrative Record and the injunctive relief requested.

Respectfully submitted,

 s/Alan I. Saltman
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Ave, N.W.

---

[44]Under Call When Needed contracts, the Forest Service places orders for helicopter services on a case-by-case basis but helicopter operator is not obligated to accept such orders. Superior Helicopter LLC. v. United States, 78 Fed Cl. 181, 183 (2007).

41

Suite 600
Washington, DC 20036
Phone: (202) 452-2140
Fax:    (202) 775-8217
email: AISaltman@smithcurrie.com

Attorney for Plaintiff

OF COUNSEL:

Stephen J. Kelleher
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Ave, N.W.
Suite 600
Washington, DC 20036
Phone: (202) 452-2140
Fax:    (202) 775-8217
email: SJKelleher@smithcurrie.com

Dated:  April 27, 2012

42

# ATTACHMENT A:

# ENTIRE DOCUMENT REDACTED