**Redacted Version**

No. 12-75C
(Judge G. Miller)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

CROMAN CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

MOUNTAIN WEST HELICOPTERS, LLC,
COLUMBIA HELICOPTERS, INC., and
SILLER HELICOPTERS, INC.,

Defendant-Intervenors.

---

**DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT
MATTER JURISDICTION, OPPOSITION TO PLAINTIFF'S MOTION FOR
JUDGMENT UPON THE ADMINISTRATIVE RECORD, AND CROSS-MOTION
FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

---

STUART F. DELERY
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

SCOTT D. AUSTIN
Assistant Director

OF COUNSEL
ELIN M. DUGAN
Senior Counsel
Department of Agriculture
Office of the General Counsel
General Law And Research Division
1400 Independence Ave, SW

RUSSELL J. UPTON
Trial Attorney
Department of Justice
Civil Division
P.O. Box 480

Room 3311-S                                    Ben Franklin Station
Washington, D.C. 20250                         Washington, D.C. 20044
Telephone:  (202) 720-4978                     Telephone:  (202) 305-3634
Facsimile:  (202) 720-5837                     Facsimile:  (202) 514-7969
E-mail:  Elin.Dugan@ogc.usda.gov               E-mail:  Russell.J.Upton@usdoj.gov

June 6, 2012                                    Attorneys for Defendant

**TABLE OF CONTENTS**

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.      Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.     The 2011 RFP And The Corrective Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          A.     2011 RFP's Aircraft Performance Specifications. . . . . . . . . . . . . . . . . . . 8

          B.     Technical Evaluation Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          C.     Price Evaluation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          D.     Optimization Model. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          E.     Corrective Action Award Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    III.    The 2012 RFP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    I.      Applicable Standards Of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          A.     Standard For Motion To Dismiss For Lack Of Subject
                 Matter Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          B.     Standard For Procurement Challenges.. . . . . . . . . . . . . . . . . . . . . . . . . . 19

          C.     Standard For Judgment Upon The Administrative
                 Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    II.     Croman's Complaint Should Be Dismissed Pursuant To RCFC
          12(b)(1) For Lack Of Subject Matter Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . 22

          A.     This Court Lacks Jurisdiction Because Croman's Bid
                 Protest Is Moot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          B.     This Court Also Lacks Jurisdiction Because Croman Has

Failed To Establish That It Has Standing To Challenge The
Forest Service's Award Decisions.................................. 24

    1.    CLINs 17, 28-30, 32, and 33. ............................. 26

    2.    CLIN 23.............................................. 27

    3.    The Four 2012 RFP CLINs. ............................ 28

    4.    The Standing Requirement Is More Stringent In Bid
        Protests, And Is An Issue That Croman Has Waived. ......... 27

III.    In The Alternative, The Court Should Grant The United States' Cross-
Motion For Judgment Upon The Administrative Record And Deny
Croman's Motion For Judgment Upon The Administrative Record. ......... 28

    A.    Croman Has Waived Its Rights To Challenge The Awards
        For CLINs 17, 23, 28-30, and 32-33. ............................ 29

        1.    Croman's Pre-Award Knowledge. ........................ 30

        2.    Croman's Post-Award Protest Is Untimely. ................ 30

    B.    Croman Has Abandoned Its Allegation In The Complaint
        That The Forest Service Improperly Cancelled CLINs 21,
        22, 27, and 34................................................ 32

    C.    The Forest Service's Award And Cancellation Of Four CLINs
        Were Not Arbitrary, Capricious, An Abuse Of Discretion, Or
        Otherwise Not In Accordance With Law........................... 34

        1.    The Administrative Record Demonstrates The
            Rationality Of The Forest Service's Award Decision. ......... 34

            a.    The Documents Upon Which The Forest
                Service Relied In Its Award Decisions Show
                In Detail How Croman's Proposed Aircraft
                Compared To Each And Every Other Proposed
                Aircraft And How Every Decision Was Justified. ....... 36

            b.    Croman Has Failed to Demonstrate The
                Irrationality Or Illegality Of Any Of The Award
                Decisions It Challenges. ........................... 40

2. The Forest Service's Use Of Numerical Ratings As Key Components In Its Award Decisions Was Appro-Priate Given The Nature Of The Aircraft Performance And Safety/Risk Management Factors.. . . . . . . . . . . . . . . . . . . . 42

    a. The Conditions Croman Alleges Can Lead To "False Precision" Did Not Exist In The 2011 Procurement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    b. Unlike The Evaluation Factors In *Serco*, The Two Most Important Technical Evaluation Factors In This Procurement Were Based Upon Objective Formulas That Required The Use Of Numerical Ratings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

3. Siller's Price For CLIN 23 Was Reasonable Compared To The Other CLIN 23 Price Proposals And The Cost Efficiency Of Its Helicopters. . . . . . . . . . . . . . . . . . . . . . . . . . 48

    a. The Forest Service Did Not Act Inconsistently In Considering Siller's Skycrane After Rejecting Two Other Helicopters Because They Were Too Expensive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    b. The Requirements For CLIN 23 Were Different From The Other Medium-Lift-Capacity CLINs And Created A Smaller, More Expensive, Pool Of Aircraft. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    c. The Awarded Helicopter Was More Cost Effective Than Croman's Three Helicopters On A Price Per Pound Basis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

4. Documentation In The Administrative Record Shows The Forest Service Had A Rational Basis For Cancelling Four CLINs In 2011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    a. Croman's Misleading Comparison Of One-Year Savings To Four Years Of CLIN 23 Payments Seeks To Obscure The Forest Service's Rational Basis For Its Award Decision.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    b.  Croman's Factual Support For Its Allegation Of
       Pretext is Incorrect And Fails To Satisfy The Court's
       "Clear and Convincing" Evidentiary Burden.. . . . . . . . . 58

IV. Croman Is Not Entitled To Permanent Injunctive Relief.. . . . . . . . . . . . . . . . . 59

  A.  The Court May Not Direct An Award To Croman. . . . . . . . . . . . . . . . 60

  B.  Croman's Failure Upon The Merits Is Dispositive. . . . . . . . . . . . . . . 60

  C.  Croman Has Not Been Irreparably Harmed.. . . . . . . . . . . . . . . . . . . . 60

  D.  The Balance Of Harms Does Not Favor Croman. . . . . . . . . . . . . . . . 62

  E.  An Injunctive Is Not In The Public's Interest. . . . . . . . . . . . . . . . . . 63

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

# TABLE OF AUTHORITIES

## CASES

*Accord Technical Innovation, Inc. v. United States*,
    93 Fed. Cl. 276 (2010)...................................................................................... 24

*Academy Facilities Mgmt. v. United States*,
    87 Fed. Cl. 441 (2009)................................................................................... 59, 60

*Alder Terrace, Inc. v. United States*,
    161 F.3d 1372 (Fed. Cir. 1998) ....................................................................... 19

*Allied Materials & Equip. Co., Inc. v. United States*,
    81 Fed. Cl. 448 (2008)...................................................................................... 60

*Allied Facilities Mgmt. v. United States*,
    87 Fed. Cl. (2008)............................................................................................ 60

*Allied Technology Group, Inc. v. United States*,
    94 Fed. Cl. 16 (2010)....................................................................................... 25

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001) ....................................................................... 59

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
    480 U.S. 531, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987).................................. 59

*AR Sales Co., Inc. v. United States*,
    49 Fed. Cl. 621 (2001)...................................................................................... 62

*Arakaki v. U.S.*,
    62 Fed.Cl. 244 (2004)....................................................................................... 32

*Argencord Mach. & Equip., Inc. v. United States*,
    68 Fed. Cl. 167 n.14 (2005).............................................................................. 29

*Avtel Services, Inc. v. United States*,
    70 Fed. Cl. 173 (2006)...................................................................................... 20

*Banknote Corp. of America v. United States*,
    56 Fed. Cl. 377 (2003)........................................................................... 36, 41, 43

*Bannum, Inc. v. United States*,
    404 F.3d 1346 (Fed. Cir. 2005) .................................................................. 21, 22

*Blue & Gold Fleet, L.P. v. United States*,
    492 F.3d 1308 (Fed. Cir. 2007) ............................................... 29, 31, 32, 34

*Bromley Contracting Co., Inc. v. United States,*
15 Cl. Ct. 100 (1988) ......................................................................................... 20

*Brooks Range Contract Services, Inc. v. United States,*
101 Fed. Cl. 699 (2011) ............................................................................... 24, 26

*Campbell v. United States,*
2 Cl. Ct. 247 (1983) ........................................................................................... 20

*Carahsoft Tech. Corp. v. United States,*
86 Fed. Cl. 325 (2009) ....................................................................................... 60

*Chapman Law Firm Co. v. Greenleaf Const. Co.,*
490 F.3d 934 (Fed. Cir. 2007) ........................................................................... 22

*Cincom Systems, Inc. v. United States,*
37 Fed. Cl. 663 (1997) ....................................................................................... 20

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971) ...................................... 20

*Cyprus Amax Coal Co. v. United States,*
205 F.3d 1369 (Fed. Cir. 2000) ................................................................... 19, 22

*DaimlerChrysler Corp. v. United States,*
442 F.3d 1313 (Fed. Cir. 2006) ......................................................................... 24

*DCS Corp, v. United States,*
96 Fed. Cl. 167 (2010) ................................................................................. 32, 34

*Defense Technology, Inc. v. United States,*
99 Fed. Cl. 103 (2011) ....................................................................................... 55

*Distributed Solutions, Inc. v. United States,*
539 F.3d 1340 (Fed. Cir. 2008) ......................................................................... 25

*Dow Elec., Inc. v. United States,*
98 Fed. Cl. 688 (2011) ................................................................................. 24, 25

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) ................................ 61

*Eskridge Research Corp. v. United States,*
10-50C, 2010 WL 1837799 (Fed. Cl. May 3, 2010) .......................................... 57

*FFTF Restoration Co., LLC v. United States,*
86 Fed. Cl. 226 (2009) ....................................................................................... 55

*Florida Power & Light v. Lorion*,
   470 U.S. 729 (1985) ................................................................................. 22

*FMC Corp. v. United States*,
   3 F.3d 424 (Fed. Cir. 1993) ...................................................................... 60

*Galen Med. Assoc., Inc. v. United States*,
   56 Fed. Cl. 104 (2003) .............................................................................. 26

*Galen Med. Associates, Inc. v. United States*,
   369 F.3d 1324 (Fed. Cir. 2004) ................................................................ 26

*Great Lakes Dredge & Dock Company v. United States*,
   60 Fed. Cl. 350 (2004) .............................................................................. 20

*Grumman Data Sys. Corp. v. Dalton*,
   88 F.3d 990 (Fed. Cir. 1996) .................................................................... 20

*GTA Containers, Inc. v. United States*,
   11-606C, 2012 WL 562432 (Fed. Cl. Feb. 22, 2012)................................. 24

*Hawpe Constr., Inc. v. United States*,
   46 Fed. Cl. 571 (2000) .............................................................................. 62

*Holley v. United States*,
   124 F.3d 1462 (Fed. Cir. 1997) ................................................................ 19

*Holloway & Company, PLLC v. United States*,
   87 Fed. Cl. 381 (2009) .............................................................................. 21

*HomeSource Real Estate Asset Servs., Inc. v. United States*,
   (HomeSource), 94 Fed. Cl. 466 (2010) ..................................................... 37

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
   238 F.3d 1324 (Fed. Cir. 2001) .................................................... 20, 21, 37

*Indium Corp. of Am. v. Semi-Alloys, Inc.*,
   781 F.2d 879 (Fed. Cir. 1985) .................................................................. 19

*Info. Tech. & Applications Corp. v. United States*,
   316 F.3d 1312 (Fed. Cir. 2003) ................................................................ 37

*LABAT-Anderson, Inc. v. United States*,
   65 Fed. Cl. 570 (2005)............................................................................... 63

*Labatt Food Serv., Inc. v. United States*,
   577 F.3d 1375 (Fed. Cir. 2009) ................................................................ 25

*Lions Raisins, Inc. v. United States*,
   51 Fed. Cl. 238 (2001)............................................................................... 21

*M.W. Kellogg Co./Siciliana Appalti Costruzioni S.p.A. v. United States,*
   10 Cl. Ct. 17 (1986) ................................................................................ 21

*Madison Services, Inc. v. United States,*
   92 Fed. Cl. 120 (2010) ................................................................ 54, 55, 58

*Magellan Corp. v. United States,*
   27 Fed. Cl. 446 (1993) ........................................................................... 61

*MED Trends, Inc. v. United States,*
   11-420, 2011 WL 4037418 (Fed. Cl. Sept. 13, 2011) ............................ 39

*Minor Metals, Inc. v. United States,*
   38 Fed. Cl. 379 (1997) ........................................................................... 60

*Monsanto Co. v. Geertson Seed Farms,*
   130 S. Ct. 2743, 177 L. Ed. 2d 461 (2010) ........................................... 61

*Myers Investigative And Sec. Services, Inc. v. United States,*
   275 F.3d 1366 (Fed. Cir. 2002) ............................................................. 25

*NEC Corp. v. United States,*
   151 F.3d 1361 (Fed. Cir. 1998) ............................................................. 19

*NEQ, LLC v. United States,*
   88 Fed. Cl. 38 (2009) ....................................................................... 35, 39

*OAO Corp. v. United States,*
   49 Fed. Cl. 478 (2001) ........................................................................... 61

*Parcel 49C Ltd. P'ship v. United States,*
   31 F.3d 1147 (Fed. Cir. 1994) ......................................................... 60, 62

*PGBA, LLC v. United States,*
   389 F.3d 1219 (Fed. Cir. 2004) ............................................................. 59

*Powell v. McCormack,*
   395 U.S. 486, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969) ......................... 19

*Redland Genstar, Inc. v. United States,*
   39 Fed. Cl. 220 (1997) ........................................................................... 20

*Rex Serv. Corp. v. United States,*
   448 F.3d 1305 (Fed. Cir. 2006) ............................................................. 25

*Rice Services, Ltd. v. United States,*
   405 F.3d 1017 (Fed. Cir. 2005) ............................................................. 19

*Savantage Fin. Services, Inc. v. United States,*
   595 F.3d 1282 (Fed. Cir. 2010) ............................................................. 63

*Scanwell Laboratories, Inc. v. Shaffer,*
    424 F.2d 859 (D.C. Cir. 1970) ................................................................. 62

*Serco v. United States,*
    81 Fed. Cl. 463 (2008) ................................................................. passim

*Sierra Military Health Serv. v. United States,*
    58 Fed. Cl. 573 (2003) ................................................................. 60

*Systems Application & Tech., Inc. v. United States,*
    100 Fed. Cl. 687 (2011) ................................................................. 20

*Tech Systems Inc. v. United States,*
    50 Fed. Cl. 216 (2001) ................................................................. 22

*Technical Innovation, Inc. v. United States,*
    93 Fed. Cl. 276 (2010) ................................................................. 19

*The Centech Group, Inc. v. United States,*
    78 Fed. Cl. 496 (2007) ................................................................. 23

*Thomas v. United States,*
    34 Fed. Cl. 619 (1995) ................................................................. 19

*Weiss v. Kempthorne,*
    1:08-CV-1031, 2009 WL 2095997 (W.D. Mich. July 13, 2009) ................................................................. 57

*Wit Assocs., Inc. v. United States,*
    62 Fed. Cl. 657 (2004) ................................................................. 63

*WorldTravelService v. United States,*
    49 Fed. Cl. 431 (2001) ................................................................. 35

*Zenith Radio Corp. v. United States,*
    710 F.2d 806 (Fed. Cir. 1983) ................................................................. 60

## STATUES

28 U.S.C. § 1491(b)(1), (4) ................................................................. 19

28 U.S.C. § 1491(b)(3) ................................................................. 29

31 U.S.C. § 3551(2)(A) ................................................................. 25

5 U.S.C. § 706(2)(A) ................................................................. 21, 35

5 U.S.C. §§ 702, 706(2)(A) ................................................................. 19, 35

**REGULATIONS**

14 C.F.R. § 137.51 ................................................................................................................ 9

4 C.F.R. § 21.2(a)(1) ........................................................................................................... 29

48 C.F.R. § 52.212-4(l) ....................................................................................................... 62

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **CROMAN CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **THE UNITED STATES,** ) | |
| ) | **No. 12-75C** |
| **Defendant,** ) | **(Judge George Miller)** |
| ) | |
| **and** ) | |
| ) | |
| **MOUNTAIN WEST HELICOPTERS, LLC,** ) | |
| **COLUMBIA HELICOPTERS, INC.,** ) | |
| **SILLER HELICOPTERS, INC.,** ) | |
| ) | |
| **Defendant-Intervenors.** ) | |

### DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD, AND CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Pursuant to Rules 12(b)(1) and 52.1 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss the Complaint for Preliminary and Permanent Injunctive Relief (complaint) filed by plaintiff, Croman Corporation (Croman), for lack of subject matter jurisdiction, or, in the alternative, enter judgment upon the administrative record in favor of the Government and deny the injunctive relief that Croman seeks. In support of our motion, we rely upon the complaint, Croman's Motion for Judgment upon the Administrative Record (motion), Croman's Supplemental Brief to Plaintiff's Motion for Judgment on the Administrative Record in the Wake of the Agency's Resolicitation of Cancelled Line Items 21, 22, 27 and 34 (supplemental brief), the administrative record (AR) filed in this matter, and the following brief.

