REDACTED VERSION

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST FILED UNDER SEAL**

| | |
|---|---|
| CROMAN CORPORATION, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | No. 12-75C |
| ) | (Judge George W. Miller) |
| THE UNITED STATES, ) | |
| ) | |
|     Defendant. ) | |
| ) | |
| and ) | |
| ) | |
| MOUNTAIN WEST HELICOPTERS, LLC, ) | |
| ) | |
| and ) | |
| ) | |
| COLUMBIA HELICOPTERS, INC., ) | |
| ) | |
| and ) | |
| ) | |
| SILLER HELICOPTERS, INC., ) | |
| ) | |
|     Defendant-Intervenors. ) | |
| ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS FOR**
**LACK OF SUBJECT MATTER JURISDICTION, OPPOSITION TO PLAINTIFF'S**
**MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD, AND**
**CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Alan I. Saltman
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20036
Phone: (202) 452-2140
Fax:    (202) 775-8217
email: AISaltman@smithcurrie.com

Attorney for Plaintiff

OF COUNSEL:

Stephen J. Kelleher
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20036
Phone: (202) 452-2140
Fax:    (202) 775-8217
email:  SJKelleher@smithcurrie.com

Dated:  June 20, 2012

## TABLE OF CONTENTS

**PAGE**

Table of Authorities ............................................................................................................ ii

ARGUMENT ....................................................................................................................... 1

I.  Croman's Protest Should Not Be Dismissed For Lack Of Subject
    Matter Jurisdiction.  The Protest Is Not Moot ................................................... 1

II.  Croman Has Standing To Bring This Protest ...................................................... 6

III.  Croman's Protest Is Timely ................................................................................ 9

IV.  Croman Did Not Abandon Its Claims That The Government
     Improperly Partially Cancelled RFP-9001 ...................................................... 12

V.  The Agency Both Conducted An Improper Tradeoff Procedure And
    Failed To Justify Why Paying A Higher Price Was Warranted ....................... 14

VI.  Additionally, The Agency Also Erred By Not Rejecting Siller's
     Proposal for CLIN 23 ...................................................................................... 24

VII.  The Technical Scores Produced And Relied Upon By The Agency
      Distorted The Difference Between Aircraft In The Most Important
      Factor (Aircraft Performance) And Were Otherwise Falsely Precise ............. 32

VIII.  Croman Is Entitled To Injunctive Relief ......................................................... 40

       A.  Relief Requested ................................................................................... 40

       B.  Croman Has Suffered Irreparable Harm ............................................... 42

       C.  The Balance Of The Harms Favors Croman.......................................... 45

       D.  Injunctive Relief Is In The Public's Interest ........................................ 47

IX.  Conclusion ....................................................................................................... 48

i

# TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE**

AFGE, Local 1482 v. United States,
258 F.3d 1294 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002) .................................6

Allied Tech. Group v. United States,
94 Fed. Cl. 16 (2010) ......................................................................................................6, 7

Arakaki v. United States,
62 Fed. Cl. 244 (2004) ........................................................................................................13

Bayfirst Solutions, LLC v. United States,
102 Fed. Cl. 677 (2012) ......................................................................................................43

Blue & Gold Fleet v. United States,
492 F.3d 1308 (Fed. Cir. 2007)......................................................................................11, 12

Brooks Range Contract Services, Inc. v. United States,
101 Fed. Cl. 699 (2011) ........................................................................................................8

Chapman Law Firm Co. v. United States,
490 F.3d 934 (Fed. Cir. 2007)...............................................................................................1

Contracting, Consulting, Engineering, LLC v. United States,
No. 12-97C, 2012 WL 1278042 (April 16, 2012) .............................................................42

County of Los Angeles v. Davis,
440 U.S. 625 (1979)...............................................................................................................3

Cyprus Amax Coal Co. v. United States,
205 F.3d 1369 (Fed. Cir. 2000)..............................................................................................3

DCS Corp. v. United States,
96 Fed. Cl. 167 (2010) ........................................................................................................13

Distributed Solutions, Inc. v. United States,
539 F.3d 1340 (Fed. Cir. 2008)..............................................................................................2

eBay, Inc. v. MercExchange, L.L.C.,
547 U.S. 388 (2006)......................................................................................................43, 44

Fox & Company,
    B-197272, 80-2 CPD ¶ 340..........................................................................16

Galen Med. Assocs., Inc. v. United States,
    369 F.3d 1324 (Fed. Cir. 2004).............................................................6, 7

Galen Med. Assocs., Inc. v. United States,
    56 Fed. Cl. 104 (2003) ...............................................................................7

GTA Containers, Inc. v. United States,
    2012 WL 562434 (Fed. Cl. 2012) .........................................................2, 3

Heritage of America v. United States,
    77 Fed. Cl. 66 (2007) ................................................................................43

Impresa Construzioni Geom. Domenico Garufi v. United States,
    238 F.3d 1324 (Fed. Cir. 2001)..................................................................7

Info. Tech. & Applications Corp. v. United States,
    316 F.3d 1312 (Fed. Cir. 2003)..................................................................8

Magnum Opus Technologies, Inc. v. United States,
    94 Fed. Cl. 512 (2010) ................................................................................2

Metcalf Construction Co., Inc. v. United States,
    53 Fed Cl. 617 (2002) ..............................................................................16

Minor Metals, Inc. v. United States,
    38 Fed. Cl. 379 (1997) ..............................................................................42

Monsanto Co. v. Geertson Seed Farms,
    130 S.Ct. 2743 (2010).........................................................................43, 44

Mori Associates, Inc. v. United States,
    102 Fed. Cl. 503 (2011) ............................................................................43

NetStar-1 Gov't Consulting, Inc. v. United States,
    101 Fed. Cl. 511 (2011) ............................................................................43

NEQ, LLC v. United States,
    88 Fed. Cl. 38 (2009) ..............................................................17, 18, 31

OAO Corp. v. United States,
    49 Fed. Cl. 478 (2001) ..............................................................................45

Overstreet Elec. Co. v. United States,
    47 Fed. Cl. 728 (2000) ................................................................................44

PGBA, LLC v. United States,
    389 F.3d 1219 (Fed. Cir. 2011) .................................................................45

Serco, Inc. v. United States,
    81 Fed. Cl. 463 (2008) ....................................................................... *passim*

Sierra Military Health Services, Inc. v. United States,
    58 Fed. Cl. 573 (2003) ................................................................................42

Software Testing Solutions, Inc. v. United States,
    58 Fed. Cl. 533 (2003) ................................................................................44

Standard Commc'ns, Inc. v. United States,
    101 Fed. Cl. 723 (2011) ..........................................................24, 30, 31, 45, 47

Technical Innovation, Inc. v. United States,
    93 Fed. Cl. 276 (2010) .................................................................................5

Transatlantic Lines, LLC v. United States,
    68 Fed. Cl. 48 (2005) .................................................................................44

United Int'l Investigative Servs., Inc. v. United States,
    41 Fed. Cl. 312 (1998) ...............................................................................43

United States v. Int'l Bus. Machines,
    892 F.2d 1006 (Fed. Cir. 1989) ...................................................................7

Wackenhut Services, Inc. v. United States,
    85 Fed. Cl. 273 (2008) ...............................................................................16

Weston Solutions, Inc. v. United States,
    95 Fed. Cl. 311 (2010) ...............................................................................15

## STATUTES AND REGULATIONS

28 U.S.C. § 1491(b)(1) .................................................................................2

FAR § 15.101-1 ..........................................................................................15

FAR § 15.308 .............................................................................................15

iv

**MISCELLANEOUS**

https://www.fbo.gov/index?tab=documents&tabmode=form&subtab=core&tabid=0be7b6524f3f
     ce466381fb9754884a61
     (last visited June 20, 2012) ............................................................................................ 26

https://www.fbo.gov/index?tab=documents&tabmode=form&subtab=core&tabid=72527ca4f7da
72635aad45be5cf2a63f
     (last visited June 20, 2012) ............................................................................................26

## ARGUMENT

Set forth below is Plaintiff's response to Defendant's motion to dismiss for lack of subject matter jurisdiction and the opposition and cross-motion of both Defendant and the Intervenors for judgment upon the administrative record.  For the reasons set forth in Plaintiff's motion for judgment upon the administrative record and this response, the motions of the Defendant and Intervenors should be denied and Plaintiff's motion should be granted.

**I.      Croman's Protest Should Not Be Dismissed For Lack Of Subject Matter Jurisdiction.  The Protest Is Not Moot**

The Government argues that the "Court should dismiss Croman's bid protest for lack of subject matter jurisdiction because the Forest Service's corrective action made Croman's protest of the initial procurement moot."  Defendant's Motion To Dismiss For Lack Of Subject Matter Jurisdiction, Opposition To Plaintiff's Motion For Judgment Upon The Administrative Record, And Cross-Motion For Judgment Upon The Administrative Record ("G's Opp.") at 22. Croman's protest has not been rendered moot by the corrective action taken by the Forest Service.  In fact, the very authority that the Government relies upon demonstrates that this Court has jurisdiction.

As set out in <u>Chapman Law Firm Co. v. United States</u>, 490 F.3d 934, 940 (Fed. Cir. 2007), G's Opp. at 20, a case should be dismissed "when, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue."  Under this standard, Croman's protest should not be dismissed as moot.  That is, the relief that Croman seeks, the opportunity to compete in a fair procurement process line for items 17, 23, 28, 29, 30, 32, and 33 as well as the four cancelled items (21, 22, 27 and 34) of RFP No. AG-02-4BS-11-9001 ("RFP-9001") based on a proper

1

evaluation and appropriate tradeoffs, has yet to occur.  <u>See</u> Complaint at 11; Plaintiff's Motion

for Judgment on the Administrative Record ("P's Motion") at 19. The so-called corrective

action, that the Government contends cured all flaws in this procurement, certainly did not do so.

As such, the questions "originally in controversy" are still at issue.  Namely, Croman contended

in its Complaint and continues to contend that the evaluation conducted and tradeoff decisions

made by the Forest Service in the initial procurement and as "corrected" were not performed in

accordance with the terms of the RFP and/or applicable statutes and regulations.  Likewise,

Croman continues to assert that the Agency's decision to cancel line items 21, 22, 27 and 34 of

RFP-9001 lacked a reasonable basis.  These assertions are not moot.

     In asking the Court to dismiss Croman's protest as moot, the Government also ignores

authority that it cites which leads to the opposite conclusion.