## STATEMENT OF THE CASE

Because the United States Department of Agriculture, Forest Service, National Interagency Fire Center (Forest Service), took corrective action, conducting a re-evaluation and making new award decisions, Croman's protest of the initial procurement is now moot. Moreover, Croman has failed to establish that it has standing to challenge the Forest Service's actions.  Croman also waived its opportunity to challenge the Forest Service's evaluation scheme by not protesting the solicitation pre-award.  Further, Croman abandoned any argument that the cancellation of a portion of the solicitation was pretextual or improper when it failed to argue as much in either its motion or supplemental brief.  Furthermore, Croman's overly simplistic description of this procurement is both incorrect and misleading, and ignores documents in the administrative record.  The administrative record clearly demonstrates that the Forest Service's partial cancellation of the solicitation, its re-evaluation of Croman's bid, and its subsequent award decisions were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Finally, Croman is not entitled to any of the injunctive relief it requests.

## STATEMENT OF THE ISSUES

1) Whether the Court should dismiss Croman's bid protest for lack of subject matter jurisdiction because the Forest Service's corrective action made moot Croman's protest, which concerns the initial procurement.

2) Whether the Court should dismiss Croman's bid protest for lack of subject matter jurisdiction because Croman has failed to establish that it has standing to challenge the Forest Service's actions.

3) Whether the Court should dismiss Croman's bid protest because Croman waived its right to object to the terms of the Forest Service's solicitation by not protesting the solicitation pre-award.

4) Whether Croman has abandoned the argument that the Forest Service pretextually or improperly cancelled a portion of the solicitation.

5) Whether the Government's cross-motion should be granted and Croman's motion denied because the administrative record demonstrates that the Forest Service's

2

re-evaluation of Croman's bid under the corrective action, its subsequent award decisions, and its partial cancellation of the solicitation, were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

6)      Whether Croman is entitled to the permanent injunctive relief it requests.

## STATEMENT OF THE FACTS

### I.      Procedural History

This protest relates to the Forest Service's procurement of helicopters for its exclusive use in fighting forest fires, pursuant to Solicitation No. AG-024B-S-11-9001 (2011 RFP). AR 38; AR 15958. On December 16, 2011, the Forest Service made award determinations for 30 out of 34 line items solicited in the 2011 RFP, having cancelled four of the line items. AR 13597-14371. Between December 29, 2011, and January 9, 2012, three unsuccessful offerors, including Croman, AR 14518, Arctic Air Service (Arctic), AR 15852, and Swanson Group Aviation (Swanson), AR 14499, filed bid protests with the Government Accountability Office (GAO), challenging awards of contract line item numbers (CLINs) 16 – 34, including the Forest Service's decision not to award CLINs 21, 22, 27, or 34. AR 14537-40. GAO consolidated the three protests on January 11, 2012. AR 14598.

On January 18, 2012, the Forest Service moved to dismiss portions of each GAO protest, including Croman's protest. AR 15881. On January 27, 2012, following briefing upon the Forest Service's motion, GAO dismissed Croman's protest in its entirety. AR 15942-44. GAO declined to dismiss any of the protest grounds asserted by Arctic or Swanson. AR 14600.

On January 30, 2012, the Forest Service notified GAO, Swanson, and Arctic that it intended to take corrective action in response to the Arctic and Swanson protests. AR 15947.

Specifically, the Forest Service proposed a re-evaluation of three out of the five technical evaluation factors in the 2011 RFP, followed by new award decisions.[1]  *Id.*

On January 31, 2012, one day after the Forest Service issued its notice of proposed corrective action, Croman filed in this Court an advance notice of bid protest filing stating its intent to challenge the December 16, 2011, awards of CLINs 16 – 33 and the Forest Service's cancellation of CLINs 21, 22, 27, and 34.  AR 15955.  Counsel for the Forest Service then notified Croman of the Forest Service's proposed corrective action and provided Croman a copy of the January 30, 2012 corrective action notice.  AR 14812-13.  On February 1, 2012, counsel for the Government suggested to Croman's counsel that Croman refrain from filing its complaint until after the corrective action had been completed, because the corrective action would render moot any earlier-filed complaint.  On February 2, 2012, in response to the Forest Service's intent to take corrective action, GAO dismissed as moot the Arctic and Swanson protests.  AR 15950.

On February 3, 2012, disregarding the notice of corrective action and Government counsel's suggestion, Croman filed its complaint in this Court.  AR 15958.  Croman's complaint seeks to enjoin the Forest Service from proceeding with:  (1) performance of CLINs 16 – 34 until after the proposals for those CLINs were "properly evaluated with respect to Aircraft Performance and appropriate awards resulting therefrom [were] made," AR 15968 (¶ 59); (2) performance of CLINs 17, 23, 28, 29, 30, 31 and 33 "until after [the Forest Service] makes a determination of the significance of any differences in the technical scores of competing offerors on those line items in the manner specified in the [2011] RFP and appropriate awards resulting therefrom are made," AR 15969 (¶ 66); (3) performance of CLINs 16 – 34 to an awardee proposing a Heavy lift helicopter, AR 15972 (¶ 81); (4) the cancellation of CLINs 21, 22, 27 and

---

[1] Our references to the Forest Service's "corrective action" encompass the re-evaluation process as well as the award decisions that followed the corrective action process.

34, "be directed to consider all proposals for those [CLINs] and ordered to continue its selection decision for those [CLINs] in accordance with applicable regulations and the [2011] RFP," AR 15974 (¶ 98); and (5) performance of CLINs 16 – 34 (excluding cancelled CLINs 21, 22, 27 and 34) "until after it solicits and receives new best and final offers on those items, evaluate those proposals and make appropriate awards thereafter." AR 15975 (¶ 105).

Between February 2, 2012, and March 15, 2012, the Forest Service implemented the corrective action it had proposed to GAO. The corrective action included re-evaluating all proposals submitted for CLINs 16 – 34 for three of the technical evaluation factors, and making a new set of awards for those CLINs, but still not awarding CLINs 21, 22, 27, or 34 to any offeror. AR 15992-16004. The corrective action, thus, resulted in award decisions for CLINs 16 – 34 that entirely replaced the initial award decisions for those CLINs. Croman did not receive any awards as a result of the corrective action. AR 16226.

On April 27, 2012, Croman filed its motion and narrowed the scope of relief originally sought in its complaint. Croman limited the challenged CLINs to 17, 23, 28-30, 32, and 33 and did not seek judgment upon the administrative record with respect to any of the four cancelled CLINs (21, 22, 27 and 34) or the awards of CLINs 18, 19, 20, 24-26, or 31.

On May 14, 2012, the Forest Service issued Solicitation No. AG-024B-S-12-9025 (2012 RFP), soliciting one to four helicopters for large fire support, to be located in Boise, ID.[2] As of the date of this filing, the Forest Service has yet to make an award under the 2012 RFP.

On May 18, 2012, Croman filed a Motion to Supplement the Administrative Record (motion to supplement) with the 2012 RFP.[3] Dkt. 37. On the same day, Croman filed its

---

[2] The Government's reference to the 2012 RFP does not imply that the 2012 RFP is related to the 2011 procurement or that the administrative record should be supplemented to include the 2012 RFP. *See* Defendant's Opposition to Plaintiff's Motion to Supplement the Administrative Record (Dkt. 40, filed June 4, 2012). We reference the 2012 RFP to fully address Croman's arguments.

supplemental brief, Dkt. 38, seeking to reinstate the four cancelled CLINs and enjoin the Forest

Service from procuring helicopter services under any solicitation other than the 2011 RFP.

We address Croman's motion and its supplemental brief below.

**II.        The 2011 RFP And The Corrective Action**

When issued on January 14, 2011, the 2011 RFP solicited proposals for 34 CLINs, each

seeking a helicopter for a specific host base that met the performance specifications for operation

at that host base.  AR 46.  The 2011 RFP presented two sets of performance specifications, one

applicable to CLINs 1 – 15, and the other applicable to CLINs 16 – 34.  AR 117.  CLINs 1 – 15

sought helicopters with, at a minimum, heavy-lift capabilities (Type I helicopters).  *Id.*, *see also*

AR 31.  CLINs 16 – 34 sought helicopters with, at a minimum, medium-lift capabilities (Type II

helicopters).  AR 117.  In addition to this distinction between performance specifications for

CLINs 1 – 15 and CLINs 16 – 34, the 2011 RFP further detailed certain specific equipment

requirements for each individual CLIN (*e.g.,* whether the helicopter needed to be equipped with

a bucket or tank).  AR 47-114.  The 2011 RFP also clearly informed offerors that "[t]he

Government reserves the right to award any combination of items and/or number of items."  AR

46.  Thus, it was possible that the Forest Service would award no CLINs at all.  Proposals

initially were due February 28, 2011, AR 31, but the deadline was extended to March 4, 2011.

AR 45.  No offeror protested the 2011 RFP prior to the March 4, 2011 extended deadline.

On October 4, 2011, the Technical Evaluation Team (TET) briefed Forest Service

management regarding the anticipated cost of funding the solicited 34 CLINs based upon the

price proposals received in response to the 2011 RFP.  AR 13393.  As a result of the briefing,

Forest Service management, among other things, recommended that only 30 of the 34 CLINs be

awarded.  AR 13394.  The TET followed this recommendation and eliminated CLINs 21, 22, 27,

---

[3] On June 4, 2012, we opposed the motion to supplement.  Dkt. 40.

and 34 from the evaluation process.  AR 13408.  The TET provided the following rationale for

this decision in a TET Consensus Report dated December 7, 2011:

> Due to budget constraints and the desire by the National Office to
> evaluate Water Scooper aircraft in FY 12, a diminution to the total
> number of line items from Thirty-four (34) to Thirty (30) line
> items was incorporated into the TET's consensus recommendation.
> . . .  [A] minimum of thirty (30) helicopters with a cap of thirty
> four (34) was determined to be the most efficient and cost effective
> to contract as Exclusive Use. . . .   Line items 21, 22, 27 & 34 were
> identified for reduction due to staffing issues and the aircraft
> locations.

*Id.*  CLINs 21, 22, 27, and 34, solicited Type I or Type II helicopters for host bases at Orland,

CA; Porterville, CA; Oakridge, OR; and Alturas, CA, respectively.  AR 87, 89, 99, and 113.

    In addition to canceling four CLINs, two specific helicopters, both "S64-F" models, were

eliminated from the competition.  AR 13408.  As the TET Chair explained:

> The average cost of fifteen (15) S64/54's recommend [sic] for
> award is $21,082 per day.  As an example, the highest S64/64 daily
> availability rate for all other proposed aircraft was $23,400, while
> the S64-F Models were ███████ up to ███████ with prices
> increasing exponentially over the option periods.

*Id.*

    Following the cancellation of the four CLINs, the rejection of the two aircraft by the

Forest Service, and the voluntary withdrawal of other aircraft by some offerors, the Forest

Service initially considered 47 aircraft for the award of 30 contracts.  AR 13409.  For the

corrective action, the Forest Service reconsidered 32 aircraft for the award of 15 contracts (*i.e.,*

CLINs 16 – 34, less the four cancelled CLINs).  AR 16009.

A.     **2011 RFP's Aircraft Performance Specifications**

To be eligible for a heavy-lift line item (CLINs 1 – 15), a helicopter had to have the "capability of [h]overing out of ground effect (HOGE)[4] [a]t 8,000 feet pressure and 25 ºC with jettisonable Payload of 5000 pounds."  AR 117.  To be eligible for a medium-lift line item (CLINs 16 – 34), a helicopter had to have a HOGE capability of "[a]t 7,000 feet pressure altitude and 20 ºC with jettisonable Payload of 3300 pounds."  *Id.*

The 2011 RFP specifically informed offerors that the "performance requirements are a *minimum*."  AR 46 (emphasis added).  Thus, helicopters satisfying the more stringent payload requirements for CLINs 1 – 15 also satisfied the less stringent payload requirements for CLINs 16 – 34.  As a result, some offerors proposed their Type I helicopters for all 34 CLINs in the procurement.  AR 16046-61.  Nothing in the 2011 RFP prohibited or discouraged them from doing so.  By contrast, Type II helicopters were effectively precluded from CLINs 1 – 15 because they could not satisfy the applicable performance specifications.  Surprisingly, however, some offerors – including Croman – proposed Type II helicopters for all 34 CLINs despite their clear inability to satisfy the performance specifications for CLINs 1 – 15.  AR 4150-288.

Payload, for purposes of this procurement, refers to the weight a helicopter can carry not including the weight attributable to fuel, pilots, and the aircraft itself.  AR 117.  Thus, the Forest Service sought helicopters that could carry *at least* 3300 pounds of water (or cargo or other retardant) as opposed to simply 3300 pounds, period.  AR 117.  For that reason, the Forest Service calculated allowable (or "computed") payload by subtracting the weight of those certain

---

[4] The 2011 RFP defines "hover-out-of-ground effect" as the "maximum pressure altitude and temperature at which a helicopter can hover (at maximum gross weight) without the effects of ground cushion per the Flight Manual/Supplements and the STC performance charts."  AR 175.  Performance specifications based upon HOGE capabilities contrast with "hover-in-ground-effect" (HIGE) capabilities, which relate to performance "using the effects of ground cushion."  *Id.*

items from the total weight at which the aircraft could operate.  AR 214.  Those certain items are

the weight of the helicopter itself (equipped with either a tank or bucket), the weight of the pilot

(set in the 2011 RFP for all aircraft at 200 pounds), and the fuel weight (set in the 2011 RFP for

all aircraft at the quantity of fuel needed to fly that aircraft for 90 minutes).  AR 117, 214.  In the

performance specifications, the 2011 RFP explained this payload calculation (which was based

entirely upon objective numbers the *offerors* provided to the Forest Service):

> [A]s determined by Exhibit 13, Standard Interagency Load
> Calculation form, using a standard pilot weight of 200 pounds and
> fuel for one hour and 30 minutes (01+30) as determined by Exhibit
> 12, Hourly Flight Rates, Fuel Consumption, and Weight Reduction
> Chart.  For Computed Gross Weight use Exhibit 22 for load
> calculation.

AR 117.

In addition to requiring certain performance capabilities, depending upon the CLIN, the

2011 RFP specified whether the aircraft proposed must be equipped with a fixed tank to carry

water or retardant, or whether offerors could alternatively propose using a bucket.  AR 47-114.

Whether the bucket option was allowed was a matter of geography, because certain host bases,

under applicable Federal Aviation Regulations, are considered to be congested areas in which

operating a helicopter with a bucket attached is considered too dangerous.  *See* 14 CFR § 137.51.

For the majority of heavy-lift line items (CLINs 1 – 15), only fixed-tank helicopters were eligible

for award.[5]  Conversely, only one of the medium-lift line items (CLINs 16 – 34), namely CLIN

23, required helicopters with fixed tanks.  AR 91.  CLIN 23 did not have a bucket option because

it was for the Fresno, CA area, which is considered a congested area.  *Id.*; *compare* AR 91 (CLIN

23, Fresno, CA, tank only) with AR 93 (CLIN 24, Helena, MT, bucket or tank permitted).  As a

result of this equipment limitation, CLIN 23 attracted fewer offerors than the other CLINs 16 –

---

[5] The exceptions were CLINs 6, 8, and 15.  AR 57, 61, and 75.