     The Court of Federal Claims has jurisdiction to "render judgment on an action by an

interested party objecting [on] any alleged violation of statute or regulation in connection with a

procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  This Court has stated that

"the phrase 'in connection with a procurement or a proposed procurement is very sweeping in

scope.'"  <u>Magnum Opus Technologies, Inc. v. United States</u>, 94 Fed. Cl. 512, 525 (2010) (<u>citing</u>

<u>Distributed Solutions, Inc. v. United States</u>, 539 F.3d 1340, 1345 (Fed. Cir. 2008)).  Furthermore,

the Court may hear any claim involving a connection with "any stage of the federal contracting

acquisition process."  <u>Id.</u> (citations omitted).

     In its opposition at page 22, the Government cites the recent case of <u>GTA Containers,</u>

<u>Inc. v. United States</u> but does not fairly quote its holding that "a case will be dismissed as moot if

an intervening event during its pendency 'renders it impossible for [the] court to grant any

2

effectual relief.'"  2012 WL 562432 (Fed. Cl. 2012) (citing Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1372-73 (Fed. Cir. 2000)).  In the instant case, the Court is certainly still in position to grant Croman the relief that it seeks.  Specifically, if the Court finds that the Forest Service did not properly evaluate proposals, conduct the requisite tradeoff, and/or improperly partially terminated RFP-9001, it can still fashion appropriate relief.

The Government further fails to acknowledge the elaboration on the mootness standard recited by the Court in GTA Containers, i.e., that the Supreme Court has held that a case becomes moot "because (1) it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." GTA Containers, 2012 WL 562432, at *9 (citing County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citations omitted)).  If both conditions are met, then the case is moot because neither party then has a "legally cognizable interest in the final determination" of the case.  Id.

In the instant case, neither of these conditions has been met.  First, the violation has likely just recurred in the form of awards made under RFP No. AG-024B-S-9025 ("RFP-9025") (the replacement RFP under which the Agency seeks to secure the services covered by the improper cancellation of line items 21, 22, 27 and 34).  RFP-9025 includes the exact same evaluation criteria pursuant to which an equally improper evaluation/award procedure was utilized.  Indeed, the results of the solicitation, which were just announced on June 18th, were that one of the items was awarded to a company proposing a Heavy-lift helicopter at a price, while less that Siller's

3

for item 23, was still very high in comparison to those submitted by offerors proposing Medium-lift helicopters.[1]

More importantly, the so-called corrective action completed in March 2012 did not "completely and irrevocably" eradicate the effects of the violations alleged. The results of the corrective action, with one exception,[2] changed nothing. By the so-called corrective action, the Agency failed to rectify its evaluation errors, its failure to perform a proper tradeoff as required by the FAR or its improper partial cancellation of RFP-9001. The corrective action certainly did not "completely and irrevocably" eradicate the effects of the Forest Service's violations; rather, it perpetuated them. As such, Croman's protest is anything but moot.

The Government also contends that the so-called corrective action was an intervening event that renders Croman's protest moot. While Croman acknowledges that the corrective action took place, as noted, the ultimate effect of it did not, however, obviate the fundamental flaws in the Agency's procurement process.

Finally, the Government contends that Croman is free to challenge the corrective action award decisions, but should have done so in a separate action. G's Opp. at 24. The Government has provided no authority for such a requirement and, given this Court's sweeping jurisdiction over bid protests under the Tucker Act, filing a separate action was not necessary. Indeed, there would seem to be little reason other to generate additional paper, to require a company that has challenged an agency's evaluation methodology, its failure to conduct a proper tradeoff

---

[1] See Attachment A. The awardee of Line Item 2 under RFP-9025 offered a base availability rate of $14,000 and a total price for the base year and the three option years of $15,526,800.

[2] The awardees for line items 31 and 32 were switched. AR 16000.

procedure and its improper partial cancellation of a RFP, to file a separate protest when the agency's so-called corrective action failed to correct any of the infirmities alleged.[3]

The Government does cite Technical Innovation, Inc. v. United States, 93 Fed. Cl. 276 (2010). However, Technical Innovation does not stand for the proposition that after a corrective action has been done by an agency that the initial plaintiff/protester must file a separate action to protest the results of corrective action taken by the Agency. In Technical Innovation, the plaintiff brought a post-award bid protest challenging the award of an indefinite delivery/indefinite quantity contract by the Air Force. The awardee, Millenium Systems Services, Inc., intervened in the protest. After the protest was filed, the Government announced that is intended to take corrective action and suspended performance of the awarded contract. The protest was stayed pending the completion of the corrective action. During the Air Force's review of the procurement, it decided to terminate the awarded contract and to issue a new solicitation for the services in question. Id. As a result of this corrective action, the Government moved to dismiss the case for lack of subject matter jurisdiction, a motion to which the plaintiff/ protester unsurprisingly did not object. Id. The intervenor, however, objected to the motion. In denying the intervenor's objection, the Court stated that dismissal of the case in which the intervenor did not file an answer or cross-claim, was entirely proper and that if the intervenor believed that in making a 180 degree change in position the agency had violated the law, it could file a separate protest action. Id. at 279. Technical Innovation does not stand, nor does the

---

[3] Indeed, the Government, the Intervenors and the Court were all fully aware of Croman's position when, after this case was put in suspense status pending the outcome of the corrective action, upon its being accomplished, Croman promptly notified the parties and the Court that it wanted to proceed with the case.

Government point to any other authority, for the proposition that where, as here, the "corrective"

action cures none of the errors initially alleged by the protester that it must file a separate action

in this Court against the agency's failure to take truly corrective action.

Given scope of this Court's bid protest jurisdiction, it is entirely appropriate, in the

absence of any meaningful corrective action, for the Court to reach the merits of Croman's

protest.

**II.      Croman Has Standing To Bring This Protest**

The Government and one of the Intervenors have argued that Croman has not established

standing to pursue this protest.  G's Opp. at 24; Defendant-Intervenor Siller Helicopters, Inc.'s

Opposition to Croman Corporation's Motion for Judgment on Administrative Record and Cross-

Motion for Judgment on Administrative Record ("Siller's Opp.") at 8.  These arguments are,

however, baseless.

 In order to establish standing, a plaintiff must show that it is an actual or prospective

offeror whose economic interest would be affected by the award of the contract, i.e., that it was

an interested party prejudiced by the award.  AFGE, Local 1482 v. United States, 258 F.3d 1294,

1302 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002).  To establish prejudice, a plaintiff

must show that there was a "substantial chance" that it would have received the award but for the

alleged errors in the procurement process.  Galen Med. Assocs., Inc. v. United States, 369 F.3d

1324, 1328 (Fed. Cir. 2004).

In its Opposition, the Government cites Allied Tech. Group v. United States, 94 Fed. Cl.

16, 37 (2010), for the proposition that "in a situation where there are multiple bidders, a protester

only has standing 'where the protestor's quotation would be next in line for selection if its protest

were sustained.'"  G's Opp. at 25.  The Government's reliance on <u>Allied Tech.</u> is, however, misplaced.  First, in that case there were only two bidders.  <u>Id.</u> at 32.  As such, if Allied Tech. succeeded in its protest it would have been next in line by default.  Additionally, in <u>Allied Tech.</u>, the Court did not say that a protester "only" has standing when it would be next in line.

      The Government's insertion of the word "only" preceding the quotation misstates the holding of that case.  The Government's reliance upon <u>Galen Med.</u> and <u>Galen Med. Assocs., Inc. v. United States</u>, 56 Fed. Cl. 104 (2003), G's Opp. at 26, also does not prove the Government's point.  Both <u>Galen</u> decisions rely ultimately on <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324 (Fed. Cir. 2001).  In <u>Impresa</u>, the Federal Circuit stated that previous cases had concluded that standing could not be found where a contractor did not submit a proposal, the bidder withdrew, or was rated below second.  <u>Id.</u>  at 1334.  Importantly, however, in <u>Impresa</u>, the Federal Circuit held that the case before it was "unlike" those earlier cases in that, if the protester succeeded, then the Government would be obliged to re-bid the contract and the protester would be able to compete for the contract again, <u>id.</u>, and, as such, that the plaintiff had standing.[4]  Such is the case here as well.  That is, if Croman succeeds, the Forest Service will be required to re-evaluate proposals, perform an adequate tradeoff analysis, to justify the award

---

[4]Though the Government and the intervenors fail to acknowledge it, the "next in line" doctrine comes out of an entirely different set of procurements than the one before the Court in this case.  The case cited by the <u>Impresa</u> Court (and noted as entirely unlike the protest in that protest) was <u>United States v. Int'l Bus. Machines</u>, 892 F.2d 1006 (Fed. Cir. 1989).  <u>Int'l Bus. Machines</u> formally advertised procurement where each offeror offered "essentially the same package of products and services" and there was no reason to believe that the second low bidder was not responsive to the solicitation.  <u>Id.</u> at 1011.  Therefore, the Court found that only the second low bidder was an interested party.

to higher priced offers and reverse the cancellation of line items 21, 22, 27 and 34.  As a result, Croman may well be awarded one or more line items.

Furthermore, in Brooks Range Contract Services, Inc. v. United States, 101 Fed. Cl. 699 (2011), this Court held that in the context of a competitively negotiated procurement that the next-in-line rule was inapplicable.  In Brooks Range, GSA had issued a Sources Sought notice seeking interest from companies on a contract under the Federal Supply Schedule.  The plaintiff and ten other contractors were selected to receive the RFP.  Id. at 702.  Five contractors submitted timely proposals.  Id. at 703.  The award decision was made on a best value basis where technical capabilities and past performance were "slightly more important than price."  Id. at 702.  After not being selected for award, the plaintiff filed suit alleging that the agency had awarded a delivery order to an entity that did not hold the required FSS contract.  Id. at 705.  The Government asserted that because Brooks Range was not next in line for award, it lacked standing.  The Court disagreed ruling that, in the circumstances, in order to have standing a plaintiff "need not be next in line for the award."  Id. at 713 (citing Info. Tech. &Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  Info. Tech., in turn, involved a plaintiff who protested the award of a professional services contract.  The contract was solicited under an RFP that called for the award to be made to the contractor who will "best meet [the] requirements affordably."  Id. at 1315.  The Federal Circuit stated that, because the protester "had greater than an insubstantial chance of securing the contract if successful on the merits," he had standing.  Id. at 1319.[5]

---

[5]The Government additionally argues that Croman cannot show that it would have been "next in line" for award of line item 23 because, even if award had not been made to Siller,

8

Given these holdings, Croman's rating of "Exceptional" in three out of the four technical

Factors and its low price, it too has greater than an insubstantial chance of securing a contract if

successful on the merits of the protest.  As such, there is little doubt but that Croman has

standing.

**III.    Croman's Protest Is Timely**

In its Opposition, the Government argues that Croman waived its right to protest the

award of any Line Items under this RFP and construes Croman's protest to be an untimely

challenge to the terms of the solicitation itself.  This is utterly fallacious.