34, who, in turn, proposed, on average, more expensive helicopters.  AR 16050-61; *see infra* §

III(C)(3)(b).

**B.**     **Technical Evaluation Process**[6]

The 2011 RFP informed offerors that this was a best-value procurement under which

awards would be made "to those offerors whose proposals are technically acceptable and whose

technical/price relationships are the most advantageous to the Government."  AR 282.  The 2011

RFP also made clear that the five technical evaluation factors "when combined, [were]

SIGNIFICANTLY MORE IMPORTANT THAN price in the award decision."  *Id.* (emphasis in

original).  The five technical evaluation factors, listed in descending order of importance, were

delineated as follows:  (1) Mandatory Documentation; (2) Aircraft Performance; (3) Safety/Risk

Management ("Safety"); (4) Past Performance; and (5) Organizational Experience. AR 280-82.

For all factors other than Mandatory Documentation, the TET assigned numerical values

to adjectival ratings, with "1" being best (Exceptional) and "5" being worst (Unacceptable).  AR

16041.  To account for the descending order of importance during its technical evaluation, the

Forest Service assigned percentage weights to each factor that received a rating (*i.e.*, every

technical factor except Mandatory Documentation).  *Id.*  Those weights were as follows:

Aircraft Performance (█ percent); Safety (█ percent); Past Performance (█ percent);

Organizational Experience (█percent).  *Id.*  The sub-factors under each technical factor were

---

[6] In its initial evaluation of technical proposals (prior to the filing of protests at GAO) the
TET was split into four groups, each with expertise in different areas:  maintenance, operations,
pilots, and safety.  Every group evaluated every offeror's proposal, and the TET then developed
consensus ratings that took into account each group's evaluations.  AR Tab 28.  However, the
four-group approach was *not* used in the corrective action.  AR 16012 ("The TET reconvened a
group on February 2, 2012 to reevaluate the technical scores that resulted from four weighted
technical factors.").  Despite this shift in the TET's approach, Croman devotes an entire section
of its motion to describing, and then challenging as imprecise, "the evaluation of Croman's
technical proposal by the teams," which evaluation is irrelevant because of the corrective action.
Motion 28.  Accordingly, the Court should disregard this portion of Croman's motion based
upon irrelevancy.

described in the 2011 RFP as being equal in importance.  AR 280.  The following 2011 RFP

language explained how the Forest Service would evaluate technical proposals:

> Mandatory Documentation is a pass/fail factor.  The Government
> will first determine whether a proposal has met the Mandatory
> Documentation requirements.  If it has not, it will be eliminated
> from further consideration.  If the Mandatory Documentation
> requirements are satisfied, the Government will next determine
> whether Aircraft Performance is acceptable (pass) or unacceptable
> (fail).  Proposals that pass will next receive qualitative evaluations
> for Aircraft Performance and for each of the remaining three
> technical evaluation factors.

*Id.*

The Aircraft Performance technical evaluation factor did not have any sub-factors and

was explained in the 2011 RFP as being simply the "Helicopter Load Calculation."  AR 281.

For this factor, offerors were instructed to "[s]ubmit an Interagency Helicopter Load calculation

for each aircraft, as per Exhibit 13 (see clause B-3 Aircraft Performance Specifications)."  AR

277.  As explained above, and as shown in Exhibit 13, the Interagency Helicopter Load

Calculation (*i.e.*, the *sole* basis for determining aircraft performance and evaluating the Aircraft

Performance factor) told the Forest Service what the payload was for a particular aircraft,

including the extent to which that payload exceeded the 2011 RFP's performance specifications.

For example, if a helicopter could carry a payload of 3400 pounds, as calculated using Exhibit

13, then it exceeded by 100 pounds the performance requirements for CLINs 16 – 34, but was

not eligible for CLINs 1 – 15.  In this example, the Forest Service would account for that 100-

pound surplus in its qualitative Aircraft Performance evaluation.  Because the 2011 RFP asked

offerors to submit nothing other than Exhibit 13 for the Aircraft Performance factor, offerors

knew that the Forest Service would evaluate this factor based entirely upon an objective number

(*i.e.,* computed payload) and the extent to which that number exceeded the payload capacity of

the performance specifications.

How the TET assigned technical ratings for Aircraft Performance is described in Attachment 1 to the SSA Recommendation.  AR 16013.  Unlike all the other technical evaluation factors (which related to the vendor), the Aircraft Performance factor took into account the specific aircraft and the specific CLIN for which it was offered.  *Id.*  Therefore, one aircraft could be assigned a range of Aircraft Performance numerical scores that varied based upon the CLIN for which it was being evaluated.  In computing the numerical rating assigned to each aircraft, the Forest Service factored in the aircraft's computed payload, the extent to which that aircraft exceeded the CLIN's minimum payload, and the extent to which other aircraft offered for that same CLIN exceeded the minimum payload.  *Id.*  The higher an aircraft's payload, the better its rating would be for Aircraft Performance.  *Id.*

The second most important technical factor, Safety/Risk Management, like Aircraft Performance, also relied upon objective criteria.  For this factor, offerors were instructed to submit for each proposed aircraft the average annual flight hours, the number of accidents and incidents reported to the National Transportation Safety Board (NTSB) in the past five years, and other required documentation such as insurance carrier verification letters.  AR 300.  The TET lead safety officer used these submissions to calculate an accident rate, which comprised 50 percent of each offeror's Safety/Risk Management rating.  AR 16014.  The other 50 percent of the rating was based upon the second sub-factor, Safety Management Systems, under which the TET awarded one point for each of four required components listed in the 2011 RFP that was included in an offeror's proposal:  Policy, Safety Assurance, Safety Promotion, and Risk Management.  AR 16015.  The numerical ratings for each sub-factor were combined to establish a Safety/Risk Management numerical rating between 1 (Exceptional) and 5 (Unacceptable).  AR 16015-16.

Past Performance and Organizational Experience, the two least important technical factors, were evaluated in accordance with the sub-factors listed for each in the 2011 RFP.  AR 278-79.  For these two factors, no calculations were necessary; TET members assigned each offeror an adjectival rating based upon forms and other information submitted by offerors, thus providing evaluations for the last two technical factors that were more subjective, contrasting with the entirely objective Aircraft Performance and Safety/Risk Management evaluations.  Still, contrary to what Croman suggests, Motion 27, TET members were guided in their assignment of adjectival ratings by the Source Selection Plan, which provided the parameters for each rating.  AR 24-25.  Also contrary to what Croman suggests, Motion 28, narrative explanations for all of the TET's ratings for Safety/Risk Management, Past Performance, and Organizational Experience are set forth in the TET Re-Evaluation Report.  AR 16018-34.

Finally, the adjectival ratings were converted to numerical ratings.  AR 15997.  This conversion allowed for the application to each technical factor of the Forest Service's pre-determined percentage weights, AR 16041, chosen to reflect the relative importance of that factor to the Forest Service.  In addition, by converting adjectival ratings to numerical ratings, the Forest Service was able to utilize a computer program (the optimization model described below) to assist it in determining the combination of awards that provided the best value.

### C.   **Price Evaluation**

The Forest Service conducted a two-pronged price evaluation by considering both the total cost of the contract and the price per pound (PPP) for each aircraft (*i.e.*, how much, for each aircraft offered, it would cost to transport a pound of product).  AR 275.  The 2011 RFP clearly informed offerors of this two-pronged approach, stating that the Forest Service would evaluate price "to determine overall price reasonableness and by using the formula specified" in section E-2 of the 2011 RFP to determine PPP.  *Id.*  The Forest Service put ███ emphasis in its price

evaluation on total contract cost, assigning that aspect a weight of ███ percent, whereas PPP was assigned a weight of ███ percent of the entire evaluation. AR 15995. That "best value formula" was used "to make tradeoff determinations to measure aircraft efficiencies of make and models of helicopters being offered." AR 275. Offerors were fully aware that their prices would be evaluated based upon both total contract cost and the best value formula.

> **D.** **Optimization Model**

In making award recommendations to the Contracting Officer, the TET considered the results of a computerized optimization model (OM). AR 16046-63 and 16210-12. Under this and prior similar procurements, multiple offerors bid multiple aircraft for some or even all of the CLINs, the result being that each CLIN ends up being bid upon by a different pool of offerors, each with their aircraft proposed for that CLIN as well as other CLINs. But once an aircraft is determined to be the best value for a certain CLIN, that aircraft must be pulled from the pool and everything re-evaluated. And once all of an offeror's finite number of aircraft are assigned to a CLIN, that offeror's aircraft must be pulled from the pool and everything re-evaluated again. In other words, because the Forest Service awards all exclusive-use large fire support contracts at the same time as part of the same procurement, it must determine not only which aircraft represents the best value for any given CLIN (as compared with the other aircraft proposed for that CLIN), but also, if that aircraft represents the best value for *multiple* CLINs, to which CLIN to award that aircraft. This process continues until every CLIN is assigned an aircraft at the best value to the Government. The Forest Service developed the OM in order to more efficiently review and evaluate what previously had required the TET to manually review more than 250 spreadsheets (more than 1000 pages in all) and required an enormous amount of time and resources.

In the case of the Forest Service's corrective action, those determinations had to be made with respect to 15 CLINs for which 32 helicopters were proposed by 15 offerors.  AR 16010-11.  The OM assisted by providing a mathematically optimal solution that recommended awards for all 15 CLINs based upon the importance the Forest Service assigned to two factors:  the technical evaluation (*i.e.*, the composite score of 1-5); and price, as defined in the 2011 RFP.  AR 16040.  As described above, price includes two components:  (1) the total contract price (for the base and option years) offered for each aircraft at each line item; and (2) the average PPP (over the life of the contract, including option years) of each offered aircraft.  AR 16042.  To run the OM, the Forest Service entered all relevant bid data for each aircraft into the database, including the following:  (1) the aircraft tail number and whether the aircraft was bid to use a bucket or tank;[7] (2) aircraft weight; (3) equipment weight; (4) the offeror's numerical score resulting from the technical evaluation; (5) fuel and pilot weights; and (6) proposed prices (with which the OM calculated both total contract cost and PPP).  AR 16040-42.

The Forest Service also programmed the OM to incorporate the percentage weights it had assigned to each technical evaluation factor and to price, reflecting all of the evaluation criteria's relative importance.  AR 16041.  The Forest Service programmed the OM with the following importance weights on the two evaluation criteria:  ■ percent on technical evaluation score, and ■ percent on price (■ percent of that was based upon total price, and ■ percent on PPP averaged over four years, to account for the options periods).  AR 16043.  The Forest Service's objective was to determine for each CLIN how it could award a contract to the proposal with the best possible technical qualifications (as represented by the numerical score) while also taking

---

[7] The tail number was entered simply as a way to identify each aircraft.  "Bucket or tank" was relevant to whether that aircraft met the equipment requirements for a particular CLIN, and allowed bid and rate flexibility.  For example, an offeror might decide to propose the same aircraft with a bucket or with a tank, charging more or less depending upon which option the Forest Service chose to award.

price into account.  AR 16040 (stating that the OM provides the best value to the Government by

"minimizing[8] the overall technical rating while also minimizing total cost and [PPP].").  The OM

provided a recommendation that would meet that objective.  *Id.*

### E.    Corrective Action Award Decision

Focusing upon the corrective action as opposed to the initial procurement, the OM results

were then subject to review by the TET members, who both confirmed that the proper numerical

ratings and measurements had been entered and tested the OM results before considering

whether each award suggested by the OM did, in fact, result in the best value to the Government.

The TET Chair explained the process as follows:

> On each of the previous OM summaries we have performed an
> abundance of confirmation checks to ensure the program is
> optimizing the inputs and providing the overall "Best Value" to the
> agency.  This OM for Large Fire Support has been no different in the
> fact we have re-checked the inputs and outputs to ensure the
> program is working as expected and reconfirmed its application as
> being a valid tool.

AR 16034.

Thus, once the TET Chair confirmed the OM's validity, the members did not simply

"rubber-stamp[]" the set of OM award recommendations, as Croman suggests, Motion 25, but

rather considered whether any of the recommendations should be changed.  AR 16034.

Following the re-evaluation, the TET determined that no changes were needed and that "the

recommendations should be awarded, as modeled, without necessitating any human element

changes." *Id.*[9]  The TET conveyed this determination to the Contracting Officer in a TET Re-

---

[8] "Minimizing" is used here because "[l]ower score reflects technical superiority."  AR
16040.

[9] By contrast, in the initial procurement, the TET did substitute the members' judgment
for a few of the OM recommendations.  For example, the TET Chair believed the Forest Service
would be disadvantaged if all four of a particular vendor's helicopters received awards, per the
OM recommendation, eliminating the ability to substitute one aircraft for another "if there were

evaluation Report.  AR 16009.  The Contracting Officer separately reviewed the OM results "to

assure that the recommendations comply with the solicitation requirements."  AR 15992.  He

concurred with the TET award recommendations and submitted them to the Source Selection

Authority (SSA), together with seven attachments that "provide[d] the basis to understand how

the award selections were determined for each line item."  *Id.*[10]

Again, focusing upon the corrective action as opposed to the initial procurement, the SSA

reviewed all of the supporting documentation and, having done so, agreed that the TET's and

Contracting Officer's award recommendations represented the best possible value for the

Government, and signed a Source Selection Certification.  AR 16213.  The SSA approved the

Contracting Officer's recommended awards on March 15, 2012.  AR 16004.  The SSA

recognized in his Source Selection Certification that the intent was for his award decision to

emphasize aircraft performance (*i.e.,* technical superiority, especially payload capacity) over low

price and that this intent was realized in the recommended set of 15 awards.  AR 16213.  With

respect to the tradeoff analysis, the SSA stated, "the importance of technical superiority is shown

in the assignment of a weight of ▮ percent to those factors as compared with ▮ percent

assigned to price factors.  The Optimization Model used those weights to perform tradeoffs

reflecting the greater importance of technical ratings."  *Id.*

On March 16, 2012, the Contracting Officer notified the offerors for CLINs 16 – 34 by

letter of the results of the corrective action.  AR 16214-33 (Tabs 69.01 – 69.05); AR 16234-84

(Tabs 70.01 – 70.11).  Croman was not awarded any CLINs in the corrective action and was

---

unforeseen problems through the contract term."  AR 13409.  Instead, the TET recommended
awarding three CLINs to that vendor.  What would have been the fourth CLIN was instead
awarded to an offeror that otherwise would have received no awards.  Although that offeror was
technically inferior to the other vendor (by .0081), *id.*, its price was lower, so the tradeoff was
justified.  *Id.*

[10] The supporting documents provided to the SSA before making his decision are
included in the administrative record at AR 15992-16212.

notified of such in the Contracting Officer's letter.  AR 16226.  Croman subsequently requested

a debriefing and received one, in writing.  AR 16289-90.

As of June 6, 2012, Croman has not filed a protest challenging the results of the

corrective action with the Contracting Officer, at GAO, or in this Court.  Croman challenges only

the awards made by the Forest Service on December 16, 2011, not the awards made on March

15, 2012.  AR 15958 (Croman's February 3, 2012, complaint, which pre-dates SSA's March 15,

2012, award decisions).  In addition, Croman now indirectly challenges in its supplemental brief

the decision made in May 2012 to award up to four medium-lift CLINs to be based in Boise, ID.

III.   **The 2012 RFP**

On May 14, 2012, the Forest Service issued the 2012 RFP, which solicits one to four

helicopters for large fire support, all to be located at the Boise National Forest host base, in

Boise, ID.  Mot. to Supp. AR, Att. 1, B-2 through 2-9.  To be eligible for award, helicopters

must, at a minimum, meet the performance specifications applicable to medium-lift, or Type II,

helicopters.  *Id.* B-11.  Under the 2012 RFP, proposals were to be submitted to the Forest Service

by May 30, 2012.  *Id.* SF1449.  As of the proposal deadline, no offeror, including Croman, has

filed a pre-award bid protest of the 2012 RFP.  As of the date of this filing, no awards have been

made under the 2012 RFP.