The Government asserts that Croman had knowledge of the terms of the RFP, i.e., that

for line items 16-34 its Medium-lift helicopters might be competing against Heavy-lift

helicopters, filed no pre-award protest, but rather, only after award, objects to the Forest

Service's evaluation scheme as to CLIN 23 by asserting that:  (1) Siller's T9125M should have

been rejected outright based upon its unreasonably high price, and (2) Siller's price premium was

not reasonably justifiable.  G's Opp. at 30.

_____

Croman cannot prove that award would not have been made to Rainer Heli International.  G's
Opp. at 27.  (In this regard, in its Motion, Croman had noted that the helicopter proposed by
Rainer for line item 23 (i.e., helicopter T699RH) was unavailable for award of line item 23
because it had been awarded contract for line item 16.  P's Motion at 18.)

The Government's suggestion that helicopter T699RH would have been available for
award of line item 23 is totally contrary to the way the OM worked.  That is, as the Forest
Service has explained, when making award recommendations, the OM simultaneously looked at
all line items and did not make award recommendations in numerical order.  AR 16042-43.  As
such, the effective removal of T699RH from the competition for line item 23 occurred at the
same instant that it was being recommended for award of line item 16.  The Government's
argument also ignores the fact that the Agency accepted the OM's recommendation and did, in
fact, award line item 16 to Rainer for helicopter T699RH.

9

The Government's assertions miss the mark.  That is, even assuming that Croman was or should have been aware that a company such as Siller might propose a Heavy-lift helicopter at an extremely high price for a line item that only required a 3,300 lbs. lift capacity, absent being clairvoyant, it had no reason to believe that the Forest Service would not reject such an over-the-top proposal.   That is, such a proposal should have been rejected as unreasonable as to price, and/or because it demonstrated a lack of understanding of what was needed for CLIN 23[6] . or not awarded a contract based in a proper  tradeoff analysis .

Lacking such clairvoyance, Croman could not have foreseen these post-award failures and certainly could not have protested them prior to the date of debriefing when they first became known.

The Government's assertions, G's Opp. at 31, to the contrary notwithstanding, Croman is not challenging the terms of the RFP, the Factors set forth therein, or the weights assigned to those Factors; nor is it suggesting that there is anything wrong with the RFP.  Indeed, if the Forest Service had followed all of the terms of the solicitation, the applicable statutes and regulations, and the terms of the Source Selection Plan, Croman would have no basis to complain about the outcome of the selection process.  The Agency did not, however, conduct the procurement and make award in a manner that followed all of the terms of the solicitation, the applicable statutes and regulations and the terms of the Source Selection Plan.

The Government's statement that "the eligibility of Siller's aircraft and the Forest Service's willingness to pay for it, were apparent on the face of the 2011 RFP," G's Opp. at 30,

---

[6] In this regard the RFP specifically stated that " price proposals shall be evaluated to determine reasonableness  and to determine the demonstrated understanding of the level of effort needed to perform the service." RFP §E-3 AR 280

is simply not true and begs the question.  Certainly, there is nothing on the face of the RFP that says specifically that Siller's aircraft was eligible for award.  Croman understood the specifications to be minimums but that the RFP and the law specifically required that any technical merit associated with proposing a helicopter that exceeded the minimum lift specification would be evaluated properly and that a tradeoff would be performed to select the proposals that represented the best value.  Moreover, nothing on the face of the RFP remotely suggested that the Forest Service was willing to spend a large amount of money to obtain services under CLIN 23 (Fresno, CA).  In fact, given that the solicitation was specifically amended to move this particular base from the Heavy-lift, line item 1-15 group to the Medium-lift, line item 16-34 group (see discussion infra), the Forest Service's multiple references during the solicitation to its tight budgetary situation, see AR 15955, see also AR 15994, 16040, and the reference in the RFP that the Forest Service would not necessarily pay for technical capabilities exceeding those needed to successful perform the work, AR 282, all indications were that spending less not more was the Forest Service's goal.

However, irrespective of all else, the RFP and the FAR required the Forest Service to conduct both a proper evaluation and a proper tradeoff thereafter to justify its selection if a high-priced offeror (such as Siller), even if, based on a proper evaluation, that offeror had a high technical score.  The Agency failed to do any of these, i.e., things that Croman had no way of knowing before being made aware that an award of line item 23 had been made to Siller at the astounding total price of $17.7 million and notwithstanding the improper evaluation of proposals.

Lastly, despite the Government's contentions to the contrary, the present situation is also unlike that in Blue & Gold Fleet v. United States, 492 F.3d 1308 (Fed. Cir.2007).  In Blue &

Gold, the plaintiff asserted, after the agency had selected the proposed awardee, that the agency should have applied the Service Contract Act ("SCA") to the procurement and evaluated each offeror's cost proposal based on the SCA's applying.  The Court held that the protester's argument was untimely, i.e., that the lack of any requisite indicia in the RFP that the agency intended to apply the SCA made it incumbent on the protester to raise the agency's apparent intent not to do so before the date set for receipt of proposals.  Here, Croman asserts that the Agency failed to properly evaluate proposals and conduct a proper tradeoff  process. Performance of a proper evaluation and tradeoff are not only mandated by regulation but, unlike applying the SCA, require no notification in the RFP (such as the inclusion of an SCA wage determination).  As such, unlike the situation in Blue & Gold, here, there was nothing in or missing from the RFP which would have put Croman on any notice that the Agency did not intend to perform duties (i.e., to perform a proper evaluation and tradeoff) required by law.  The same is, of course, also true with regard to the Agency's improper partial cancellation of RFP-9001.

In sum, despite the Government's concerted attempt to contort Croman's challenge of the Agency's failures during the evaluation/selection process into a challenge of the terms of the RFP, Croman is simply not challenging the solicitation.  As such, Croman's protest is timely.

**IV.     Croman Did Not Abandon Its Claim That The Government Improperly Partially Cancelled RFP-9001**

Despite the Government's arguments, Croman has also not abandoned its allegation that the cancellation of line items 21, 22, 27 and 34 was improper.  As Croman has argued "In its Complaint, Croman asserted that the Forest Service lacked a reasonable basis for partially cancelling RFP-9001," Croman's Supplemental Brief. ("P's Supp. Br.") at 2, and that this Court

should  "permanently enjoin the Forest Service from obtaining performance of the services

covered by Contract Line Items 21, 22, 27 and 34 of RFP AG-02-4BS-11-9001 (and RFP No.

AG-024B-S-12-9025) from any company or companies other than to the properly evaluated

offeror(s) whose proposal(s) provide(s) the Government the best value pursuant to and consistent

with the terms of RFP AG-02-4B-S-11-9001 for Contract Line Items 21, 22, 27 and 34."  P's

Supp. Br. at 2.

    In support of its abandonment assertion, the Government cites DCS Corp. v. United

States, 96 Fed. Cl. 167 (2010).  DCS Corp. does not, however, support the notion that Croman

has abandoned its claims.  In DCS Corp., the plaintiff failed to raise issues from two of its

counts.  However, the basis for the Court's ruling that those claims had been abandoned was that

the plaintiff had failed to "address these issues in its briefs or **at oral argument**" (emphasis

added).  The Government, in quoting this line from DCS Corp., has overlooked the simple fact

that the instant case has yet to reach oral argument and that, even if it had not already done so in

its briefing, Croman could have avoided a finding of abandonment simply by asserting the issue

at oral argument.

    The additional authority cited by the Government to support its argument that Croman

has abandoned its claim is irrelevant to these proceedings.  In Arakaki v. United States, 62 Fed.

Cl. 244, 246 (2004), the plaintiff raised a claim that a contract violated the statute of frauds for

the first time in its reply brief and at oral argument.  The Court ruled that it would not consider

the arguments.  The cited situation is hardly analogous to that in the instant case.  Indeed, in the

Government's own words, here, Croman raised the issue of the improper cancellation in its

Complaint, see G's Opp. at 32, not for the first time in some briefing thereafter.

13

Simply put, Croman remains of the view that the issuance of RFP-9025 is clear evidence that the Forest Service's assertion that it had to partially cancel four items in RFP-9001 due to a lack of funds, AR 15955, is simply not true.

## V.   The Agency Both Conducted An Improper Tradeoff Procedure And Failed To Justify Why Paying A Higher Price Was Warranted

In its Motion, Croman demonstrated that the Agency both failed to conduct a proper tradeoff procedure and failed to justify why paying the awardees' higher price was warranted with regard to line items 17, 23, 28, 29, 30, 32, and 33.  Id. at 19-35.  Unfortunately, in its Opposition, the Government ignores much of the law laid out in those pages.  For example, Croman pointed out that in Serco, Inc. v. United States, 81 Fed. Cl. 463, 496 (2008), the Court held that

> "[e]ven where, as here, a solicitation provides that technical criteria are more important than price, an agency must select a lower-priced, lower technically scored proposal if it reasonably decides that the premium associated with selecting the higher-rated proposal is unwarranted."

P's Motion at 20 (emphasis added).[7]

---

[7]In footnote 14 on page 28 of the Government's Opposition, it asserts that Serco is distinguishable because:

> the solicitation there "added an important caveat" not present in the 2011 RFP. 81 Fed. Cl. at 466.  Specifically, the Serco solicitation stated that "the closer the technical scores . . . are to one another, the more important cost or price considerations become in determining the overall best-value for the Government." Id. at 466-67.  The Serco Court subsequently referenced this "important caveat," suggesting that the defendant had ignored it when evaluating proposals. Id. at 493 n.45.  There was no such "important caveat" ignored by the Forest Service here.

Even if the RFP here in issue did not contain such a caveat, Serco is not distinguishable. That is, Serco teaches that an Agency must be concerned with whether perceived technical merit is worth the expenditure of additional money to obtain.

This holding notwithstanding, relying on the fact that the RFP indicated that in the evaluation process technical criteria are more important than price, the Government states that "**forsaking lower prices for better performance was required by the 2011 RFP**."  G's Opp. at 40 (emphasis in original).[8]  As described below, this incorrect belief appears to have served as a mantra for the Agency's failure to engage in a proper tradeoff procedure.

In discussing what constitutes an appropriate tradeoff process, the Court in Serco held that:

> [FAR §§ 15.101-1 and 15.308] requires the agency to make a business judgment
> as to whether the higher price of an offer is worth the technical benefits its
> acceptance will afford.  See, e.g., TRW, Inc.[ v. Unisys Corp.], 98 F.3d 1325
> 1327 (Fed. Cir. 1996); Dismas Charities, Inc., .[ v. United States],  61 Fed. Cl.