## ARGUMENT

I.   **Applicable Standards Of Review**

A.   **Standard For Motion To Dismiss For Lack Of Subject Matter Jurisdiction**

It is axiomatic that, if this Court does not possess subject matter jurisdiction to entertain

the claims in the complaint, the Court must dismiss the complaint.  RCFC 12(b)(1).  In deciding

a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), a

"[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it

18

must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citations omitted).

In "ruling on a motion to dismiss for lack of jurisdiction, the court is not confined to an examination of the complaint, but may take into account 'evidentiary matters outside the pleadings.'" *Thomas v. United States*, 34 Fed. Cl. 619, 621 (1995) (quoting *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985)). The non-moving party bears the burden of establishing jurisdiction. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998).

The mootness of a case is properly the subject of an RCFC 12(b)(1) motion. *Technical Innovation, Inc. v. United States*, 93 Fed. Cl. 276, 278 (2010). Federal courts are permitted only to entertain matters in which there is an on-going justiciable issue. *See NEC Corp. v. United States,* 151 F.3d 1361, 1369 (Fed. Cir. 1998). Mootness is therefore a question of subject matter jurisdiction. *Id.* ("If a case becomes moot it no longer presents a justiciable controversy over which a federal court may exercise jurisdiction.").

"A case is moot 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Rice Servs., Ltd. v. United States*, 405 F.3d 1017, 1019 n.3 (Fed. Cir. 2005) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). A case will be dismissed as moot if an intervening event during its pendency "renders it impossible for [the] court to grant any effectual relief. . . ." *Cyprus Amax Coal Co. v. United States,* 205 F.3d 1369, 1372 (Fed. Cir. 2000).

### B.     Standard For Procurement Challenges

Judicial review of agency actions in bid protest cases is not a *de novo* proceeding; rather, the scope of the review is limited to the administrative record. The proper standard of review is

whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law based solely upon the administrative record.  28 U.S.C. § 1491(b)(1), (4); 5 U.S.C. § 702, 706(2)(A); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

When reviewing agency action alleged to be arbitrary or capricious or an abuse of discretion, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Systems Application & Tech., Inc. v. United States*, 100 Fed. Cl. 687, 711 (2011) (quoting and citing *Impresa*, 238 F.3d at 1332-33) (quotation marks and citations omitted).  But the scope of the Court's review is very limited. *Cincom Systems, Inc. v. United States*, 37 Fed. Cl. 663, 671 (1997).

The Court should recognize that the decision is entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (citations omitted), and that the Court should not substitute its judgment for that of the agency, "even if reasonable minds could reach differing conclusions."  *Great Lakes Dredge & Dock Company v. United States*, 60 Fed. Cl. 350, 359 (2004); *see also Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220 (1997); *Cincom*, 37 Fed. Cl. at 672.  Thus, the disappointed bidder "bears a heavy burden of showing that the award decision had no rational basis" and the procurement officer is "entitled to exercise discretion upon a broad range of issues confronting [her]."  *Impresa*, 238 F.3d at 1332-33 (quotation marks and citations omitted).  This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities."  *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see also Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983); *cf. Avtel Services, Inc. v. United States*, 70 Fed. Cl. 173, 185 (2006) ("A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence.") (citing *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990,

995-96 (Fed. Cir. 1996)).  An agency decision lacks a rational basis if the contracting officer

"entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise."  *Holloway & Company,*

*PLLC v. United States*, 87 Fed. Cl. 381, 389 (2009).  When a disappointed bidder alleges

contravention of law, they must show "a clear and prejudicial violation of applicable statutes or

regulations." *Impresa*, 238 F.3d at 1333 (quotation marks and citations omitted).

As such, a bid protest proceeds in two steps.  First, "the trial court determines whether the

government acted without rational basis or contrary to law when evaluating the bids and

awarding the contract."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005);

*see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference

must be afforded to an agency's . . . procurement decisions if they have a rational basis and do

not violate applicable law or regulations").  Second, "if the trial court finds that the government's

conduct fails the [Administrative Procedure Act (APA)] review under 5 U.S.C. § 706(2)(A), then

it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."

*Id.*; *see also id.* at 1354 (requiring a showing of "significant prejudice") (citations omitted).  To

establish significant prejudice, the protestor must show that "there was a 'substantial chance' it

would have received the contract award but for the errors . . . ." *Id.*

### C.   <u>Standard For Judgment Upon The Administrative Record</u>

Pursuant to RCFC 52.1, this Court reviews the agency's procurement decisions to

determine whether they are supported by the already-existing administrative record.  The

standards applicable to a motion for judgment upon the administrative record differ from those

applied in the context of a Rule 56 motion for summary judgment.  *Bannum*, 404 F.3d at 1355-

56; *Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238, 246-47 (2001).  Unlike a Rule 56 motion,

"proceeding under RCFC [52.1] merely restricts the evidence to the agency record . . . ." *Bannum*, 404 F.3d at 1356. "Thus, the central inquiry on a motion for summary judgment – whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment – has no bearing on a review of the administrative record . . . ." *Tech Systems, Inc. v. United States*, 50 Fed. Cl. 216, 222 (2001); *accord Bannum*, 404 F.3d at 1356 (holding that RCFC [52.1] requires a different standard of review without the burden-shifting and presumptions required pursuant to RCFC 56). The inquiry in a record review case, such as a bid protest, instead is whether, given all the disputed and undisputed facts, the plaintiff has met its burden of proof that the contracting officer's decision was arbitrary, capricious, or contrary to law. *Tech Systems*, 50 Fed. Cl. at 222. In reviewing the agency's action under this narrow, deferential standard, "the focal point for judicial review should be the administrative record already in existence, not some record made initially by the reviewing court." *Florida Power & Light v. Lorion*, 470 U.S. 729, 743-44 (1985).

## II. Croman's Complaint Should Be Dismissed Pursuant To RCFC 12(b)(1) For Lack Of Subject Matter Jurisdiction

### A. This Court Lacks Jurisdiction Because Croman's Bid Protest Is Moot

The Court should dismiss Croman's bid protest for lack of subject matter jurisdiction because the Forest Service's corrective action made Croman's protest of the initial procurement moot. A case should be dismissed as moot if an intervening event renders it impossible for the Court to grant relief. *Cyprus Amax Coal Co.*, 205 F.3d at 1372; *see also Chapman Law Firm Co. v. United States*, 490 F.3d 934, 940 (Fed. Cir. 2007) ("When, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed.").

22

In the present case, the chronology of events is clear.  The Forest Service made its initial procurement awards on December 16, 2011.  AR 13597-14371.  Following certain bidder protests to the GAO, the Forest Service decided to take corrective action, informing the GAO on January 30, 2012.  AR 15947.  One day later, Croman filed its advance notice of bid protest filing, stating among other things that it intended to challenge certain December 16, 2011 awards.  AR 15955.  The Forest Service provided its notice of corrective action to Croman shortly thereafter.  AR 14812-13.  And, on February 1, 2012, counsel for the Government suggested to counsel for Croman that it not file its complaint until after the corrective action was completed.  Croman disregarded this information and filed its complaint on February 3, 2012.  AR 15958.  The Forest Service implemented the corrective action between February 2, 2012, and March 15, 2012.  AR 15992-16004.

As Croman's complaint was filed over a month before the corrective action was completed, logically Croman could only have been challenging the December 16, 2011 award decisions.  But the corrective action by definition replaced the December 2011 award decisions.  The corrective action was an intervening event.  As such, Croman's complaint is challenging award decisions that no longer exist.

Although this Court possesses jurisdiction to review corrective action decisions, *see, e.g., The Centech Group, Inc. v. United States*, 78 Fed. Cl. 496, 506 (2007), Croman has yet to protest the corrective action.  This is not a merely semantic distinction, but rather a distinction that is dispositive of the Court's jurisdiction.[11]  As this Court recently noted:

> Jurisdiction must be established before the court may proceed to
> the merits of a case.  Courts are presumed to lack subject matter

---

[11] Croman's failure to acknowledge this distinction has resulted in Croman's assertion of certain arguments that are premised upon documents from the initial procurement that are no longer relevant, and further, are contradicted by documents from the corrective action.  *See infra* § III(C)(2)(a).

> jurisdiction unless it is affirmatively indicated by the record;
> therefore, it is a plaintiff's responsibility to allege facts sufficient
> to establish the court's subject matter jurisdiction.

*GTA Containers, Inc. v. United States*, 2012 WL 562432, at *8 (Feb. 22, 2012) (internal citations omitted); *see also DaimlerChrysler Corp. v. United States,* 442 F.3d 1313, 1318 (Fed. Cir. 2006) ("[I]t is settled that a party invoking federal court jurisdiction must, *in the initial pleading*, allege sufficient facts to establish the court's jurisdiction.") (emphasis added).  Croman has not alleged facts in its complaint sufficient to establish this Court's subject matter jurisdiction to entertain a challenge to a procurement completed after its complaint was filed.  As such, the Court should dismiss Croman's complaint for lack of subject matter jurisdiction because Croman's protest of the initial procurement is now moot.  Croman is free to challenge the corrective action award decisions, but should do so in a separate action.  *Accord Technical Innovation, Inc. v. United States*, 93 Fed. Cl. 276, 279 (2010).[12]

> ### B.   This Court Also Lacks Jurisdiction Because Croman Has Failed To Establish That It Has Standing To Challenge The Forest Service's Award Decisions

Assuming that the Court finds Croman's protest not to be moot, a position with which we disagree, Croman's protest should still be dismissed for lack of jurisdiction because Croman has failed to establish that it has standing to challenge the Forest Service's corrective action.

It is Croman's burden to establish that it has standing to challenge the Forest Service's corrective action.  *See Dow Elec., Inc. v. United States*, 98 Fed. Cl. 688, 694 (2011).  As this Court noted in *Brooks Range Contract Services, Inc. v. United States*, 101 Fed. Cl. 699 (2011):

> It is a long-settled principle that standing cannot be inferred
> argumentatively from averments in the pleadings.  Moreover, a
> plaintiff's burden of proof varies with the procedural context of the

---

[12] Croman's protest may also become moot based upon the forthcoming award decisions under the 2012 RFP because, if Croman's aircraft are awarded some of those CLINs, Croman would no longer possess any aircraft to service any of the CLINs it is challenging from the 2011 RFP.

> case.  While more general allegations may suffice during the
> pleading stage, when the petitioner is asking the court for a final
> judgment on the merits, based upon the application of its legal
> theory to facts established by evidence in the record, the
> requirement that plaintiff demonstrate standing is heightened.
> These requirements are no less applicable in the bid protest
> context, in which the standing requirements are more stringent than
> those applicable under Article III jurisdiction.

*Id.* at 709-10 (internal quotations and citations omitted).  The Court also noted that an issue, such

as the prejudice necessary to establish standing, is waived when not raised by a plaintiff in its

*opening brief*.  *Id.* at 710.  If a plaintiff fails to establish standing, the Court does not possess

jurisdiction to entertain the complaint.  *Myers Investigative & Sec. Servs., Inc. v. United States,*

275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue.").

Moreover, as this Court noted in *Dow Electric*, 98 Fed. Cl. at 694, a plaintiff must be an

"interested party" to possess standing, and the "Federal Circuit has construed the term 'interested

party' to be synonymous with the definition of 'interested party' as defined in the Competition in

Contracting Act ('CICA'), 31 U.S.C. § 3551(2)(A)."  *Id.* (citing *Rex Serv. Corp. v. United States,*

448 F.3d 1305, 1307 (Fed. Cir. 2006)).  To be an "interested party," a protestor must show that:

(1) it was an actual or prospective bidder or offeror; and (2) it had a direct economic interest in

the procurement or proposed procurement.  *See id.* (citing *Distrib. Solutions, Inc. v. United*

*States,* 539 F.3d 1340, 1344 (Fed. Cir. 2008)).  A protestor must also show that "the alleged

errors in the procurement were prejudicial."  *Id.* (citing *Labatt Food Serv., Inc. v. United States,*

577 F.3d 1375, 1378-79 (Fed. Cir. 2009)).  Prejudice requires that, "but for the error, [the

protestor] would have had a *substantial chance* of securing the contract."  *Id.* (citing *Labatt Food*

*Serv*, 577 F.3d at 1378) (emphasis added).  In a situation where there are multiple bidders, a

protestor only has standing "where the protestor's quotation would be *next in line* for selection if

its protest were sustained."  *Allied Technology Group, Inc. v. United States*, 94 Fed. Cl. 16, 37

(2010) (emphasis added) (citing *Galen Med. Assoc., Inc. v. United States*, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (finding protestor had substantial chance of receiving award because it finished second to the contract awardee)); *see also Galen Med. Assoc., Inc. v. United States*, 56 Fed. Cl. 104, 108 (2003) ("This standard weeds out protestors that . . . finish lower than second after evaluation.").

Croman's motion and supplemental brief make clear that it is only challenging the awards of CLINs 17, 23, 28-30, 32, and 33 (Motion 14, 33), and the award of four CLINs under the 2012 RFP.  Supp. Br. 5.  But Croman's motion and its supplemental brief make it equally clear that Croman fails to meet its burden of demonstrating that it has standing to challenge any of those seven awarded CLINs, or the award of four CLINs under the 2012 RFP.  Establishing standing is Croman's burden and that requirement is more stringent in the bid protest context. Having failed to establish its standing in its opening brief (or its supplemental brief for that matter), Croman has waived its right to do so in subsequent briefing.  *See Brooks Range*, 101 Fed. Cl. at 709-10.

### 1. CLINs 17, 28-30, 32, and 33

For Croman's challenge to the awards of CLINs 17, 28-30, 32, and 33, Croman entirely fails to address, let alone meet, its burden of establishing that it has standing to challenge the awards for these six CLINs.

For CLINs 29, 30, and 32, Croman states that it had "both a lower price . . . and its helicopter had a greater lift capacity . . . than did the awardee, Columbia."  Motion 34; *see also* Motion 6.  For CLINs 17, 28, and 33, Croman states that it had a lower price, but admits its helicopter did not have a greater lift capacity than did the awardee, Firehawk.  Motion 34; *see also* Motion 6.  Beyond that, Croman merely argues that "[f]or all the reasons noted above with

regard to line item 23" and then listing those reasons in one long sentence, the Forest Service

should have awarded CLINs 17, 23, 28-30, 32, and 33 to Croman.  Motion 34-35.

Croman does not even allege that its bid resulted in it being "next in line" to the awardees

of these six CLINs, Columbia and Firehawk.  The closest thing offered to a standing justification

would be a table in Croman's motion.  Motion 33.  But that table fails to compare Croman's bid

to the bids of *any* of the offerors other than the awardee for each of the six CLINs.  Accordingly,

Croman has failed to establish that it has standing the challenge the Forest Service's awards for

CLINs 17, 23, 28-30, 32, and 33.

### 2.    CLIN 23

Turning to Croman's challenge to the award of CLIN 23, Croman states that its price was

▮▮▮▮▮▮▮ lower than that of the awardee, Siller Helicopters, Inc. (Siller).  Motion 6.  Croman

fails to state that its bid put it "next in line" to Siller for CLIN 23.  Although Croman tries to

address the bids of the other offerors for CLIN 23, Helicopter Transportation Services, Inc.,

Rainer Heli International (Rainer), and Construction Helicopters, Motion 18, Croman's casual

dismissal of Rainer's bid is particularly conspicuous.  Croman merely states that "[t]he helicopter

proposed by Rainer . . . was awarded contract line item 16 and is therefore unavailable."  *Id.*

This argument is inadequate to confer standing upon Croman, because it fails to address whether

Rainer would have been awarded CLIN 23 *if* Siller had not been awarded CLIN 23.  It is

certainly possible that, has Siller not received the award for CLIN 23, Rainer might have, and

some other offeror might have received the award for CLIN 16.  *See supra* § II(D).  Simply

noting that the award of CLIN 16 made Rainer's helicopter unavailable for CLIN 23 completely

ignores this possibility; a situation where Rainer would be "next in line," not Croman.

In fact, for CLIN 23, Rainier had a better overall technical rating than Croman, its total

price and PPP were lower than Croman's, its proposed helicopter had greater payload capacity

than any of Croman's (resulting in a superior Aircraft Performance rating), and it had a better

Safety/Risk Management rating than did Croman.  AR 16054.  Rainier received ratings that were

inferior to Croman's in only the two *least* important technical evaluation factors.  *Id.*  Therefore,

even if Siller had not been awarded CLIN 23, Rainier was more likely than Croman to have been

awarded that CLIN.  Croman has thus failed to establish that it would be "next in line" for CLIN

23.  As such, Croman cannot plausibly allege that it had a "substantial chance" of being awarded

CLIN 23 if the award did not go to Siller.  Accordingly, Croman has failed to meet its burden of

alleging sufficient facts to prove it has standing to challenge the award for CLIN 23.