---

That said, RFP-9001 did, however, contain what could also be called an important caveat, i.e., the following proviso in § E-4:  "The significance of the spread of scores will be determined on the basis of what the difference might mean in terms of performance and what it would cost the Government to take advantage of it."  AR 282.  As this proviso makes clear, there is the difference between the costs of two technically acceptable proposals increases, the significance of any difference in technical scores should decrease.

While not suggesting that Serco is distinguishable, Columbia appears to aver that the Court consider the complexity of this procurement when taking into account the propriety of the Agency's actions.  Columbia's Opp. at 5-6.  There is, however, no allowance in the FAR or the case law for an Agency to deviate, due to the complexity of procurement, from what is otherwise required of it.  Indeed, Columbia cites no authority for the proposition it asserts.  Moreover, as exemplified by Serco and many other complex procurements, there is no reason why all of the normal procurement rules cannot be followed even in complex procurements.  Lastly, had the Forest Service's evaluation process been properly structured so as to actually determine the strengths and weakness (and the degree thereof) of competing proposals, there is no reason why the SSA could not have made the tradeoff decisions required of him by law.

[8]The Government goes so far on page 40 of its Opposition as to truncate the assertion made by Croman at P's Motion at 34 and make it seem that Croman was protesting the fact that the Agency had in every instance simply "failed to make award to the low-priced offeror."  See similar assertion in Siller's Opposition at 9.  As the  Court will note, Croman's assertion is that the Agency, when considering whether to make an award to other than the low-priced offeror, failed to perform the steps required by FAR §15.101-1 as iterated in Serco.

15

191, 203 (2004).  Doing this, the decisional law demonstrates, obliges the agency to do more than simply parrot back the strengths and weaknesses of the competing proposals – rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price.

81 Fed. Cl. at 497.  As outlined in P's Motion, at least for the line items in question, the Agency totally failed to determine whether the relative strengths and weaknesses of the competing proposals was worth paying the proposed awardee's higher price.[9]  P's Motion at 21.

---

[9]At pages 39-41 of its Opposition, the Government essentially argues that, irrespective of the lack of a tradeoff process such as described in Serco, the protested selection decisions were nevertheless reasonable, i.e., that the SSA articulated a rational connection between the "valuable information continued in the Spreadsheets the OM produced" and his award decisions.  Id. at 39.  Unfortunately, the basis that the Government uses to assert the reasonableness of the Agency's selection decisions is the differences in the technical evaluation scores (as reflected on Attachment 4 of tab 67 of the AR, i.e., AR 16046-16061) between lower-priced offerors (such as Croman) and offerors receiving better evaluation scores.

In doing so, the Government totally ignores the fact that:

1.  "Technical scores alone . . . do not form the basis for the award of a contract.  Numerical point scores, when used for proposal evaluation, are useful as guides to intelligent decision making, but are not themselves controlling in determining award, since these scores can only reflect the disparate, subject and objective judgments of the evaluators."  Fox & Company, B-197272, 80-2 CPD ¶ 340 (emphasis added).  Accord Weston Solutions, Inc. v. United States, 95 Fed Cl. 311 , 328 (2010); Wackenhut Services, Inc.  v. United States, 85 Fed. Cl. 273, 293 (2008) ("Adjectival ratings and point scores are only a guide to assist agencies in evaluating proposals; information on advantages and disadvantages of proposals is the type of information that source selection authorities should have in addition to ratings and point scores to enable them to determine whether and to what extent meaningful differences exist between proposals"); Metcalf Construction Co., Inc. v. United States, 53 Fed. Cl. 617, 640 (2002) (same).

2.  As discussed infra, here, the technical scores assigned by the  Agency distorted the difference between aircraft in the most important factor (Aircraft Performance) and were otherwise falsely precise.  Moreover, no strength and weakness were identified or discussed in the evaluation.

16

Conveniently ignoring the fact that because the Agency used the OM to "determin[e] for each line item, which aircraft will provide the best value to the Government," AR 16040,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

AR16044 (emphasis added), the Government nevertheless attempts to suggest that the Agency did somehow engage in an appropriate tradeoff process, asserting that:

A. Attachments 4 and 7 of Tab 67 of the AR (AR 16046-61 and 16210-12, respectively) "contradict Croman's arguments that the Forest Service never documented Croman's strengths and weaknesses compared with other proposals, and that the administrative record includes no documentation of the tradeoffs the Forest Service made as to each award decision."

B. This Court should conclude that the tradeoff process here was acceptable, as was the one at issue in <u>NEQ, LLC v. United States</u>, 88 Fed. Cl. 38, 51 (2009). G's Opp. at 39-40.

In the latter regard, as the Government notes in <u>NEQ</u>, which involved a proposed EPA contract to provide fast environmental cleanup services of hazardous substance spills throughout the Midwest, 88 Fed. Cl. at 41, the Court found that "[r]ather than summarily concluding that a premium should be paid, the tradeoff discussion here ran a half dozen pages, exhaustively relying on the charts and statistics recounted in the background segment above." <u>Id.</u> at 51. That

---

3. The RFP stated in pertinent part:

"The critical factor in making any price/technical tradeoff is not the spread between the technical scores but the significance of the difference," and

"The significance of the spread of scores will be determined on the basis of what the difference might mean in terms of performance and what it would cost the Government to take advantage of it." § E-4, AR 282.

4. No such determination of the significances of the spread of scores was ever made.

said, the Government, however, ignores the fact that the tradeoff decision made in NEQ (i.e., the decision to make award to an offeror (LATA-KEMRON) whose price was a mere 2.2% higher than the protestor's) relied on the detailed explanation made by the technical evaluation panel of the strengths that it found in LATA-KEMRON's technical proposal and why those strengths were meaningful, i.e., the Source Selection stated:

> "The panel has concluded that LATA-KEMRON has the most thoroughly identified team subcontractor network, and the highest level of direct presence overall in the nine emergency response metropolitan areas.  Having a thoroughly identified team subcontractor network and a higher level of direct presence in the emergency response metropolitan areas significantly benefits the EPA because response times are reduced.  Note that the SOW 4-hour arrival time requirement for these metropolitan areas is the LATEST permissible arrival time.  Earlier arrival times mean earlier start of cleanup actions and less impact on human health and the environment.  Another benefit to having personnel located within the metro area is significant[ ] savings on per diem expenses during a time critical response.  Time critical responses, unlike emergency responses, are planned, but have similar requirements.  For example, Region 5 has recently had several residential sites in Minneapolis, Detroit, and Chicago.  Labor availability in these areas would have resulted in significant cost savings to the Government because per diem costs of approximately $200.00 per day would have been avoided."

> "[t]he panel also feels that LATA-KEMRON has proposed a more realistic labor mix" – a reference, inter alia, to the mix between different types of supervisory, skilled and unskilled workers.

88 Fed. Cl. at 45.

No such exposition on strengths (and why they were meaningful) was included with or referenced by the SSA in his selection statement.  Indeed, as outlined below, no summarization of the strengths and weaknesses of competing proposals was or could have been prepared here.[10]

---

[10]For this, among other reasons, the apparent suggestion at page 20 of  Columbia's Opposition, that the Court not enjoin performance of the awarded contracts (either permanently or even temporarily) while the Agency engages in new, properly conducted best value tradeoff analyses is not appropriate.  See, infra, note 16.

Indeed, here, all that the Source Section statement indicated was that the SSA agreed with the proposed awards shown in the Summarization of Recommended Awards, AR 16000 (and in bold on OM Model Data, AR Tab 67, Attachment 4), and believed that "the model's results" represents the best value and prioritized aircraft performance over price, while still taking price into account.  AR 16000.

Additionally, the Government's assertions to the contrary notwithstanding, neither Attachment 4 nor Attachment 7 of Tab 67 sets forth the specific strength or weaknesses of the offerors' proposals.  Each spreadsheet is merely a computer compilation of the technical scores assigned by the Agency to each helicopter proposed coupled with other data (by line item) such as an arithmetic statement of each offeror's total proposed costs (by helicopter), the lift capacity of each helicopter that the offeror proposed and the average cost of the helicopter to carry a pound of water.  The compilation of technical scores set out on these spreadsheets does nothing to contradict Croman's position that, here, the Agency failed to determine whether the relative strengths and weaknesses of the competing proposals were such that it is worth paying a higher price.  Indeed, such a determination was not even possible because the AR is utterly devoid of any statement as to the relative strengths and weaknesses of any of the proposals.

As the RFP itself made clear, "the critical factor in making any price/technical tradeoff is not the spread between the technical scores but the significance of the difference."  RFP at § E-4, AR 282.  The array of technical scores set out on Attachments 4 and 7, no matter how seemingly impressive (even if accurate) shows nothing more than the spread between the technical score of offeror A and offeror B.  It does nothing to allow the SSA to determine if that spread is or is not truly significant.  (As noted, point scores ( even if properly assigned)  are useful as guides to

19

intelligent decision making, but are not themselves controlling in determining award.)  See discussion supra at note 9.

Notably, the Agency was to assign Adjectival ratings (Exceptional, Acceptable, Neutral, Marginal and Unacceptable) in for each of four quantitatively evaluated Factors, i.e., Aircraft Performance, Safety/Risk Management; Past Performance; and Organizational Experience.[11] Request for Revised Source Selection Authority, March 5, 2012, AR Tab 67 at 15995.  The definition of each of these ratings indicated that the appropriate Adjectival rating was to be assigned in substantial part based on the number and degree (major or minor) of perceived "strengths" of a proposal in the Factor or subfactor being evaluated  in comparison to the number and degree of perceived "weaknesses."  That said, the AR is nevertheless devoid of any articulation of the strengths and weaknesses of the offerors' proposals.  As noted, without such an array of the strengths and weaknesses of the offerors, making the requisite determination as to "whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price," Serco, 81 Fed. Cl. at 497, was not possible and therefore was never done.

The Government asserts that the record "includes[ ] 16 pages of narrative," AR 16018-34, explaining the basis for each offeror's rating under the Safety, Past Performance, and Organizational Experience factors."  G's Opp. at 44.  However, an examination of those pages

---

[11]Because of the Agency rated each aircraft individually, the Adjectival rating assigned each aircraft in Aircraft Performance is not set out in the table on AR 15997 or anywhere else in the AR.  The numerical scores for Aircraft Performance are set out in Column U of Attachment 4, Tab 67 to the AR.  As discussed infra, those numerical scores do not, however, comport with the Source Selection Plan.  As a result, the numerical scores assigned aircraft in this Factor improperly distorted the value of a helicopter's having a lift capacity in excess of the minimum specified, i.e., 3,300 lbs. for the Medium-lift, line 16-24 group.

reveals that they do little to nothing to point out strengths or weaknesses, let alone the magnitude

of them.  For example, the narrative relating to the evaluation of Organizational Experience set

out at AR 16029-34 lays out the three subfactors within Organizational Experience (Management

Personnel Commensurate with Size and Complexity of Operation; Pilot(s) in Command; and

Maintenance Personnel) and gives a summary conclusion, <u>without explanation</u>, with regard to

each one.  <u>E.g.</u>, **Croman Helicopters**



AR 16031.[13]

---

[12]Notwithstanding the broad generalities stated in the evaluation, Croman's proposal was rated as Exceptional in this Factor and assigned a score of ▮ .