### 3.  The Four 2012 RFP CLINs

Finally, as to Croman's challenge in this protest to the forthcoming award of the four

CLINs under the 2012 RFP, Croman could not possibly have standing for that challenge as

Croman has not protested the 2012 RFP.  Moreover, Croman's supplemental brief is entirely

silent regarding any facts that could suggest that Croman might possess standing.  *See generally*

Supp. Br.  As to the claim in Croman's complaint that the Forest Service improperly partially

cancelled the 2011 RFP, that claim has been abandoned.  *See infra* § III(B).

## III.  In The Alternative, The Court Should Grant The United States' Cross-Motion For Judgment Upon The Administrative Record And Deny Croman's Motion For Judgment Upon The Administrative Record

Should the Court conclude that it possesses jurisdiction to entertain Croman's bid protest,

a position with which we disagree, it should grant our cross-motion for judgment upon the

administrative record and deny Croman's motion.  First, by failing to file a pre-award protest,

Croman has waived its right to protest the award for CLINs 17, 23, 28-30, and 32-33.  Second,

Croman has abandoned the allegations stated in its complaint concerning the cancellation of

CLINs 21, 22, 27, and 34.  Finally, our cross-motion should be granted and Croman's motion

denied because the Forest Service's relevant award decisions and cancellation of four CLINs were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### A.   Croman Has Waived Its Right To Challenge The Awards For CLINs 17, 23, 28-30, and 32-33

Croman failed to protest the terms of the 2011 RFP by March 4, 2011, the date of the proposal deadline.  By failing to file such a pre-award protest, Croman has waived its right to challenge the awards made by the Forest Service for CLINs 17, 23, 28-30, and 32-33.

"[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  The court in *Blue & Gold Fleet* identified the purposes of this waiver rule.  First, it explained that the rule furthers the statutory mandate that the courts, during bid protests, "'give due regard to . . . the need for expeditious resolution of the action.'"  *Id.* (citing 28 U.S.C. § 1491(b)(3)).  Second, the court, analogizing the waiver rule to the doctrine of patent ambiguity, explained that it prevents an offeror from taking advantage of the other actors in the procurement and costly, after-the-fact litigation.  *Id.* at 1314.  The *Blue & Gold Fleet* court explained that "[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, then roll the dice and see if they receive award and then, if unsuccessful, claim the solicitation was infirm."  *Id.* (quoting *Argencord Mach. & Equip., Inc. v. United States,* 68 Fed. Cl. 167, 175 n.14 (2005)).  The Federal Circuit noted that it found support in the GAO's similar rule[13] and the analogous doctrines of laches and equitable estoppel in patent cases.  *Id.* at 1313.

---

[13] 4 C.F.R. § 21.2(a)(1) ("Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals.").

### 1.     __Croman's Pre-Award Knowledge__

Since the day that the 2011 RFP was issued in January 2011, Croman has been on notice that its medium-lift helicopters might be competing for CLINs 16 – 34 against heavy-lift helicopters with far superior performance capabilities, such as the Siller T9125M that was awarded CLIN 23.  Indeed, the 2011 RFP required minimum, *but not maximum*, performance capabilities for all CLINs.  AR 117.  In addition, the 2011 RFP very clearly informed offerors that, after Mandatory Documentation, Aircraft Performance was the most important technical evaluation factor, AR 280, and that all technical evaluation factors were, together, "SIGNIFICANTLY MORE IMPORTANT THAN price."  AR 282 (emphasis in original). Therefore, Croman also knew before submitting its proposal in March 2011 the extent to which the Forest Service prioritized high lift capacity over low price and, thus, that the agency willingly would pay premiums for superior firefighting capabilities.  Yet it filed no pre-award protest.

### 2.     __Croman's Post-Award Protest Is Untimely__

Nonetheless, Croman now objects post-award to the Forest Service's evaluation scheme, arguing as to CLIN 23 that:  (1) Siller's T9125M should have been rejected outright based upon its unreasonably high price, Motion 15; and (2) Siller's price premium was not reasonably justifiable.  Motion 19.  In addition, despite the clear statements in the 2011 RFP that the Forest Service intended to award contracts to technically superior offerors – and *not* to those proposing the lowest prices, AR 282 – Croman  now argues with respect to CLINs 17, 23, 28-30, and 32-33 that the Forest Service "failed to make award to the low-priced offeror."  Motion 34.

All of these objections come too late.  The eligibility of Siller's aircraft, and the Forest Service's willingness to pay for it, were apparent on the face of the 2011 RFP.  Although Croman claims that its protest of the Siller award is an objection to an "award decision," Motion 15-25, Croman's *real* complaint is that it had to compete against far superior aircraft in a

procurement that explicitly valued superior performance over price, thus decreasing the likelihood that Croman's low prices alone (for only medium-lift performance) would result in an award for CLINs 16 – 34.  Thus, Croman's complaint is with the criteria the Forest Service used, and the weight it gave the various criteria, rather than its award decisions.  Even assuming *arguendo* that the Forest Service erred in using the criteria it did, that error was "patent," and Croman was required to assert its challenge prior to the deadline for the receipt of proposals. Instead, Croman chose to "sit on its rights," *Blue & Gold Fleet*, 492 F.3d at 1313, and delay its protest of the 2011 RFP terms until it received confirmation that its comparatively low prices would not result in an award in a competition that included helicopters with much higher payload capacity.

Croman seeks to avoid a claim that it waived its right to protest by characterizing its challenge as an objection to the final award decisions and to a perceived lack of documentation, stating that the Forest Service "failed to compile the strengths and weaknesses of competing proposals, make a business judgment as to whether the higher price of highest [sic] technically scores offeror was worth the technical benefits its acceptance would afford . . . and document the rationale for doing so."  Motion 34-35.  But, at its core, Croman's protest is against the Forest Service's decision to value performance over low prices (*i.e.*, "make a business judgment . . ."), a decision which had already been made as of January 2011, and which was explicitly set forth to offerors in the 2011 RFP.  The court in *Blue & Gold Fleet* recognized that the waiver rule applies to protests such as Croman's, where the protestor attempts to disguise its challenge as one to the alleged unfairness of an award.  *Id.* at 1313.  Because Croman does not argue with any of the specific technical ratings assigned to its proposal or to the awardees' proposals, it is not protesting any Forest Service final decision *except for* the decision to value performance over

price.  Because that decision was made abundantly clear in the 2011 RFP, Croman's protest

should be dismissed pursuant to *Blue & Gold Fleet*.

> ### B.   Croman Has Abandoned Its Allegation In The Complaint That The Forest Service Improperly Cancelled CLINs 21, 22, 27, and 34

The Court should dismiss as abandoned any argument by Croman that the Forest Service

improperly partially cancelled the 2011 RFP.  Although the complaint alleges an improper

cancellation by the Forest Service of CLINs 21, 22, 27, and 34, that allegation has been

abandoned in both Croman's motion and its supplemental brief.

In *DCS Corp, v. United States*, 96 Fed. Cl. 167 (2010), the plaintiff in a post-award

protest a multiple-count complaint in this Court and then filed a motion for judgment upon the

administrative record, claiming the agency violated the APA with respect to its past performance

evaluation.  *Id.* at 169.  The plaintiff's motion for judgment and related briefs failed to address all

of the counts in the complaint.  *Id.* at 169 n.2.  As a result, the Court deemed the unaddressed

counts abandoned.  *Id.* ("In counts two and three of the Complaint, plaintiff pleads issues other

than the evaluation and rating of past performance information but does not address these issues

in its briefs or at oral argument.  Accordingly, these issues have been abandoned."); *see also*

*Arakaki v. U.S.,* 62 Fed.Cl. 244, 246 (2004) ("The court will not consider arguments that were

presented for the first time in a reply brief or after briefing was complete.").

Here, count four of Croman's complaint alleges that "the Forest Service Improperly

Partially Cancelled the Solicitation," referring to the decision not to award CLINs 21, 22, 27, and

34.  AR 15972.  Croman's complaint acknowledges both that:  (1) "an Agency need only have

reasonable basis to cancel a solicitation in whole or in part," and (2) "lack of funding can be a

reasonable basis for cancellation of a solicitation."  AR 15974.   Nonetheless, Croman alleged

that "it is impossible to conclude that the Agency had a reasonable basis for its decision."  AR

15973.  According to Croman's complaint, the Forest Service's stated reasons for cancelling four

CLINs – a lack of funding – were "a pretext for the Forest Service's purposefully avoiding any

award to offerors proposing to use S-61 helicopters."  *Id.*  Croman argued that, because pretext

was alleged, the Court was required to pay the partial cancellation "greater scrutiny."  *Id.*

Croman has abandoned the allegations made in the complaint.  Specifically, not since its

complaint has Croman contended that the Forest Service failed to state a reasonable basis for

cancelling the four CLINs or that the stated reason was pretextual, despite having filed both its

motion and its supplemental brief.  Croman's motion twice references the Forest Service's

cancellation of four CLINs, but makes no argument that the cancellation was improper.  *See,*

*e.g.,* Motion 4 (referring to the cancellation as a "necessity" resulting from the award of CLIN 23

to Siller and listing the reasons the Forest Service provided at Croman's debriefing for deciding

to cancel the CLINs, but making no allegations of wrongdoing); Motion 12 (noting that one of

the grounds for its protest before GAO was that "the Forest Service improperly cancelled part of

the solicitation, *i.e.,* line items 21, 22, 27, and 34," but asserting that allegation only in a section

providing background concerning Croman's GAO protest and not in an argument).

Likewise, although Croman's supplemental brief states that reinstatement of the

solicitation is a suitable remedy for an improperly cancelled solicitation, the brief makes no

attempt to demonstrate that the cancellation of the four CLINs was improper.  Specifically, the

supplemental brief states that "[i]n its Complaint, Croman asserted that the Forest Service lacked

a reasonable basis for partially cancelling RFP-9001."  Supp. Br. 2.  But Croman does not make

that same assertion in its supplemental brief, nor does it request judgment based upon the

cancellation.  Rather, the supplemental brief seeks an injunction without arguing that the partial

cancellation was improper, stating that "to the extent that the Forest Service had a reasonable

basis for partially cancelling [the 2011 RFP], such as a lack of funds . . . no such basis presently exists." *Id.* 3.

What basis "presently exists" is irrelevant to the reasonableness of a decision the Forest Service made in 2011, which is the subject of the complaint, and Croman does not appear to argue otherwise. Croman's statements, therefore, do not constitute an argument that the 2011 cancellation of the four CLINs was improper. *Id.* What Croman argues is "arbitrary, capricious and otherwise contrary to law" in its supplemental brief is *not* the decision to cancel the four CLINs, but instead "the Forest Service's actions in not reinstating [the 2011 RFP] and not obtaining its need for the four helicopters through a proper evaluation and award under [the 2011 RFP]." *Id.* Croman has therefore abandoned any argument that the Forest Service's cancellation of the four CLINs was improper. *See DCS Corp.*, 96 Fed. Cl. at 169.

> ### C. The Forest Service's Awards And Cancellation Of Four CLINs Were Not Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law

Assuming that this Court finds that is had jurisdiction to hear Croman's protest and that it is not waived pursuant to *Blue & Gold Fleet*, positions with which we disagree, the administrative record clearly demonstrates that the Forest Service's re-evaluation of Croman's bid, its subsequent award decisions, and (assuming that the Court finds Croman's challenge not abandoned) its cancellation of CLINs 21, 22, 27, and 34 were not arbitrary, capricious, or an abuse of discretion, and were in accordance with law.

> ### 1. The Administrative Record Demonstrates The Rationality Of The Forest Service's Award Decisions

The awards for CLINs 17, 23, 28-30, and 32-33 were not arbitrary, capricious, or an abuse of discretion, and were in accordance with law.

For all seven protested CLINs, Croman alleges that the Forest Service conducted an improper tradeoff procedure and failed to justify its decision to award those CLINs to higher-priced, technically superior proposals.  Motion 19-25, 33-35.  Croman's specific complaints are that:  (1) the Forest Service did not specify the relative strengths and weaknesses of Croman's proposal as compared with those of the awardees, *id.* 22 (CLIN 23), 34-35 (other protested awards); and (2) the Forest Service did not explicitly make a determination in each case that the awardee's higher technical rating justified its higher price.  *Id.*  These two complaints fail to recognize the value of the information supplied by what Croman repeatedly dismisses as a "dazzling array of numbers," Motion 20, 22, and 23, upon which the SSA made his award decisions.  As demonstrated below, the OM results, as shown in Attachments 4 and 7 to the Contracting Officer's memorandum to the SSA, AR Tab 67, provide snapshots for each CLIN of every aircraft's strengths and weaknesses compared against all competing aircraft.

Moreover, even if Croman's two complaints were accurate, and they are not, Croman still has not met its heavy burden of demonstrating that "there is no rational basis for the agency's decision," as documented in the administrative record.  *WorldTravelService v. United States*, 49 Fed. Cl. 431, 438 (2001).  Each award decision Croman challenges was rational pursuant to an evaluation scheme that emphasized technical capability "SIGNIFICANTLY MORE" than price.  AR 282.  Croman is not entitled to judgment in its favor unless the Court concludes that the award decisions for the protested CLINs were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also NEQ, LLC v. United States*, 88 Fed. Cl. 38, 46 (2009).  Nothing in the administrative record supports such a finding.  To the contrary, the administrative record demonstrates that the SSA, having reviewed extensive documentation, (1) was fully cognizant of the fact that the Forest Service would be paying more than the lowest possible prices for helicopters, and (2) intentionally and properly awarded

35

contracts that would "emphasize technical superiority (especially payload capacity) over low price." AR 16213. Therefore, even if the administrative record lacks the specific statements Croman alleges it must contain, there is no evidence that the award decisions were irrational or contrary to law. Absent such evidence, Croman cannot prevail on its motion as a matter of law, because "[i]t is the burden of the aggrieved offeror to demonstrate that the challenged agency decision is either irrational or involved a clear violation of applicable statutes and regulations." *Banknote Corp. of America v. United States*, 56 Fed. Cl. 377, 380 (2003).

> **a.     The Documents Upon Which The Forest Service Relied In Its Award Decisions Show In Detail How Croman's Proposed Aircraft Compared To Each And Every Other Proposed Aircraft And How Every Decision Was Justified**

The administrative record contains documentation showing that Croman's strengths and weaknesses were evaluated and that the Forest Service conducted a proper tradeoff procedure in making its awards.

In its references to the OM results and the data used to derive them, Croman describes "mind-numbing" "mathematical manipulations," Motion 29-30, that led to the Forest Service's "automatic selections" of the contract awardees based upon "scores without more." Motion 33. As a preliminary matter, despite Croman's contrary contentions, there were no "automatic selections," nor were the OM results "rubber-stamped." Motion 25, 33. The administrative record is replete with statements that the OM results were tested, reviewed, and considered by the Forest Service at every step in the evaluation process. AR 16034 (TET review), 15993 (Contracting Officer review), and 16213 (SSA review). In recommending awards during the constructive action, the TET considered whether "any human element changes" were needed, "due to constraints with host unit limitations, vendor issues/concerns etc." and concluded they were not necessary and that the OM had "identified the optimum configuration of helicopters,

36

the best make/model and provided the most reasonable price for the agency per the Source Selection Plan."  AR 16034-35.  *See supra* n. 9 (noting human changes made to initial procurement OM results).

The evidence in the administrative record thus demonstrates a thoughtful review. Croman's conclusory assertions to the contrary are insufficient to rebut either the presumption of regularity afforded agency decisions, *see Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1323 n. 2 (Fed.Cir.2003) (citing *Impresa Construzioni Geom. Domenico Garufi,* 238 F.3d at 1341), or the presumption that Forest Service personnel acted correctly, honestly, and in good faith when considering the offerors' proposals.  *See HomeSource Real Estate Asset Servs., Inc. v. United States*, 94 Fed. Cl. 466, 479 (2010).