[13]The narrative for Siller was no more revealing and stated:



AR 16033.  Siller's proposal was also rated as Exceptional in this Factor and was assigned a score of ▮ .

The listing of mere summary conclusions with respect to the offerors in the narrative relating to Organizational Experience is simply not the information on the advantages and disadvantages of proposals that a Source Selection Authority should have in addition to ratings and point scores to enable him to determine whether and to what extent meaningful technical differences exist between proposals.  Nevertheless, merely providing summary conclusions was the technique used by the Agency not only in the "evaluation" of Organizational Experience but also with regard to Past Performance.  See AR 16022-29.

AR 16018-34, which the Government asserts "explains the basis for each offeror's rating," provides absolutely no indication as to why the conclusions listed were reached,  if Croman's proposal contained any perceived major or minor strengths or weakness (and what they were) and, if any weaknesses existed, whether or not they were easily correctable.[14]  Under the definitions of the Adjectival ratings to be assigned by the Agency, AR 24, precisely this sort of information should have been generated in the course of the evaluation and included in the material presented to the SSA so that he could use it in making his tradeoff decisions and meet his concomitant duty under the RFP to determine the significance of the spread of technical

---

As can be seen, the only distinction between the evaluation of Siller and Croman is that in the **Pilot(s) in Command** subfactor Siller received ██████████ ██████ whereas Croman received an ████████ which in turn lead to Siller's receiving a █ point scoring advantage in this Factor.  What that difference constituted and whether it was based on a perceived major or minor strength in Siller's proposal (or a major or minor weakness in Croman's) is not indicated. (N.B. the Adjectival rating of ██████████████ was used in the narratives for several offerors.  However, nowhere in the RFP was that term defined.)

[14]The same criticisms are true with respect to the evaluation of each offeror.

scores on the basis of what the difference might mean in terms of performance and what it would cost the Government to take advantage of it."  § E-4, AR 282.  Clearly, it was not.

As such, while the SSA did not simply parrot back the strengths and weaknesses of the competing proposals, the Agency certainly did not "dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price" as <u>Serco</u> required.  81 Fed. Cl. at 497.

Lastly, contrary to the Government's argument, Attachment 7 to the Tab 67 of the AR (something created during the corrective action) does not document any tradeoffs that the Government purports were made.  At its core, all that Attachment 7 does is to lay out, by line item, the technical score of:

- the offeror selected for award by the OM,

- the offeror with the best technical score (<u>i.e.</u>, what is dubbed the "total low adjectival"),

- the offeror with the projected lowest total cost, and

- the offeror with the total lowest price per pound.

Neither Attachment 7 nor any other document in the AR explains why (other than being based on the technical scores, and that the computer said to[15]) the SSA made numerous awards to

_____

[15]As set forth in the Request for Revised Source Selection Authority, March 5, 2012, AR Tab 67 at 15995, "The OM was designed to analyze the TET consensus adjectival rating, convert the rating to a number, apply the appropriate Factor weight and provide recommendations for the most efficient helicopters, representing the overall best value for all line items."  As stated in the original Request for Source Selection Authority dated November 17, 2001, "It is important to understand that the OM is a tool that assists with the technical and cost outputs but there must be a human influence for the overall evaluation and recommendations to be complete."  AR 13409.

offerors with higher technical scores (and higher prices) than to lower-priced offerors such as

Croman.

Given the above, it is clear that the SSA failed to make appropriate tradeoffs.  This failure

occurred at least with respect to each of the line items on which Croman has protested – line

items 17, 23, 28, 29, 30, 32, and 33.  As such, the selection decisions, with respect to those items,

were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law and

appropriate injunctive relief is warranted.[16]

## VI.    Additionally, The Agency Also Erred By Not Rejecting Siller's Proposal For CLIN 23

At pages 15-18 of its Motion, Croman asserted that the Agency should have rejected

Siller's proposal for line item 23 at a total proposed cost of $17,675,100[17] just as it did for two

proposals submitted by ███████████████, i.e., the ██████████ proposed by ██████ base

year availability rates for the two rejected helicopters were more than ██████ higher than those

---

The Agency, however, paid lip service to this fact, i.e., it made the awards which Croman
challenges with no human influence and did not conduct a proper tradeoff.

[16]At pages 19-20 of the Opposition filed by Columbia, it asserts that, as this Court did in
Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. 723 (2011), at most the Court should
merely direct the Agency to engage in new, properly conducted best value tradeoff analyses and
properly explain and document the decisions reached.  Croman avers that such a remedy is,
however, neither is possible or appropriate here.  That is, unlike the situation in Standard
Commc'ns, here, the wrongful actions of the Agency do not simply involve the failure of the
SSA to determine and document that the relative strengths and weaknesses of competing
proposals were such that it was worth paying a higher price.  Rather, there was an underlying
failure of the Agency to provide him with the requisite indications of strengths and weaknesses
which would allow him to do so.  Likewise, because of the distortions false precision of the
technical scores discussed infra, he could not, as the RFP required, "determine the significance
of the spread of technical scores on the basis of what the difference might mean in terms of
performance and what it would cost the Government to take advantage of it."

[17]105% higher than Croman's proposed price.

of the offerors selected for award of comparable items whereas the proposed base year

availability rate proposed by Siller for line item 23 was ████████ than to those of the

offerors selected for award of comparable items.[18]  (Emphasis in original.)

The Government asserts that a comparison of Siller's price with the price at which all

other items that could have been successfully performed by a Medium-lift helicopter (i.e., lines

16-34) were awarded is inappropriate because line item 23 was "critically different from every

other line item in the CLIN 16-34 group, in that it required a helicopter equipped with a fixed

tank.  AR 91."  G's Opp. at 51.  As such, it asserts that a comparison only with the other prices

received for line item 23 is appropriate.  See id. at 51-52.  More specifically, it suggests that "the

only fair comparisons are the awarded price [($17.7 million)] against the average price bid on

CLIN 23 [($15.7 million[19]) (which shows Siller to be 12% higher)] or against each of the CLIN

23 price proposals – not just against Croman's second-lowest price ████████."  Id. at 53.

The Government's suggestion is, however, misplaced.

The fact is that Croman, like several other companies proposing Medium-lift helicopters,

could meet the specifications laid out for line item 23 at a cost far lower than Siller's.  See

Attachment B hereto.  As such, a comparison between Croman's price ████████ and Siller's

was entirely relevant to how much more an award to Siller would cost the Government.

---

[18]The ████ was based on a comparison of the base year availability rate proposed by
Siller for line item 23 with the average base year availability rate proposed by the offerors
awarded the other items in the Medium-lift, line 16-34 group.  See P's Motion at 23.

[19]As described below, the reason why the average price of all offerors on line item 23
including Siller's is $15.7 million is that a number of offerors, like Siller, proposed expensive,
Heavy-lift helicopters which had lift capacities far in excess of the 3,300 lbs. minimum set out in
the specifications for the Medium-lift, line 16-34 group.

Moreover, the average total price of all Medium-lift helicopters proposed on and capable of performing line item 23 was $9,093,688.  Id.

A comparison of Siller's price for its Heavy-lift helicopter (with a lift capacity (7,972 lbs.), see AR 16054, line 499, column Q) that greatly exceeded both the 5,000 lbs. minimum lift requirements for  the Heavy-lift, line item 1-15 group and the lesser 3.300 lbs. minimum lift requirement for the Medium-lift, item 16-24 group, with the prices for Medium-lift helicopters is particularly appropriate.  That is, originally, the Forest Service had included the requirement for this particular item (Fresno, CA) within the Heavy-lift, line item 1-15 group.  See RFP-9001 as originally issued at p. B-25 (i.e., the specification for this service originally required a helicopter with a minimum lift of 5,000 lbs.[20]).  Pursuant to Amendment 1 to RFP-9001, the Agency reduced the lift capacity required to meet the specifications for the Fresno base to 3,300 lbs. by moving the Fresno requirement out of the Heavy-lift, line item 1-15 group and putting into in the Medium-lift, item 16-24 group.  Amendment 1 to RFP-9001[21] at B-46.  The only rational basis for the Agency's doing this was to reflect a reduction of its minimum needs for this item.  Given this fact, plus the RFP's  admonition that "Award may not necessarily be made for technical capabilities that would appear to exceed those needed for the successful performance of the work," RFP at § E-4, AR 282, and the Agency's admittedly tight agency budget, AR 15993, a

---

[20]Available at https://www.fbo.gov/index?tab=documents&tabmode=form&subtab=core&tabid=0be7b6524f3fce466381fb9754884a61 (last visited June 20, 2012).

[21]Available at: https://www.fbo.gov/index?tab=documents&tabmode=form&subtab=core&tabid=72527ca4f7da72635aad45be5cf2a63f  (last visited June 20, 2012).

comparison of Siller's price and those of responsive Medium-lift helicopters was entirely appropriate.

Using either of the metrics noted above, there is no doubt but that the cost of an award to Siller was about double the projected cost of an award to a offeror proposing a Medium-lift helicopter that meet the specifications for line item 23.  On this basis alone, the Government's suggestion that the cost of the award to Siller was only slightly greater than awarding line item 23 to another offeror, and therefore that Siller's proposal should not have been rejected, is fallacious.