Further, Croman both mischaracterizes and improperly attempts to minimize the usefulness of the OM and the data that went into the Forest Service's calculations.  Two spreadsheets in particular contradict Croman's arguments that the Forest Service never documented Croman's strengths and weaknesses compared with other proposals, AR 16046-61, and that the administrative record includes no documentation of the tradeoffs the Forest Service made as to each award decision.  AR 16210-12.

The first document, entitled "All Aircraft Optimization Model (OM) Data, Attachment 4" (Attachment 4), shows how each one of Croman's proposed helicopters compared, at each CLIN, to every other helicopter proposed for that CLIN.  AR 16050-61.  It does so in general terms by providing overall technical scores, and also in specific terms, by providing scores for every evaluation factor, as well as price components, total cost, and PPP.  *Id.*  For example, in Column Y (Computed Adjectival Rating) for CLIN 17 it can be plainly seen that the recommended awardee's helicopter, Firehawk's B135BH, received neither the best nor, by far, the worst technical score from the TET.  AR 16051.  The overall score for Firehawk's B135BH was better

than for Croman's helicopters, and that aircraft had better ratings than all of Croman's proposed helicopters in the two most important technical evaluation factors.  *Id.* (Columns U and V).  All of this information, documented in Attachment 4, is the "statement of the relative strengths and weaknesses of Croman's" proposal as compared with Firehawk's and (at other CLINs) Siller's and Columbia's proposals, that Croman alleges is lacking in the administrative record. Moreover, Attachment 4 was not "rubber-stamped."  It was reviewed by TET members, AR 16034, by the Contracting Officer, AR 15993, and by the SSA.  AR 16213.  Each reviewer thus was personally aware that none of Croman's helicopters was especially strong in the most important evaluation factor (Column U) or in the overall technical score (Column Y).

The second document, "Attachment 7 – Tradeoff Analysis comparing OM assignments for line items 16 – 34 between weighted solution and 3 single objective optima" (Attachment 7), also allowed reviewers to see exactly how much the Forest Service would be trading low price (or low PPP) for technical superiority by choosing the set of awards recommended by the OM, with percentage weights applied.  For example, in the corrective action for CLINs 16 – 34, if total cost had been the *only* consideration, then the average total cost over CLINs 16 – 34 (plus flight rate) would have been $121,616,110, and the average adjectival (technical) score would have been 2.4969.  AR 16210.  Because the Forest Service wanted to assign "total cost" only ■ percent importance, as opposed to 100 percent, awarding the entire OM recommendation would result in paying an average total cost of $135,395,290, about $13.8 million more than if total cost had been the only consideration.  *Id.*  However, with the Forest Service's desired weights applied, the average technical score over CLINs 16 – 34 would improve, from 2.4969 to 2.2957. *Id.*  These OM calculations, documented in Attachment 7, provided the Forest Service with assurances that, despite paying more overall, it would essentially be buying technical superiority with those additional funds, thus satisfying the intent stated in the 2011 RFP: "Evaluation

factors other than cost or price, when combined, are SIGNIFICANTLY MORE IMPORTANT THAN price in the award decision."  AR 282.

Given the amount of valuable information the Forest Service was able to, and did, obtain from reviewing the spreadsheets the OM produced, Croman's characterization of this information as nothing more than a "dazzling array of numbers" is completely incorrect.  Motion 20, 22, and 23.  Instead, the Court should recognize that the SSA reviewed the OM spreadsheets and conclude that, as a result, the SSA "articulated a rational connection between" the information contained therein and his award decisions.  *See NEQ LLC*, 88 Fed. Cl. at 51 (stating the "court's role is to ensure that the contracting officer examined the relevant data and articulated a rational connection between the facts found and the choice made") (citations and quotations omitted); *see also Med Trends, Inc. v. United States*, 2011 WL 4037418, at *7 (Sept. 13, 2011) ("While the decision could have benefitted from more detail, we are entitled to infer that the Contracting Officer was fully aware of the significant differences in technical and past performance ratings and that, in light of the RFQ's weighting of those factors, she concluded that award . . . was warranted.").

In *NEQ LLC*, this Court considered an analogous assault upon an agency's tradeoff decision.  88 Fed. Cl. 38 (2009).  In *NEQ LLC*, the plaintiff suggested the agency's tradeoff discussion contained the sort of "conclusory statements, devoid of any substantive content" that this Court rejected in *Serco v. United States,* 81 Fed. Cl. 463 (2008).  *NEQ LLC*, 88 Fed. Cl. at 51.  The Court, however, disagreed, stating that "[r]ather than summarily concluding that a premium should be paid, the trade-off discussion here ran a half dozen pages, exhaustively relying on the charts and statistics recounted in the background segment above.  That plaintiff disagrees with the agency's rationale for concluding that [the awardee's] technical strengths . . .

warranted paying a $2.2 million price premium is, of course, quite irrelevant." *Id.*  The Court should reach a similar conclusion here.

> ### b. Croman Has Failed To Demonstrate The Irrationality Or Illegality Of Any Of The Award Decisions It Challenges

For every award Croman protests, the Forest Service did exactly what it said it would do in the 2011 RFP by rewarding the technical superiority of Siller's, Firehawk's, and Columbia's proposals, even though Croman's overall contract prices were lower.  In this procurement, "[e]valuation factors, when combined, [were] SIGNIFICANTLY MORE IMPORTANT THAN price in the award decision." AR 282.   Therefore, forsaking lower prices for better performance was required by the 2011 RFP, entirely reasonable, and should have been expected by offerors such as Croman.

Croman erroneously argues, for all seven challenged CLINs, that the tradeoff procedure was not properly documented and that the Forest Service "failed to make award to the low-priced offeror."  Motion 34.  This statement encapsulates the fundamental flaw in Croman's protest. Croman seeks to make low price the determining factor in a procurement that expressly states that price was not important relative to technical merit.  Croman improperly *completely ignores* the Forest Service's evaluation of Aircraft Performance, Safety/Risk Management, Past Performance, Organizational Experience, and PPP, and also *completely ignores* its own inferior technical ratings compared to the awardees' ratings, only hinting that better technical performance, in Croman's view, may not have been worth the higher cost.  Motion 13 n.19, 14 n.20.

In fact, for *all* of the protested CLINs, the helicopters Croman proposed received overall technical scores that were inferior to the awardees' scores.  AR 16290-92.  In addition, the

following facts explain why, despite Croman's lower prices, the protested awards were

reasonable:

> a.      At CLIN 23, Croman proposed three helicopters. Only one other helicopter proposed for CLIN 23 (Withrotor's) had a worse overall technical score than Croman's three helicopters. AR 16054. Also, at CLIN 23, Croman's three helicopters had the worst Aircraft Performance ratings of all the helicopters bid on that line item. *Id.* Aircraft Performance was the most important technical factor. AR 280-81.

> b.      Croman's helicopters were less cost efficient on a PPP basis than all of the awarded Firehawk helicopters (CLINs 17, 28, and 33). AR 16051, 16056-57, and 16060. All of Firehawk's helicopters outperformed all of Croman's, *id; see also* Motion 33, and, again, Aircraft Performance was the most important technical evaluation factor. AR 280-81.

> c.      Although three of Croman's helicopters were less expensive than Columbia's and scored better than Columbia's on Aircraft Performance, Columbia had better ratings than Croman on *three of the four* qualitatively evaluated technical factors: Safety/Risk Management, Past Performance, and Organizational Experience. AR 16057-58 and 16059-60. These three factors together represented ▓ percent of the overall technical rating, AR 16012, justifying the awards to Columbia in the face of Croman's better performance.

The standard this Court applies in a bid protest "recognizes the possibility that there

exists a zone of acceptable results in a particular case and requires only that the final decision

reached by an agency be the result of a process which considers the relevant factors and is within

the bounds of reasoned decision making." *Banknote*, 56 Fed. Cl. at 380 (quotations and citations

omitted). Given the above results, there can be no question that the protested decisions were

within a zone of acceptable results that should not be disturbed.

2.      **The Forest Service's Use Of Numerical Ratings As Key Components In Its Award Decisions Was Appropriate Given The Nature Of The Aircraft Performance and Safety/Risk Management Factors**

Croman argues, erroneously, that the awards were improper because they were substantially based upon falsely precise numerical ratings.  Specifically, Croman states that "[t]he use of ratings that were *subjective and inherently imprecise* as a key component of the final evaluation score and the concomitant automatic selections made based on those scores without more renders those selection 'decisions' arbitrary, capricious and otherwise contrary to law."  Motion 33 (emphasis added).  Croman suggests two bases for this argument, Motion 27-28, but both of Croman's bases are blatant misstatements about the contents of the administrative record.

As explained in detail below, the adjectival ratings *were* defined by the Forest Service (Croman incorrectly says they were not, Motion 27) and they *were* supplemented by narratives (Croman erroneously says they were not, Motion 28).  In addition, unlike the procurement in *Serco*, a case upon which Croman relies heavily, the procurement in the present case required the use of numerical ratings because the two most important technical evaluation factors were entirely based upon *objective* calculations.  Because the numerical ratings that led to the challenged awards were not subjective or imprecise, and because those ratings were necessary for qualitative evaluations of Aircraft Performance and Safety/Risk Management, their use did not result in false precision or a flawed procurement.

a.      **The Conditions Croman Alleges Can Lead To "False Precision" Did Not Exist In The 2011 Procurement**

Croman states that the Forest Service's ratings were subjective and imprecise "because the meaning of the adjectival ratings being assigned was not made clear."  Motion 28.  Further,

42

Croman alleges that "the AR does not contain or even reference any such definitions of the adjectival ratings." *Id.* 27. Croman's assertions on this point are demonstrably wrong.

First, the Source Selection Plan (SSP) included a section conspicuously titled "Adjectival Rating Description," which defined each of the following ratings that TET members used to evaluate proposals: Exceptional, Acceptable, Neutral, Marginal, and Unacceptable. AR 24. For example, "Exceptional" is defined as a proposal that:

> [I]s very comprehensive, in-depth, clear and uniformly outstanding in quality. Consistently high quality performance can be expected. The proposal, as written, exceeds requirements and demonstrates an exceptional understanding of goals and objectives of the acquisition. One or more major strengths exist. No significant weaknesses exist.

*Id.* Each of the other ratings is defined in similar detail. AR 24-25. Croman's "false precision" argument, Motion 26, therefore relies upon a misstatement of the administrative record that is demonstrably wrong.

Second, Croman erroneously argues that "the compilation of the opinions of the members of the various teams was not supplemented by narratives, notes or even annotations that provided any insight into what the teams' thought processes were in assigning any adjectival rating." Motion 28. This argument is irrelevant and incorrect. Croman's reference to "team" evaluations refers to a process that was *not* used in the corrective action, but rather only in the initial procurement. *See supra* § n. 6. Croman cites only to documentation from the initial procurement as opposed to the corrective action. Motion 28 (citing AR Tabs 28.02 to 28.05, and AR 13367).[14] Ratings were not compiled or averaged in the corrective action, but determined by a group convened by the TET Chair on February 2, 2012, AR 16012, as recorded by the TET

---

[14] We demonstrate above why Croman's improper conflation of the initial procurement and the corrective action renders Croman's bid protest moot and requires dismissal for lack of jurisdiction pursuant to RCFC 12(b)(1). *See supra* § II(A).

Chair on evaluation worksheets.  AR 15977-91.  The documentation relevant to the corrective

action is found at Tabs 66 and 67 of the AR and, contrary to Croman's assertion, includes 16

pages of narrative, AR 16018-34, explaining the basis for each offeror's rating under the Safety,

Past Performance, and Organizational Experience factors.  Thus, Croman's "false precision"

argument again relies upon a misstatement of the administrative record that is demonstrably

wrong.  The administrative record contains the narratives that Croman claims don't exist.

>    **b.**    **Unlike The Evaluation Factors In *Serco*, The Two Most Important Technical Evaluation Factors In This Procurement Were Based Upon Objective Formulas That Required The Use Of Numerical Ratings**

Croman erroneously relies upon the *Serco* Court's skepticism that the evaluators in that

case could "make rational distinctions based upon the thousandths of a point."  Motion 30; *see*

*also Serco*, 81 Fed. Cl. at 487.  The problem, according to the *Serco* Court, is that false precision

can "[charm] the unwary into making arbitrary comparisons based upon digits that are not

meaningful."  *Serco*, 81 Fed. Cl. at 488.  Croman also quotes a treatise on statistics that questions

the use of falsely precise numbers that merely "symbolic . . . measurements."  Motion 31.

*Serco* is clearly distinguishable.  First, as we demonstrated, the numerical ratings used in

the present case were not falsely precise because they were based upon adjectival ratings that

were defined in the SSP (unlike in *Serco*, Motion 28 (citing *Serco*, 81 Fed. Cl. at 463, 483)) and

supported by narrative explanations in the TET Re-Evaluation Report.  Second, the clearest

distinction between the present case and *Serco* turns upon the objective versus subjective nature

of the information being evaluated.  In this case, the two most heavily weighted numerical

ratings, Aircraft Performance and Safety/Risk Management, were *actual, objective*

*measurements*, the calculations of which Croman has not challenged.[15]  As such, the digits that

formed the basis for comparing one aircraft's performance against another's, and one

contractor's accident history and management system against another's, were in fact quite

meaningful.  The *Serco* Court's concern, therefore, is not raised by the present procurement.

Turning to the specifics of the evaluation in the corrective action, section E-3 of the 2011

RFP lists the five technical evaluation factors in descending order of importance, along with the

sub-factors by which they would be evaluated.  AR 280-81.  Aircraft Performance, the most

important qualitatively evaluated technical factor,[16] included only the one-line explanation:

"Helicopter Load Calculation."  AR 281.  The instructions for the Aircraft Performance factor

were simply to "[s]ubmit an interagency Helicopter Load calculation for each aircraft, as per

Exhibit 13."  AR 277.  Accordingly, offerors were put on notice that their rating under the

Aircraft Performance factor would entirely depend upon the payload of the aircraft they bid,

because "actual payload" was the result of the interagency load calculation.  AR 214.

To determine how well one helicopter performed as compared with others that had been

bid for a particular CLIN, the Forest Service considered how much payload that helicopter could

carry above the minimum required (3300 pounds for CLINs 16 – 34 (AR 117)) and used that

figure in a second formula.  AR 16013.  That calculation resulted in the assignment of lower (*i.e.,*

better) numerical ratings to helicopters that could carry payload in excess of the minimum

performance specification.  *Id.*  As such, and unlike the *Serco* evaluation, even a rating

---

[15] Croman does state, incorrectly, that the Safety/Risk Management factor was based upon "unexplained opinions that was [sic] solicited without defining the criteria for the critical distinctions being made."  Motion 29.  Contrary to Croman's argument, the TET's re-evaluation of the Safety/Risk Management factor is fully explained in the administrative record.  AR 16014-22.

[16] Although Mandatory Documentation was the most important technical factor, it was evaluated on a pass/fail basis and, thus, did not receive a weighted score in the evaluation process.  AR 280.

difference as small as .0001 is meaningful because it relates directly to an actual, objective measurement – the payload calculation – and not to an evaluator's subjective opinion.  Despite Croman's protestations, these numbers did not depend upon evaluators applying their "own preconceptions of the definitions of the adjectival ratings," Motion 27-28, or upon any other subjective variable.

The corrective action re-evaluation of the Safety/Risk Management factor was similarly dependent upon objective data, and not upon the subjective adjectival ratings (defined or undefined) of TET members.  To re-evaluate this factor, the TET lead safety officer performed a series of calculations using data and information *supplied by offerors*.  AR 16014.  For the first of two equally weighted *sub-factors*, Accident History, she calculated an accident rate for each offeror based upon the offeror's average annual flight time and number of accidents in the five previous years (2006 through 2010).  *Id.*  In assigning a point value to that accident rate, the lead safety officer compared each offeror's accident rate against a national average of 7.4 accidents per 100,000 hours.  *Id.*  The best possible point value was zero (for an accident rate of between 0.0 and 2.959) and an offeror with that point value for the Accident History sub-factor received a full 50 percent credit for that sub-factor, because Accident History was one of two equally important sub-factors.  AR 16015.  Conversely, the worst possible point value for accident rate was 5 (for an accident rate of more than 14.8), and an offeror with that point value would have received zero percent for the Accident History sub-factor.  *Id.*

To rate the second *sub-factor* for the Safety/Risk Management factor, Safety Management Systems (SMS), the TET gave each proposal one point for each of the four SMS elements required by the 2011 RFP that the offeror included in its proposal:  Policy, Assurance, Risk Management, and Promotion.  AR 16015.  For example, a proposal with all four elements received an initial rating of 4 under the SMS sub-factor, while a proposal lacking one of the

elements would receive an initial rating of 3.  As with Accident History, these point values were

converted to percentages, such that an offeror with 4 points received full credit for the SMS sub-

factor, which represented 50 percent of the total credit for the Safety/Risk Management factor.