Moreover, as noted, in rejecting the two Erickson helicopters, the Forest Service compared the base year availability rates proposed for the two rejected helicopters with corresponding rates of offerors selected for award.  Both the Government and Siller assert that the items in the Medium-lift, line item 16-34 group, other than line item 23, do not constitute similar item to that being procured in line item 23.  Even assuming that they are correct, the fact remains that Siller's base year availability rate for line item 23 was $23,250 per day, see AR 16054, Line 499, Column F, whereas the average base year availability rate for line item 23 bid by all offerors proposing a Medium-lift helicopter that meets the specifications for line item 23 was only $12,975.  See Attachment B hereto, i.e., Siller's base year availability rate for line item 23 is 79% greater than the average base year availability rate for line item 23 bid by all offerors proposing a Medium-lift helicopter.[22]

_____

[22]Given this fact, plus the fact noted above, that the projected cost of an award to Siller was about double the projected cost of an award to a offeror proposing a Medium-lift helicopter that meets the specifications, the Government's additional argument that (assuming that outright

On this basis, as well as the fact that the projected total cost of an award to Siller is about double the projected cost of an award to any offeror proposing a Medium-lift helicopter that meets the specifications for line item 23, the Agency should have rejected Siller's proposal just as it did ███████ proposal to provide two expensive helicopters and the Court should hold that the Agency's failure to do so was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

In a last ditch effort to avoid such a result, the Government asserts, without any support, that in rejecting Erickson's helicopters "the Forest Service saw $23,400 as the highest base year daily availability rate it was willing to pay for a Skycrane-type helicopter [such as Siller proposed for line item 23 at a base year daily rate $150 per day less – $23,250].  G's Opp. at 51. However, as the AR demonstrates, the Forest Service's rejection of Erickson's two helicopters was premised on a comparison of Erickson's proposed base year daily availability rates with the base year daily availability rates of other offerors who could perform that work.[23]

 Even if rejection of Siller's proposal was not improper, any way one slices it, the cost of awarding line item 23 to Siller was still grossly higher than awarding that item to the operator of a Medium-lift helicopter that met the specifications and only $150 (1%) less than what the Government itself asserts was the highest base year daily availability rate that the Agency was

rejection of Siller's was not mandated) the more careful tradeoff analysis required by Serco was not necessary, G's Opp. at 49, is also fallacious.



willing to pay for a Skycrane.  Nevertheless, notwithstanding (a) the legal requirement that the

Agency determine whether the relative strengths and weaknesses of the competing proposals are

such that it is worth paying a higher price and (b) the language of RFP which, among other

things, stated that "Award may not necessarily be made for technical capabilities that would

appear to exceed those needed for the successful performance of the work," RFP at § E-4, AR

282, the Government eschews the necessity for any such determination.  That is, even though

Croman proposed a ███████ was rated as ████████ in ████████ technical factors that

were quantitatively evaluated, and proposed a helicopter that exceeded the specified 3,300 lbs.

minimum lift capability for line item 23, see AR 16054, Line 489, Column Q, the Government

asserts that "it would not even [have made] sense to perform a tradeoff analysis" between

Croman and Siller, G's Opp. at 49, and that "Croman was not even close to being the agency's

second choice for the CLIN 23 award."  Id.[24]

These and other statements demonstrate that the Government fails to appreciate that the

purpose of a tradeoff is to allow an agency to "award to other than the lowest priced offeror,"

FAR § 15.101-1, and the holding of Serco in this regard that "[e]ven where, as here, a

solicitation provides that technical criteria are more important than price, an agency must select a

lower-priced, lower-technically scored proposal if it reasonably decides that the premium

---

[24]As demonstrated in P's Motion at 18, infirmities and circumstances similar to those possessed by Siller also existed with regard to virtually all other offerors who proposed to perform line item 23.  Accordingly, of the remaining offerors Croman and ███████████ Croman was lower in price and had a higher total technical score better cost per pound. Compare the data on lines 489 and 500 of AR 16054.

associated with selecting the higher-rated proposal is unwarranted." 81 Fed. Cl. at 496

(emphasis added), cited favorably in cases including Standard Commc'ns, 101 Fed. Cl. at 733.[25]

   At page 53 of its Opposition, the Government asserts that the award to Siller was

appropriate because, notwithstanding the above, Siller's cost per pound of delivering water

███████ was ███████████████████████ less than Croman's ███████.  Compare AR

16054, Lines 499 and 489, Column O.[26]  Unfortunately, the time and place for a statement like

---

[25]Indeed, statements by the Government that "frankly, at only 55 percent of the CLIN 23 average bid, Croman's bid prices are outliers," G's Opp. at 53, and "forsaking lower prices for better performance was required by the 2011 RFP," G's Opp. at 40, are indicative of the blinders that the Agency had on during this procurement.  As Serco teaches, the proper way to look at a low cost proposal like Croman's is that it may allow the Government to obtain the services specified in the RFP at a reasonable cost and, as such, an analysis must be done to see if strengths perceived in a higher scored, higher cost proposal are worth the Government's incurring the increased costs of an award to that higher-scored offeror.

[26]Not only does Siller concur in this but it asserts, albeit without full elucidation, that Serco is distinguishable because the Price factor included a provision to take price per pound ("PPP") into account.  See Siller's Opp. at 15.  It is not.  As even Siller notes, both Serco and line item 23 involve an award to an offeror at a price much higher than that of the protestor. However, Siller asserts that the PPP calculation as part of the price evaluation is entitled to great weight.   This fact is, however, dispelled by the Government which stated that "[t]he Forest Service conducted a two-pronged price evaluation by considering both the total cost of the contract and the price per pound (PPP) for each aircraft," but that it "put more emphasis in its price evaluation on total contract cost, assigning that aspect a weight of ██ percent, whereas PPP was assigned a weight of ██ percent of the entire evaluation.  AR 15995.

   That Siller's price assumedly was evaluated more favorably by the Agency because of its PPP, while beneficial to Siller, does not, however, obviate the necessity for the SSA to determine if the perceived strengths and weaknesses of Siller's proposal warranted the Government's incurring the extra costs (represented by Siller's evaluated price) for them.

   For the same reasons, Croman does not, as alleged by both the Government and Siller, ignore the PPP portion of the Agency's price evaluation.  G's Opp. at 53, Siller's Opp. at 16. Croman acknowledges both that it was done and that constituted █% of the overall evaluation. That evaluation certainly does not, however, mean that, without more, the Agency was warranted in spending $9 million more on an award to Siller without doing a proper tradeoff analysis.

this is not in a post-award brief by the Government, but rather in the AR or more precisely the Source Selection statement.[27]  See, e.g., the portions of the Source Selection statement set out in NEQ, 88 Fed. Cl. at 45, quoted in the previous section.  Here, the two paragraphs of the Source Selection Certification talk only about the OM making tradeoffs.  AR 16005.  The OM did not make tradeoffs.  Indeed, the Agency admits that it could not do so.  See AR 16044 quoted earlier.  In fact, even the best technical evaluation (and this one was far from the best) can only tell the SSA what net benefits the evaluators perceived to be contained in each proposal, it cannot determine for the SSA whether those perceived benefits (even if accurately and completely assessed) are worth spending the Agency's scarce resources to obtain.

More importantly, nowhere in the SSA's Source Selection Certification is there any indication that he decided that awarding line item 23 to Siller at its high price was justified because of a price per pound and/or any other perceived advantage.  Indeed, at best, it is simply not possible to determine if the SSA engaged in any appropriate best-value tradeoff analysis. See Standard Commc'ns, 101 Fed. Cl. at 737-38.

---

[27]The same is true with respect to the assertions in Siller's Opposition that:  Siller could cover both the area around Fresno, California (the home base for line item 23) and Portersville, California (the home base of one of the cancelled items).  Siller's Opp. at 13, 14.

**VII.    The Technical Scores Produced And Relied Upon By The Agency Distorted The Difference Between Aircraft In The Most Important Factor (Aircraft Performance) And Were Otherwise Falsely Precise**[28]

In the most important technical Factor, Aircraft Performance, the Agency rated each

aircraft individually.  AR 15997.  In this regard, the Source Selection Plan stated that the TET

███████████████████████████████████████████████████████

███████████████████████ Exceptional, Acceptable etc. [29]  The Adjectival rating assigned each

---

[28]In this regard, contrary to the Government's assertion, G's Opp. at 31, Croman certainly does take issue with specific technical rating assigned during the course of the evaluation.

Furthermore, as described herein, even if the individual members of various teams that initially evaluated each subfactor were aware of and copiously followed the definitions of the adjectives to be used in evaluating proposals, the total technical scores produced by the Agency which lead to the far less-than-a-single-point differences by which the Agency distinguished proposals, remain falsely precise.

[29]The precise descriptions were as follows:



aircraft in Aircraft Performance is not set out in the table on AR 15997 or anywhere else in the

AR.  This can perhaps be explained by the statement at AR 16041 that with regard to Aircraft

Performance for each aircraft the Agency ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

ADJECTIVAL RATING RESULTS                          Value
E=Exceptional
A=Acceptable
N=Neutral
M=Marginal
U=Unacceptable



The numerical scores for each aircraft in Aircraft Performance are, however, set out in

Column U of Attachment 4, Tab 67 to the AR.  (The range of numerical scores that each offeror

received for its helicopters in Aircraft Performance, as well as each offeror's numerical score in

each of the other Factors, is shown in AR Tab 67 at 16011.)  Notably, at the bottom of that page,

_____



AR 24.

[30]That the numerical score assigned was to have corresponded to the adjectival ratings is
also made clear at AR 15995 where the Agency states that

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

(Emphasis added.)

[31]This assignment was purportedly done by the TET.  AR 16041.  However, the fact is
that it was done by the OM.  AR 15996.

33

the Agency iterates the numerical equivalent to each Adjectival rating, <u>i.e.</u>, ███████████

████████████████████████████████

    As noted  at AR 16013, contrary to the Source Selection Plan, not only did the TET never

assign an Adjectival rating to any aircraft in Aircraft Performance but more importantly the

numerical scores assigned by the OM were inconsistent with the Adjectival ratings and their

meanings; something which distorted the scoring difference between offerors whose helicopter

greatly exceeded the minimum lift specified and those whose helicopter merely exceeded the

minimum lift requirement by a small amount.  That is, as the Agency describes at AR 16013,

████████████████████████████████████

██████████████████████████████ Conversely, higher

scores (<u>i.e.</u>, scores closer to 5.0) were assigned for aircraft with low amounts of net payload over

minimum.  <u>Id.</u>  This can be seen in the chart below:

Random Scores for Aircraft Performance for line item 17,
AR 16051



---

<sup>32</sup>The numerical range corresponding to each Adjectival rating is reiterated at AR 16016.

Using the example set out on AR 16013, an aircraft that had the minimum lift capability (3,300 lbs.) would have received a numerical score of ███████████████████ Unfortunately, as set forth above, a ██████ corresponds with a rating of "Unacceptable," the definition of which is that "[t]he proposal fails to meet minimum requirements."  Indeed, the same definition is also applicable to proposals that are Marginal and entitled to a score of ██████ ███  In fact, the lowest Adjectival rating that could be assigned to a proposal which met the minimum lift requirement is ████████████ see AR 24, which has a corresponding numerical range of ███████

Such being the case, the Agency was wrong in evaluating Aircraft Performance by assigning numerical scores on the basis that merely providing the specified minimum lift capacity  warranted a score of ████████  Put in more practical terms, (a) at worst, a proposal offering a helicopter that exceeded the minimum only slightly should have received a score approaching ████████  in Aircraft Performance; (b) based on the use of an improper scale, virtually every numerical score in Aircraft Performance is erroneous; and (c) the improper numerical scoring of Aircraft Performance wrongfully distorted  the true difference between offerors proposing helicopters with substantial lift capacities and those that only slightly exceeded the specified  minimum, i.e., it made the differences worth more point than they have been the case.