*Id.*  The TET then combined each offeror's percentage score for Accident History with its

percentage score for SMS to get a final score for Safety/Risk Management that was represented

as a percentage.  *Id.*  To keep the Safety/Risk Management ratings consistent with those of the

other technical factors, which used a 1-5 rating scale, each percentage was converted to a

numerical rating, with 1-1.99 including Exceptional proposals, and 5 being Unacceptable.  AR

16016.

      The evaluation in *Serco* was entirely different.  In *Serco*, the agency assigned multiple

digit ratings to its evaluations of past performance and technical proposals.  *Serco,* 81 Fed. Cl. at

486.  Unlike the Aircraft Performance and Safety/Risk Management factors in the present case,

neither of the two factors (or their sub-factors) evaluated in *Serco* was based upon actual,

objective measurements.  *Id.*  Thus, the *Serco* Court appropriately questioned that agency's over-

reliance upon seemingly precise numerical ratings.  *Id.* at 488-89.

      As to the last two technical factors, the Forest Service assigned numerical scores to Past

Performance and Organizational Experience, and these factors did not require actual, objective

measurements.  But Croman has presented no evidence that the Past Performance or

Organizational Experience factors were falsely precise.  As such, the *Serco* Court's concerns do

not apply in the present case.

      Moreover, in the present case, Past Performance and Organizational Experience were the

two least important technical evaluation factors, representing, respectively, ■ percent and ■

percent of the weight of the overall technical evaluation (*i.e.,* only ■ percent in sum).  In *Serco*,

the numerical ratings the court suspected were imprecise represented the *entirety* of the technical

47

evaluation results (*i.e.,* 100 percent in sum).  *See Serco,* 81 Fed. Cl. at 487 (showing in chart how

two problematic numerical ratings were combined to form one averaged technical score).

Therefore, even if Croman had introduced evidence to challenge the Past Performance or

Organizational Experience ratings here, which it did not, Croman's challenge would still be on a

far weaker footing than in *Serco*, where the Court was questioning numerical ratings used for

100 percent of the overall technical rating (versus ██ percent here).[17]

### 3.    Siller's Price For CLIN 23 Was Reasonable Compared To The Other CLIN 23 Price Proposals And The Cost Efficiency Of Its Helicopter

The Forest Service awarded CLIN 23 to Siller, which proposed a Skycrane[18] (tail number

T9125M) at a total contract price of $17,675,100, AR 16038, as compared with Croman's

proposed total contract price of $ ██████  for each of three non-Skycrane helicopters it

proposed for CLIN 23.  AR 16054.  According to Croman, that price differential alone should

have led the Forest Service to determine Siller's price was unreasonable, as it did with respect to

two Erickson Air-Crane (Erickson) helicopters, and to exclude Siller's T9125M from further

consideration for CLIN 23.  Motion 17.

As we have repeatedly demonstrated, the 2011 RFP made clear that the other evaluation

factors were, when combined, "SIGNIFICANTLY MORE IMPORTANT THAN price."  AR

282.  When viewed in context, that fact alone is sufficient to demonstrate that Croman's protest

of the CLIN 23 award must fail.  Croman addresses CLIN 23 separately from the other six line

---

[17] *Serco* is further distinguishable because the solicitation there "added an important caveat" not present in the 2011 RFP.  81 Fed. Cl. at 466.  Specifically, the *Serco* solicitation stated that "the closer the technical scores . . . are to one another, the more important cost or price considerations become in determining the overall best-value for the Government."  *Id.* at 466-67.  The *Serco* Court subsequently referenced this "important caveat," suggesting that the defendant had ignored it when evaluating proposals.  *Id.* at 493 n. 45.  There was no such "important caveat" ignored by the Forest Service here.

[18] Skycranes are indicated in this procurement by all of the following model numbers: CH54B, CH54A, S64E, and S64F (the eliminated model from Erickson).  Skycranes were awarded the following CLINs: 1-5, 7-15, and 23.  AR 16000-02.

items, apparently because it considers that award to be especially unjustified given the price

differential between Croman's proposed aircraft and the awarded Siller aircraft.  Motion 19-25.

However, with respect to CLIN 23, Croman has incorrectly tried to skew the tradeoff analysis in

its favor by comparing the awarded price to *its own bid* (which is not even the lowest) – as

though the Forest Service were choosing between Siller and Croman – rather than to the price

proposed for an aircraft that, after Siller, more likely would have received the award.  The

likelihood that Croman would be awarded CLIN 23 was extremely slim, because Croman had

the *three worst Aircraft Performance ratings* of all the CLIN 23 bids.  Croman was not even

close to being the agency's second choice for the CLIN 23 award.

Croman's comparison of Siller's price to Croman's prices misleads the Court as to the

amount of the premium that had to be justified in the tradeoff analysis.  With nearly the lowest

prices on CLIN 23 and the *worst* Aircraft Performance ratings for that CLIN, Croman's

helicopters were outliers against which it would not even make sense to perform a tradeoff

analysis, and yet that is the comparison Croman asks the Court to make when identifying a

"premium in excess of 100% on line item 23."  Motion 25.  Croman argues that, under *Serco,* a

premium of more than 100 percent mandates that the Forest Service "needed to conduct more

careful tradeoff analyses."  *Serco,* 81 Fed. Cl. at 498, n.57.   But the CLIN 23 premium is not

more than 100 percent; rather it is 12 percent (*i.e.*, the extent to which Siller's total price on that

line item ($17.7 million) exceeds the *average* bid for CLIN 23 ($15.7 million)).  AR 16054.

Therefore, the "more careful" tradeoff analysis the *Serco* court indicated might be necessary was

not, in fact, called for in evaluating the CLIN 23 proposals.

In any event, Croman's motion omits three other very significant facts that place the

award of CLIN 23 to Siller in the proper context and demonstrate that Siller's price was the not

the extremely high premium Croman would have the Court believe.  First, the administrative

49

record includes documentation that directly contradicts Croman's allegation that the Forest

Service was inconsistent in considering Siller's T9125M aircraft while rejecting Erickson's

aircraft for being too expensive.  Second, CLIN 23 had different equipment requirements than all

the other 16 – 34 CLINs and, thus, attracted a unique assortment of bids and received a higher

average price than all of the other 16 – 34 CLINs.  Third, despite its higher total cost, the Siller

Skycrane was actually *less* expensive on a PPP basis than any of Croman's aircraft under CLIN

23, a fact the Forest Service properly considered as part the best value analysis described in the

2011 RFP.

> **a.   The Forest Service Did Not Act Inconsistently In Considering Siller's Skycrane After Rejecting Two Other Helicopters Because They Were Too Expensive**

Croman's argues, incorrectly, that there is an inconsistency between allowing Siller to

compete for CLIN 23 while rejecting two Erickson helicopters (S-64F models) as being too

expensive.  Motion 15-19.  As the Contracting Officer explained in his Request for Source

Selection Authority following the corrective action, the S-64F models were too expensive when

compared "to other similar performing aircraft," AR 15994, as opposed to when compared to *all*

aircraft.  For Erickson's two helicopters, it was proposing to charge $█████ and $█████ per day

in the base year, respectively, while every other helicopter in the same S64/54 category – which

includes Siller's "similar[ly] performing" T9125M – would cost $23,400 per day in the base

year.  In the words of the TET Chair:

> The average cost of fifteen (15) S64/54's recommend [sic] for
> award is $21,082 per day.  As an example, the highest S64/64
> daily availability rate for all other proposed aircraft was $23,400,
> while the S64-F Models were $█████ up to $█████ with prices
> increasing exponentially over the option periods.

AR 13408.

Therefore, the Forest Service saw $23,400 as the highest base year daily availability rate it was willing to pay for a Skycrane-type helicopter.  Moreover, the Skycrane Siller proposed for CLIN 23 will cost the Forest Service less than that amount per day; specifically, $23,250.  AR 16054 (line 499, column F).

Despite Croman's protestations that the base year daily rate for the T9125M was "**87.7% higher** than to [sic] those of the offerors selected for award of comparable items,"[19] Motion 17 (emphasis in original), that rate was nonetheless within the range of what the Forest Service appropriately found to be reasonable.  Allowing Siller's Skycrane to compete was, thus, not inconsistent with rejecting Erickson's helicopters.

### b. The Requirements For CLIN 23 Were Different From The Other Medium-Lift-Capacity CLINs And Created A Smaller, More Expensive, Pool Of Aircraft

CLIN 23 was critically different from every other line item in the CLIN 16 – 34 group, in that it required a helicopter equipped with a fixed tank.  AR 91.  Every other specification in the CLIN 16 – 34 group allowed offerors to propose a helicopter with either a fixed tank or a bucket.  Because buckets were not an option for CLIN 23 helicopters – something made clear in the 2011 RFP – CLIN 23 attracted fewer bidders, who in turn proposed a different assortment of, and on average more expensive, aircraft. AR 16050-61.

The administrative record makes clear that CLIN 23 is unlike the other 16 – 34 CLINs.  Specifically, for CLIN 23, offerors proposed only 16 aircraft with an average total contract price of $15.7 million.  AR 16054.  If Croman's three outlier bids are excluded, this average climbs to $17.4 million, which is only slightly lower than Siller's

---

[19] Croman provides no explanation or support for this percentage, so it is unclear what comparison is being made.

price of $17.7 million.  By contrast, for each of the other 16 – 34 CLINs (excluding CLIN

23 and the four cancelled CLINs), offerors proposed on average 45 aircraft with an

average total contract price of $11.2 million.  AR 16056-57.  Moreover, Siller proposed

the median price for CLIN 23; more than half of the 16 aircraft the Forest Service had to

choose from were equal to, or more expensive than, Siller's T9125M.  AR 16054.  In

sum, the pool of available aircraft and the associated price competition for CLIN 23 were

vastly different than for the balance of the 16 – 34 CLINs.  Understanding this distinction

is critical to understanding the Forest Service's evaluation; Croman, however, glosses

over it.

 Croman incorrectly compares the awarded CLIN 23 price to:  (1) the average

medium-lift helicopter price for the entire procurement; and (2) Croman's own price.[20]

These comparisons make little sense and are misleading.  The FAR provides that, to

"ensure a fair and reasonable price," contracting officers may rely upon a "[c]omparison

of proposed prices received *in response to the solicitation*."  FAR 15.404-1(b)(2)(i)

(emphasis added).  Contrary to the implication in Croman's motion, "proposed prices

received in response to the solicitation" cannot logically include price proposals for line

items other than CLIN 23, where offerors propose bucketed helicopters that were *not

even eligible* to compete for CLIN 23.[21]

---

[20] *See* Motion 15 (stating Siller's total cost for CLIN 23 was "more than twice the
average evaluated price of the Medium helicopter awardees") and 22 (calling "materially
flawed" the award of CLIN 23 "at a price more than twice that of Croman's").

[21] For example, Heliqwest's C-FXFT, which was awarded CLIN 31 at a price of $8.2
million, AR 16059, and is equipped with a bucket, AR 16003, would not have been eligible for
CLIN 23, and was not bid on CLIN 23.  AR 16054.  Its price is irrelevant to the reasonableness
of any CLIN 23 price proposed, but Croman has nonetheless included it in the average price
against which Croman compares Siller's price.  *See, e.g.,* Motion 15 (comparing Siller's price to
"average evaluated price of the other Medium helicopters [sic] awardees").

The only fair comparisons are the awarded price ($17.7 million) against the average price bid on CLIN 23 ($15.7 million) or against *each* of the CLIN 23 price proposals – not just against Croman's second-lowest price.  Frankly, at only ▮ percent of the CLIN 23 average bid, Croman's bid prices are outliers.  The purportedly "extremely high" price the Forest Service will pay for Siller's T9125M over the four-year contract term is only 12 percent higher than the average CLIN 23 bid.  And, if Croman's three outlier bids are excluded, that "premium" drops to 1.7 percent.

### c. The Awarded Helicopter Was More Cost Effective Than Croman's Three Helicopters On A Price Per Pound Basis

Finally, Croman improperly ignores the second part of the two-prong price evaluation set forth in the 2011 RFP, namely, the Best Value Formula.  The 2011 RFP informed offerors that:

> A price analysis will be conducted to determine overall price reasonableness and by using the formula specified below.  The 'Best Value' formula computes the amount it would cost to transport a pound of product for the specific helicopter being offered.  The best value formula will be used to make trade-off determinations to measure aircraft efficiencies of make and model of helicopters offered.

AR 275.

The outcome of the Best Value Formula was a price per pound (PPP) value that varied based upon the applicable CLIN and make and model of aircraft proposed for that CLIN.  *See, e.g.,* AR 16054 (showing that Croman's tanked 611CK would cost $▮▮ per pound at CLIN 23, but $▮▮ per pound at CLIN 24).  The Siller helicopter that was awarded CLIN 23 had a PPP of $0.41 for CLIN 23.  AR 16054.  The three Croman aircraft proposed for CLIN 23 had PPPs of $▮▮▮▮.  *Id.*  In other words, by awarding CLIN 23 to Siller instead of Croman, the Forest Service obtained greater value.

The FAR expressly permits the Government to consider value in determining price reasonableness: "Value analysis can give insight into the relative worth of a product and the Government may use it in conjunction with the price analysis techniques listed in paragraph (b)(2) of this section [such as comparing proposed prices to each other and to historical prices paid]." FAR 15.404-1(b)(4). Admittedly, of the ▮ percent weight attributed to price factors, the Forest Service attributed ▮ percent to total price and ▮ percent to PPP. AR 16043. Still, Croman's analysis completely ignores PPP, a critical omission when Siller's helicopter had a lower PPP than *any* of Croman's three helicopters.

### 4.    Documentation In The Administrative Record Shows The Forest Service Had A Rational Basis For Cancelling Four CLINs In 2011

Croman claims in its complaint that the Forest Service's cancellation of four CLINs in the 2011 RFP is improper because the Forest Service lacked a rational basis for its decision and that its given reason for not awarding those CLINs – use of its limited funds for other purposes – was a pretext for "avoiding any award to offerors proposing to use S-61 helicopters." AR 15974. As noted previously, neither Croman's motion nor its supplemental brief raise, or provide support for, this argument.[22]

To succeed in its challenge, Croman bears a high burden – which it fails to meet – because "the regulatory standards for the cancellation of a negotiated procurement are so extraordinarily permissive that they impose no constraints upon a contracting officer's discretion beyond what reasoned judgment requires." *Madison Services, Inc. v. United States*, 92 Fed. Cl. 120, 126 (2010). The Court is especially cognizant of this extreme discretion in cases where the solicitation provides for the possibility of no awards at all. *Id.* at 125. That is precisely the situation presented here by the 2011 RFP, which stated that the Forest Service's objective of

---

[22] It is for this reason that we claim Croman has abandoned it claim premised upon the cancelation of the four CLINs. *See supra* § III(B).

procuring "One (1) to Thirty four (34)" helicopters and reserved the Government's "right to award any combination of items and/or number of items."  AR 46.

In analyzing a protester's challenge to a cancelled solicitation in a negotiated procurement, the Court begins by determining whether the procuring agency had a rational basis for its decision.[23]  *Madison Services, Inc.,* 92 Fed. Cl. at 126.  Next, if the agency's decision is determined to be rational, but the protester has alleged that the agency's stated reason for the cancellation is a pretext for an improper motive, then the Court "will closely examine the reasonableness of the agency's actions in canceling the acquisition."  *FFTF Restoration Co., LLC v. United States*, 86 Fed. Cl. 226, 250 (2009) (citations omitted).  An allegation of pretext is tantamount to an allegation of bad faith on the part of the contracting official.  *See Defense Technology, Inc. v. United States*, 99 Fed. Cl. 103, 122 (2011).  Overcoming the Court's strong presumption of good faith that "attaches to any rational agency decision" requires clear and convincing evidence.  *Madison Services, Inc.,* 92 Fed. Cl. at 129.