On this basis alone, the evaluation of proposals was totally defective.  Indeed, because of the distorted numerical scores used in Aircraft Performance, the degree of technical superiority that the Agency perceived between offerors because of the difference in numerical scores in

35

Aircraft Performance was erroneous.[33]  Clearly, with these scoring distortions, the Agency did

not have a rational basis for making the selection decisions that it did.

That said, as Croman argued in its Motion at 31, distorting the differences between

proposals in Aircraft Performance was not the only deficiency in the Agency's evaluation

process.  Here, just as in Serco, over and above the distortions in Aircraft Performance, there are

additional  strong reasons to suspect that the ultimate comparison of technical proposals using

the four decimal point technical score of each proposal on each line item was undermined by

false precision.  In its Motion, Croman asserted that the Adjectival subfactor ratings prepared by

the TET's four teams were converted into their corresponding numerical values then averaged to

produce a Factor score for Past Performance and for Organizational Experience for each offeror,

after which the Factor scores from each of the teams were further averaged to produce a

numerical score for each offeror in Past Performance and Organizational Experience.  Id. at 26.[34]

In its Opposition, the Government takes issue with this and avers that, contrary to

Croman's assertions, "ratings were not compiled or averaged in the corrective action, but

determined by a group convened by the TET Chair on February 2, 2012."  G's Opp. at 43.  This

statement is not completely true, but more importantly, contrary to the Government's further

argument, Croman's assertion of false precision did not ignore the fact that that the "re-

evaluation" occurred.  See P's Motion at 12.  What the Government ignores is that the opinions

---

[33] The "valuable information" that the Agency was purportedly able to gain from a
review of the spreadsheets produced by the OM, see G's Opp., at 35, 39, was in fact virtually
useless information.

[34]As the parties agree, these two Factors represented ■% of the weight assigned to all
technical Factors.

of the members of the evaluation teams and the method by which those opinions were compiled

and averaged remains entirely relevant to the Court's assessment of the false precision of the

four decimal point technical scores that the Agency produced and on which it relied.  That is,

while the Government contends that the independent evaluations by the TET teams were "not

used in the corrective action, but rather only in the initial procurement," G's Opp. at 43, this is

not the case.

 While the TET chair did reconvene a "group" on February 2, 2012 to ostensibly

███████████████████████████████████████████████████████████ with

regard to the Past Performance and Organizational Experience factors, AR 16012, the results of

the "reevaluation" were virtually identical, down to the fourth decimal place, to the initial

evaluation that was conducted.  For example, in the so-called "reevaluation of technical scores,"

Croman was assigned a ███████████████████████████████ AR 16025.

This is the exact same numerical rating (down to the 10,000th of a point) that Croman received in

the initial evaluation conducted by averaging and reaveraging the opinions of the members of the

various TET evaluation teams.  See AR 13222-13223.  The same thing happened with virtually

all other technical scores for Past Performance and Organizational Experience.[36]  That the group

---

[35]As stated at AR 16013, the most important Factor "Aircraft Performance [,] was not re-evaluated in the corrective action.

[36]An analysis of the "reevaluated" scores for all offerors in Past Performance reveals the following:  five ratings for Past Performance were changed; three offerors received higher Adjectival ratings while two received the same rating with higher underlying scores.  See AR 15997.  Of those five, the changes were not the result of differences in opinion between the initial evaluation and the TET re-evaluation group.  ████████████ received a rating of ████████ as a result of the TET taking into consideration ██████████ See AR 16022.  Two ratings, for ████████████████ and

convened by the TET Chair independently came up with precisely the same scores down to four decimal places for Croman and all others offerors is a virtually an impossibility.  Moreover, the ability of a group, any group to make such fine distinctions, i.e., to one 10,000[th] of a point, as the Government suggests, is, to say the least, mind boggling.[37]  Such being the case, the only logical conclusion is that the "group" simply accepted the numerical technical scores originally produced.

Doing so was, however, not only inconsistent with the Government's narrative but was totally at odds with the evaluation scheme outlined in the AR.  The AR recites that, at the completion of the "independent evaluations" conducted by the "group" on February 2, 2012, ██

████████████████████████████████████████████████████████

_____

████████████ were changed as a result of the TET group catching and correcting a mistake on the part of the independent teams that had checked a sub-factor as ██████ when the ██████ rating was inappropriate for use for a contractor that was not a "new" contractor.  See AR 16026 and AR 16028.  ██████████████████ received a slightly different score as a result of the TET finding that ████████████████████ AR 16028.  In the table at AR 15997, ████████ is listed as ████████████ for Past Performance.  Whether the TET group changed ██████ score for Past Performance is not clear as the number listed in the table at AR 15998 is ██████  Whereas the other four that had their ratings changed for the reasons stated above, no information is given on the change to ████████ rating.  See AR 16023.  The conclusion to draw is that the annotation in AR 15997 is a clerical error and the rating for ██████ did not change.  Nothing in the information supplied in the Re-Evaluation indicates that the TET group that was convened in February made any substantial changes to independent teams' evaluation of the offerors. This is demonstrated through the Re-evaluation repeating the same numerical scores for the majority of the offerors, the above changes aside.

For the evaluation of Organizational Experience, no changes were made to the evaluation of any offeror, AR 16029.  The TET, therefore, clearly adopted or ratified the scores of independent teams rather than performing its own evaluation of this criterion as the Government asserts.

_____

[37]Indeed, if in fact the "group" made distinctions down to one 10,000[th], as the Government avers that they did, there would be little question but that the technical scores used by the Agency were grossly falsely precise.

████████████████████████████████████████████ AR at

15997 (emphasis added).  Those Adjectival ratings were listed in a table at AR 15997 and were

to be used in the OM evaluation process.  See AR 15998 ████████████████████████

█████████████████ (emphasis added).  Nowhere in the AR does it indicate

that the OM was to use the four decimal place Factor scores derived from averaging and

reaveraging the numerical results the opinions of the members of the various TET evaluation

teams.  Rather, the AR makes it clear that, by whatever means, averaging the opinions of the

members of the various TET evaluation teams or otherwise, the TET and/or the "group" was to

come up with a **ADJECTIVAL** (not numerical) rating of each proposal in each factor, AR

15997, and that adjectival rating was what would be input into the OM (not the raw four decimal

point number produced either by averaging and reaveraging the opinions of the members of the

various TET evaluation teams or somehow divined by the "group" reconvened to reevaluate

technical scores).  Indeed, what was to be input into the OM was not some meaningless and

falsely precise four decimal place number, but rather the numerical equivalent of the overall

Adjectival consensus rating ultimately assigned, either by the TET or the group, to each offeror

in each Factor, i.e., 1 for Exceptional, 2 for Average etc.  (This view of how the evaluation

process was to have worked is echoed in Columbia's Opposition to Croman's Motion, where it

indicates a belief that offerors' scores for the technical Factors were, in fact, "translated

downwards and assigned the associated [numerical score] with the next lowest, rather than

nearest, integer."  Columbia's Opp. at 8.[38])

---

[38]Columbia avers that doing so lead to an appearance of equality that is "highly
misleading."  Columbia's Opp. at 8.  In so averring, Columbia however ignores the fact that the

As noted, the Request for Source Selection Authority dated March 5, 2012 stated that "the OM was designed to analyze the TET <u>consensus adjectival rating</u>, <u>convert the rating to a number</u>, apply the appropriate weight of importance and provide recommendations" for award. <u>See</u> AR 15995. This notwithstanding, the Agency did not do so. That is, rather than inputting the consensus Adjectival rating, which would convert to a whole number, <u>e.g.</u>, 1, 2 etc., just as it did in the initial OM process, the Agency apparently used the averaged and reaveraged four decimal place numerical technical scores produced by the teams and directly inputted them into the OM. Doing, so, in and of itself lead to falsely precise total technical scores.

## VIII.   Croman Is Entitled To Injunctive Relief

Based on the above and Croman's original Motion, it is clear that the Agency committed numerous serious errors in this procurement. As also set forth in Croman's Motion and further discussed below, Croman meets the applicable tests for granting injunctive relief. In the latter regard, Croman believes that it is not sufficient to simply ask the Court "for an injunction" but that it is incumbent on it to outline with some specificity exactly what injunctive relief it believes is appropriate and why. For this reason, Croman reiterates, and makes more specific, its request.

### A.      Relief Requested

Based on the serious errors committed by the Agency in the evaluation and tradeoff processes (as further ventilated both herein and in the opposition briefs filed by the Government

---

four decimal place numerical scores (no matter how created) represent a falsely precise view of the differences between offerors and that to the using Adjectival ratings or their whole-integer equivalents would have bunched technical scores even closer than the OM actually did the solutions was for the SSA to engages in an appropriate tradeoff process based on the perceived strengths and weaknesses of the proposals. As noted, here, no strengths and weaknesses were, however, provided and no proper tradeoff process occurred or was possible.

and the Intervenors) and the impropriety of the Agency's cancellation of line items 21, 22, 27 and 34,[39] Croman respectfully requests that the Court permanently enjoin the Agency from obtaining performance of:

- contract line items 29, 30 and 32 from Columbia Helicopters

- contract line items 17, 28 and 32 from Firehawk Helicopters and

- contract line items 23  from Siller Helicopters.

Additionally and in the alternative, because the Agency failed to properly reject Siller's high priced proposal for line item 23, Croman requests that the Court permanently enjoin the Forest Service, from:

- obtaining the performance of contract line items 23 from Siller Helicopters and

- obtaining the performance of contract line items 23 from any other offeror until the Agency (a) properly evaluates the price proposal of each remaining offeror on that line item pursuant to the RFP's requirement "to determine its reasonableness and determine that the offeror has demonstrated understanding of the level of effort needed to successfully perform the services," and the proviso in the RFP that that Award may not necessarily be made for technical capabilities that would appear to exceed those needed for the successful performance

---

[39]In this regard, Croman also reiterates the concomitant impropriety of obtaining those services under a newly issued RFP.

of the work," and (b) conducts a proper evaluation and (c) completes a proper tradeoff procedure thereafter.

Additionally, Croman requests that the Court permanently enjoin the Forest Service from obtaining performance of the services covered by Contract Line Items 21, 22, 27 and 34 of RFP-9001 (and RFP No. AG-024B-S-12-9025) from any company or companies other than from the offeror(s) whose proposal(s) after proper evaluation provide(s) the Government the best value pursuant to and consistent with applicable law and the terms of RFP-9001 for Contract Line Items 21, 22, 27 and 34.