Although Croman alleges in its complaint a lack of funding is "a pretext for the Forest Service's purposefully avoiding any award to offerors proposing to use S-61 helicopters," AR 15974, Croman offers little but speculation to support its claim.  Moreover, the administrative record supports the opposite conclusion.

---

[23] The analysis typically also includes a determination that the agency has complied with applicable law, because "an agency decision, even if rational, may yet be shown to violate applicable statutes and regulations."  *Madison Services, Inc.,* 92 Fed. Cl. at 126.  Croman, however, does not claim the Forest Service violated any specific law, aside from the APA, when it partially cancelled the 2011 RFP.  AR 15972-74.  The *Madison Services* court held that, "as applied to the cancellation of a negotiated procurement, the APA standard reduces to nothing more than rational-basis review."  *Id.*

a.    **Croman's Misleading Comparison Of One-Year Savings To Four Years Of CLIN 23 Payments Seeks To Obscure The Forest Service's Rational Basis For Its Award Decision**

In alleging in its complaint that "it is impossible to conclude that the Agency had a reasonable basis for its decision," Croman states that,"[i]f the Forest Service had not awarded Line Item 23 to Siller at a cost of approximately $█████ more [than a contract with Croman] *for the full term of the contract*, the Forest Service would have been able to use that amount to partly fund the waterscooper study."  AR 15973 (¶¶ 86, 88) (emphasis added).  The suggestion that the Forest Service is wasting $█████ by awarding CLIN 23 to Siller instead of Croman while also trying to save $8 million by cancelling four CLINs is extremely misleading because it compares four years' worth of premium payments to one year's worth of cost savings.  That is, by not awarding the four cancelled CLINs, the Forest Service avoids obligating approximately $8.17 million *in fiscal year (FY) 2012*.[24]  In the same fiscal year, the Forest Service will pay about $█████ more for Siller's services than it would for Croman's, which grows to Croman's nearly $█████ figure *only if* the Forest Service exercises an additional three option years.

Accordingly, when the Forest Service was deciding in 2011 whether to cancel CLINs to conserve its FY 2012 funding, it was considering costs savings that are nearly *four times* the premium it would pay for Siller's services in 2012.[25]  Over four years, if the Forest Service never procured those four cancelled CLINs, it would actually save at least $35 million, not accounting

[24] This estimate is derived by multiplying the number of cancelled line items (4) by the average cost per medium-lift line item during the contract base year ($2.04 million).  AR 16037-38.  This average is calculated without the cost of CLIN 23, which has different equipment requirements than all of the other medium-lift CLINs and, therefore, attracted a more expensive group of bidders.

[25] For two reasons, FY 2012 is the only year that is relevant to the analysis.  First, it remains unknown whether new appropriations in FY 2013 might relieve budget constraints.  Second, the Forest Service's stated intent was to "evaluate Water Scooper aircraft *in FY 12*," not in future fiscal years, as Croman's comparison assumes.  AR 13408 (emphasis added).

for price escalation, as compared with the nearly $██████ the Forest Service might have "saved" through an award to Croman instead of Siller.

The Forest Service, however, did not consider *only* cost savings, but also whether 30 helicopters would be enough to fulfill its firefighting mission in 2012.  Based upon a 2006 study, Forest Service officials knew when deciding to cancel the four CLINs that they could effectively fulfill the agency's fire suppression mission with between 30 and 34 exclusive-use helicopters. AR 13408 (stating the 2006 study determined "a minimum of thirty (30) helicopters with a cap of thirty four (34) was . . . the most efficient and cost effective to contract as Exclusive Use"). Thus, the Forest Service expressly determined that, if it were to decrease the number of available helicopters to 30, it would not be jeopardizing its mission for the purpose of saving money.

As Croman points out in its supplemental brief, the Forest Service is now in the process of procuring four additional helicopters under the 2012 RFP.  But, "[g]enerally, a court's review is confined to the administrative record."  *Weiss v. Kempthorne*, 2009 WL 2095997, at *1 (Fed. Cl. July 13, 2009).  Moreover, under the applicable APA standard, if "information was not before the agency and therefore could not have been considered by the agency at the time of the decision," then the Court will not include it in the administrative record.  *Eskridge Research Corp. v. United States,* 2010 WL 1837799, at *3 (Fed. Cl. May 3, 2010).  In any event, the 2012 RFP, having been issued in May 2012, cannot have had, and did not have, any bearing upon the decision made in late 2011 to decrease the number of helicopters believed to be necessary and affordable at that time.  The 2012 RFP should not be included in the administrative record for this procurement, and the Government has thus opposed its inclusion.  *See* Defendant's Opposition to Plaintiff's Motion to Supplement the Administrative Record (opposition to supplement) (Dkt. 40, filed June 4, 2012) (citing cases).  The Court's determination as to the rationality of the decision to partially cancel the 2011 RFP should be limited to the

administrative record, and the administrative record contains ample explanation for the decision. *See* Opp. to Supp. 7-8.

> ### b. Croman's Factual Support For Its Allegation Of Pretext Is Incorrect And Fails To Satisfy The Court's "Clear and Convincing" Evidentiary Burden

According to Croman's complaint, even if the Court determines that the decision to cancel the four CLINs was rationally based on funding concerns, the cancellations were nonetheless improper because funding concerns were not the real reason for the cancellation. AR 15974. Rather, Croman asserts that the Forest Service improperly sought "to avoid awarding any Line Item to an S-61 helicopter." *Id.* That is an allegation of pretext, which this Court equates to an allegation of bad faith. *See Madison Services, Inc.*, 92 Fed. Cl. at 130.

The basis for Croman's allegation of pretext is: (1) in 2008, an S-61 helicopter crashed during a Forest Service firefighting mission, killing eight Forest Service firefighters; and (2) the only remaining available helicopters for the cancelled line items were S-61s.[26] AR 15973. Based upon these facts alone, Croman concludes that the Agency avoided awarding any CLINs to S-61 helicopters. Croman offers nothing further to support its pretext claim. This is a far cry from the "well-nigh irrefragable proof" that this Court has required for over 50 years to overcome the strong presumption here that Forest Service contracting officials acted in good faith when deciding to cancel the four CLINs. *Madison Services, Inc.,* 92 Fed. Cl. at 129.

Moreover, one of the two factual bases for Croman's allegation of pretext is demonstrably wrong. There were more helicopters available for the cancelled CLINs than just S-61s. Firehawk's SK-70C, Helicopter Transport Services, Inc.'s SK-64E, BH-214ST, and CH-

---

[26] The complaint alleges Forest Service bias against "S-61" helicopters, and includes in that category its offered SH-3H helicopters, which it says are "a slight variant of the S-61." AR 15961. We assume that Croman considers all variations of its offered Sikorsky aircraft (referred to in evaluation documents as "SK-61A") to be S-61s for purpose of this protest, including the SK-61N and SK-61V.

54A, and Swanson's K-1200 are not S-61s, but were offered for CLINs 21, 22, 27, and 34, and ultimately were not awarded any line items, thus making them available, alongside S-61s, for any of the cancelled CLINs.  AR 13519-96.  That this variety of offered aircraft did not receive awards and were available to be awarded contracts for the cancelled CLINs disproves Croman's claim that the CLINs were cancelled due to a bias against S-61s.

## IV.        Croman Is Not Entitled To Permanent Injunctive Relief

Croman argues in its motion that it is entitled to various forms of permanent injunctive relief.  Motion 34 (seeking to enjoin the Forest Service from obtaining performance on CLINs 17, 23, 28-30, and 32-33 from any company other than Croman); Supp. Br. 5 (seeking to restrict performance for CLINs 21, 22, 27, and 34).

Croman cannot demonstrate, however, that it is entitled to any injunctive relief in this case because it fails to satisfy each of the four relevant factors.  When deciding whether to issue a permanent injunction, this Court should consider four factors:  "(1) whether, as it must, the plaintiff has succeeded upon the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief."  *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. Of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)); *accord Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) ("[A] movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm.") (emphasis in original) (citation omitted).  Moreover, injunctive relief is an "extraordinary remedy," *Academy Facilities Mgmt. v. United States*, 87 Fed. Cl. 441, 473 (2009), and it is the plaintiff's burden to

demonstrate entitlement to it.  *See Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337

(2009) (citing *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993)).

### A.       The Court May Not Direct An Award To Croman

As an initial matter, Croman improperly requests that the Court award the challenged

CLINs to Croman.  While the Court generally has authority to restore a procurement to the status

*quo ante* prior to the irrational or illegal action, it may not direct award of a contract to the

plaintiff.  *Parcel 49C Ltd. Partnership v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994).

### B.       Croman's Failure Upon The Merits Is Dispositive

As demonstrated above, Croman cannot prevail upon the merits of its protest.  For that

reason alone, this Court should end its inquiry and deny Croman's requested permanent

injunctive relief.  *See Academy Facilities Mgmt.*, 87 Fed. Cl. at 473; *Allied Materials & Equip.

Co., Inc. v. United States*, 81 Fed. Cl. 448, 463 (2008).

Even assuming Croman's success upon the merits, however, Croman has not

convincingly demonstrated that any of the other three considerations set forth by the Federal

Circuit in *PGBA* support the issuance of a permanent injunction.  Each of those three

considerations is addressed in turn below.

### C.       Croman Has Not Been Irreparably Harmed

Croman claims that it has been irreparably harmed:  (1) because it lost its opportunity to

compete in a fair procurement process; and (2) in the form of lost profits.  Motion 36-37; Supp.

Br. 5.  Such economic harm alone, however, is not sufficient to establish irreparable injury.  *See

Minor Metals, Inc. v. United States*, 38 Fed. Cl. 379, 381-82 (1997) (citing *Zenith Radio Corp. v.

United States*, 710 F.2d 806, 810 (Fed. Cir. 1983)) ("[E]conomic harm, without more, does not

seem to rise to the level of irreparable injury.").  This Court has applied this principle in the bid

protest context.  *See, e.g., Sierra Military Health Serv. v. United States*, 58 Fed. Cl. 573, 582

(2003) (quoting *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001)) ("[T]hese potential

losses are primarily monetary.  While these losses may be substantial, they are not irreparable.").

Croman further argues irreparable harm because it lacks an adequate remedy at law

because disappointed bidders are limited, by statute, to recovering bid preparation costs.  Motion

37.  That reasoning, taken from *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993),

and "numerous other cases" that Croman does not cite, has been called into question, however,

by the Supreme Court's decisions in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)

and *Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743 (2010).

In *eBay*, the Supreme Court stated that, in deciding whether to award permanent

injunctive relief, courts must apply the traditional four-factor test applied by courts of equity.

547 U.S. at 392-93.  In so holding, the Supreme Court noted that it has long recognized that "a

major departure from the long tradition of equity practice [*i.e.*, the traditional four-factor test]

should not be lightly implied" and that "nothing in the Patent Act indicates that Congress

intended such a departure."  *Id.* at 391-92 (citations omitted).  If, in bid protest cases, lost profits

and/or the loss of the opportunity to compete in a fair procurement process amounts to

irreparable harm, then a protestor's success upon the merits will nearly *always* result in a finding

of irreparable harm, and a portion of the four-factor injunctive relief test will effectively be

eliminated.  This is precisely what the Supreme Court held was improper.  *Id.* at 392-93.

Expanding upon its reasoning in *eBay*, the Supreme Court in *Monsanto* reaffirmed that

the "drastic and extraordinary remedy" of injunctive relief should not be "granted as a matter of

course."  130 S. Ct. at 2761 (citation omitted).  The Supreme Court emphasized that it "is not

enough for a court considering a request for injunctive relief to ask whether there is a good

reason why an injunction should *not* issue; rather, a court must determine that an injunction

*should* issue under the traditional four-factor test[.]"  *Id.* at 2757.

61

Moreover, in the Government contracting context, lost profits and other economic harm are too speculative to rise to the level of irreparable harm, even where protestors are limited to bid preparation and proposal costs.  Even if Croman had a right to receive a Government contract, which it does not, *see Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C. Cir. 1970), there is no guarantee that the contract would last any appreciable amount of time.  Unlike contracts between private parties, in nearly every Government contract, including the contract at issue, the Government retains the right to terminate the contract for the Government's convenience.  *E.g.,* 48 C.F.R. § 52.212-4(l); *see also AR Sales Co., Inc. v. United States*, 49 Fed. Cl. 621, 630 (2001) (after a termination for convenience, the contractor "cannot recover either lost profits it anticipated upon completion of the subject contract or lost profits it anticipated from other, unrelated contracts.").  Therefore, even if Croman were entitled to a contract award, any "lost profits" as a result of that contract would be completely speculative.

For all the foregoing reasons, Croman has not demonstrated that it has suffered *any* irreparable harm.

### D.	The Balance Of Harms Does Not Favor Croman

Croman's requested relief through its request for an injunction – that it be awarded several CLINs – is beyond this Court's authority to grant.  *Parcel 49C Ltd. Partnership*, 31 F.3d at 1153.  Moreover, if Croman's alleged harm of lost profits is redressable in the way that Croman suggests (*e.g.,* awarding Croman certain CLINs), that must be balanced against the lost profits that current awardees, including the intervenors, will suffer if the Court rescinds their awards in favor of Croman.  As this Court has stated, "[a] remedy that simply shifts the harm from one party to another . . . is not proper."  *Hawpe Constr., Inc. v. United States*, 46 Fed. Cl. 571, 582 (2000).  Finally, although the harm to the Forest Service of injunctive relief would be minimal, Croman's total lack of irreparable harm is balanced out by the Government's minimal

harm, just as Croman's alleged lost profits are balanced out by the intervenor's arguable lost profits. Ultimately, the stalemate that results makes non-dispositive the balance of harms factor in determining whether permanent injunctive relief is appropriate.

### E.        An Injunction Is Not In The Public's Interest

Croman argues that the "public interest in protecting the integrity of the procurement system is well served by granting injunctive relief" it has requested. Motion 37-38; Supp. Br. 6. This factor cannot, however, dominate the analysis of the public interest prong because that would create a presumption in favor of an injunction, which the Supreme Court rejected in *eBay*. Furthermore, there is a strong countervailing public interest in avoiding interference with the procurement process of Government agencies. *See LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 581 (2005) (public interest is not served by interfering with procurement process so long as the agency did not violate applicable laws and regulations).

Croman further argues that allowing the Forest Service's award decisions to stand will be an unnecessary waste of taxpayer money, "spending considerably more . . . than necessary to meet the government's needs or to get less helicopter coverage than the government should for the same dollar expenditure." Motion 38; *see also* Supp. Br. 6. However, it is well settled that "[d]etermining an agency's minimum needs 'is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess.'" *Savantage Fin. Serv., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004)). Finally, the focus of Croman's request for injunctive relief (*i.e.,* that the court direct awards to it) is excessive and would infringe upon the lawful discretion of the agency. Accordingly, it is in the public's interest to deny Croman's injunction request.

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court dismiss plaintiff's complaint for lack of subject matter jurisdiction; or, in the alternative, deny plaintiff's motion for judgment upon the administrative record, enter judgment upon the administrative record in favor of the Government, and deny the injunctive relief that plaintiff requests.

Respectfully submitted,


STUART F. DELERY
Acting Assistant Attorney General


JEANNE E. DAVIDSON
Director


s/ Scott D. Austin
SCOTT D. AUSTIN
Assistant Director

OF COUNSEL
ELIN M. DUGAN                              s/ Russell J. Upton
Senior Counsel                             RUSSELL J. UPTON
Department of Agriculture                  Trial Attorney
Office of the General Counsel              Department of Justice
General Law And Research Division          Civil Division
1400 Independence Ave, SW                  P.O. Box 480
Room 3311-S                                Ben Franklin Station
Washington, D.C. 20250                     Washington, D.C. 20044
Telephone:  (202) 720-4978                 Telephone:  (202) 305-3634
Facsimile:  (202) 720-5837                 Facsimile:  (202) 514-7969
E-mail:  Elin.Dugan@ogc.usda.gov           E-mail:  Russell.J.Upton@usdoj.gov

June 6, 2012                               Attorneys for Defendant

64