**B.      Croman Has Suffered Irreparable Harm**

In its Opposition, the Government cites to two decisions of this Court for the proposition that the lost opportunity to compete in a fair procurement process and resulting lost profits is not sufficient to establish irreparable harm.  G.'s Opp. at 60 (citing Minor Metals, Inc. v. United States, 38 Fed. Cl. 379 (1997), and Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573 (2003)).  Both of these cases are inapposite.  In Minor Metals, Inc., a pre-award challenge to the solicitation, this Court found that the plaintiff's claim of irreparable harm due to "potential lost profits" was "purely speculative," given that plaintiff was not precluded from participating in the solicitation.  38 Fed. Cl. at 381-82.  Moreover, in Sierra Military Health Services, the protestor was not alleging lost profits, but other sorts of financial harm.  58 Fed. Cl. at 582.  The Government's argument also ignores the myriad cases in the Court of Federal Claims recognizing that lost profits can constitute irreparable injury.  E.g., Contracting, Consulting, Engineering, LLC v. United States, No. 12-97C, 2012 WL 1278042, at *22 (April 16, 2012) (finding that plaintiff had "demonstrated irreparable harm in the form of lost profits

42

and lost opportunity fairly to compete"); Bayfirst Solutions, LLC v. United States, 102 Fed. Cl.

677, 696 (2012) ("The court considers the loss of potential profits from a large government

contract award, in this instance, to constitute irreparable harm"); NetStar-1 Gov't Consulting,

Inc. v. United States, 101 Fed. Cl. 511, 530 (2011) (quoting United Int'l Investigative Servs., Inc.

v. United States, 41 Fed. Cl. 312, 323 (1998), for the proposition that "the opportunity to

compete for a contract and secure any resulting profit has been recognized to constitute

significant harm"); Mori Associates, Inc. v. United States, 102 Fed. Cl. 503, 552 (2011) ("[O]ur

court has found that lost profits due to an arbitrary solicitation cancellation constitute irreparable

injury."); Heritage of America v. United States, 77 Fed. Cl. 66, 78 (2007) (noting that "where, as

here, plaintiff has no action against the United States for lost profits, the harm to the plaintiff is

irreparable and that harm satisfies the second criterion for injunctive relief") (internal citation

omitted).

  The Government also asserts that Croman's argument that it has suffered irreparable

harm because it has no adequate remedy at law "has been called into question, however, by the

Supreme Court's decisions in eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006), and

Monsanto Co. v. Geertson Seed Farms, 130 S.Ct. 2743 (2010)."  G's Opp. at 61.  This assertion

is delusory.

  The absence of an adequate remedy at law is one of the four factors that must be

demonstrated before a court may grant a permanent injunction.  Moreover, it has also long been a

basis for a plaintiff to demonstrate that it has suffered an irreparable injury.  See NetStar-1 Gov't

Consulting, Inc., 101 Fed. Cl. at 530 (noting that "[w]hen assessing irreparable injury, '[t]he

relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the

absence of an injunction"); see also Transatlantic Lines, LLC v. United States, 68 Fed. Cl. 48, 56-57 (2005) ("This court considers whether a petitioner has an adequate remedy at law when deciding irreparable harm") (citing Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 744-45 (2000)).  Neither eBay nor Monsanto, in anyway, changed this.  Rather, all that eBay did was to reinforce the applicability of the four-factor test (even in patent cases) and the necessity of the courts to apply traditional equitable principles in deciding a motion for injunctive relief.

As set forth in its Motion at 38-40, absent an injunction, Croman will suffer irreparable harm in the form of a lost opportunity to compete in a fair procurement process for as many as three contracts on which it stood to earn a profit.  Moreover, for as long as Croman is denied these awards as a result of the Agency's improper actions and it does not find replace work for its helicopter(s), it will also incur substantial idle helicopter expenses.

In its Opposition, Columbia avers that Croman has delayed pursuing injunctive relief, something which it asserts in Software Testing Solutions, Inc. v. United States, 58 Fed. Cl. 533, 537 (2003), was found to undercut the notion that irreparable injury exists.[40]  Columbia Opp. at 16.  As such, it asserts that Croman has nothing more than "monetary damages" which, absent

---

[40]Software Testing does not, however, stand for the precise proposition asserted and is, in any event factually distinguishable.  That is, the case involved a motion for a temporary restraining order that was being sought against an awarded contract on which performance was well underway.  The plaintiff whose protest of the award to GAO had been dismissed as untimely and without factual support on July 25, 2003 did not file its complaint in this Court until November 12, 2003.  Because of the delay in filing, the Court stated that "[b]y virtue of plaintiff's delay, defendant . . . would be required to incur significant costs that otherwise could have been avoided" and that "there was a strong argument in favor of applying laches." 58 Fed Cl. at 536.  In the instant case, Croman neither delayed filing its complaint once GAO dismissed its protest nor is it seeking emergency injunctive relief on the theory that there is an urgent need for speedy action to protect the plaintiff's rights.  Moreover, unlike the situation in Software Testing, there is no delay in this case which will cause the Government to incur any costs that otherwise could have been avoided.

extraordinary circumstances, do not give rise to irreparable harm.  Id. at 17 (citing OAO Corp v. United States, 49 Fed. Cl. 478, 480 (2001)).  The citation to OAO is unavailing.  That is, since money damages are recoverable at law, it stands to reason that their existence would not generally constitute irreparable harm.  Here, although, absent an injunction Croman will continue to suffer the substantial losses described above, it has no claim for monetary damages by which it can recover those losses, i.e., the harm that it has and will continue to suffer is thus by definition irreparable.

**C.     The Balance Of The Harms Favors Croman**

As this Court recently reiterated in Standard Commc'ns, 101 Fed. Cl. at  744, "to warrant issuing an injunction, the Court must find that balancing the hardships to plaintiff  and defendant weighs in favor of affording relief to plaintiff" (citing PGBA, LLC v. United States, 389 F.3d 1219, 1229 (Fed. Cir. 2011).[41]  As noted, absent an injunction, Croman will suffer irreparable harm in the form of a lost opportunity to compete in a fair procurement process for as many as three contracts on which it stood to earn a profit and will likely incur substantial idle helicopter expenses.  In contrast, the Government candidly and correctly admits that **"the**

---

[41]The Government avers that "if Croman's alleged harm of lost profits is redressable in the way that Croman suggests (e.g., awarding Croman certain CLINs), that must be balanced against the lost profits that current awardees, including the intervenors, will suffer if the Court rescinds their awards in favor of Croman."  G's Opp. at 62.  Since Croman is not and never has asked the Court to direct award any CLIN to it, the Government's suggestion that profits to be lost by current awardees should be considered, is inapposite.

Moreover, Siller does not indicate if or to what extent it would be harmed but rather only avers that "the Forest Service would be greatly harmed if the injunction was issued.  Siller's Opp. at 20.  Of course, the Government has indicated that the harm to the Forest Service from an injunction would be "minimal."  G's Opp. at 62.

**harm to the Forest Service of injunctive relief would be minimal."** G's Opp. at 62

(emphasis added).[42]

In contrast, that the awardees of the line items which Croman has protested would

harmed by an injunction halting performance of their contracts is far from certain. As noted in

P's Motion at 39, the Agency has advised that it has exercised the options contained the previous

Exclusive Use contracts (i.e., the contracts pursuant to which the Government obtained Medium-

lift helicopter service last season).[43] By so doing, even if the Court enjoined performance of line

items 17, 23, 28, 29, 30, 32, and 33 at least some awardees will be able to continue performance

under these existing contracts through the bulk of the 2012 fire season, i.e., until September 30,

2012. As such, even if the Court were to issue an injunction, unlike Croman, many awardees are

likely to have work under these exercised options for their helicopters from the Forest Service.

Moreover, they, like Croman, may also have the opportunity to fill any gaps in coverage

pursuant to the Call When Needed contracts that the Forest Service has with many helicopter

companies including Croman, Siller, Columbia and Firehawk.

Based on the above, it is quite clear that the balance of the harms strongly weighs in

favor of affording relief to Croman.

---

[42]Likewise the $97,000 which Columbia indicates that it has incurred preparing to perform its contracts, Columbia's Opp. at 19 (even if unrecoverable in a termination for convenience settlement or otherwise), is a pittance in comparison to the potential profits that Croman stands to lose and the idle helicopter costs that it will likely incur as a result of having been denied the opportunity to compete in a fair procurement process.

[43]No such option was exercised with regard to any item on which Croman held an EU contract.

### D.     Injunctive Relief Is in the Public's Interest

In Standard Commc'ns, 101 Fed. Cl. at 745, this Court reiterated the well-established precepts that the "public interest in protecting the integrity of the procurement system is well served by granting injunctive relief" and that "ensuring that the Government follows applicable procurement regulations also promotes the public interest."

Contrary to the Government's assertions (G's Opp. at 63), in issuing an injunction, the Court will not be interfering with the Agency's determination of its minimum needs.  Here, the Agency set out its minimum needs for the Medium-lift, item 16-34 group in the RFP.  An injunction would be issued because the Agency did not follow the proper procedures to obtain those minimum needs.  In issuing an injunction, the Court would also not "infringe upon the lawful discretion of the agency."  Id.  That is, while the procurement laws grant an agency substantial discretion  in the evaluation of offerors and the selection of proposed awardees, to the extent that any such discretion was exercised here, it was not done within the confines of the terms of the RFP and/or applicable law and regulations and therefore, absent more, warrants being enjoined.

Both Columbia and Siller assert that injunctive relief is not in the public interest because it will jeopardize the Forest Service's ability to insure public safety.  Columbia's Opp. at 18; Siller's Opp. at 20.  This assertion is not true.  As noted, if an injunction were issued halting any performance of improperly awarded line items 17, 23, 28, 29, 30, 32, and 33, as outlined above, the Forest Service has several means of obtaining helicopters to cover its needs and public safety will not suffer.  Indeed, the intervenors' protestations notwithstanding, the Government states that "the harm to the Forest Service of injunctive relief would be minimal."  G's Opp. at 62.

47

## IX.     Conclusion

For the reasons set forth both herein and in its original Motion, Croman is entitled to

judgment in the Administrative Record and a permanent injunction as outlined.


Respectfully submitted,


 s/Alan I. Saltman_____
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Ave, N.W.
Suite 600
Washington, DC 20036
Phone: (202) 452-2140
Fax:    (202) 775-8217
email:  AISaltman@smithcurrie.com

Attorney for Plaintiff

OF COUNSEL:

Stephen J. Kelleher
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Ave, N.W.
Suite 600
Washington, DC 20036
Phone: (202) 452-2140
Fax:    (202) 775-8217
email:  SJKelleher@smithcurrie.com

Dated:  June 20, 2012